PETER C. WOLFF, JR.  #2332
Federal Public Defender
District of Hawaii

ALEXANDER SILVERT
First Assistant Federal Defender
300 Ala Moana Boulevard, Suite 7104
Honolulu, Hawaii  96850-5269
Telephone:  (808) 541-2521
Facsimile:  (808) 541-3545
E-Mail:       alexander_silvert@fd.org

Attorney for Petitioner
REGINA SMITH

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| REGINA SMITH, | ) | CIVIL NO. 04-00091 HG-KSC |
| | ) | |
| Petitioner, | ) | MEMORANDUM IN SUPPORT OF |
| | ) | PETITION UNDER 28 U.S.C. § 2254 |
| vs. | ) | FOR WRIT OF HABEAS CORPUS |
| | ) | BY A PERSON IN STATE |
| JOHN F. PEYTON, JR., Director, | ) | CUSTODY; CERTIFICATE OF |
| State of Hawaii Department of Public | ) | SERVICE |
| Safety, MILLICENT NEWTON- | ) | |
| EMBRY, Warden, Mabel Bassett | ) | |
| Correctional Center, and MARK J. | ) | |
| BENNETT, Attorney General, State | ) | |
| of Hawaii, | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |

**MEMORANDUM IN SUPPORT OF PETITION UNDER 28 U.S.C. § 2254
FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY**

## ISSUES PRESENTED

I.    DID THE STATE TRIAL COURT VIOLATE SMITH'S FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS RIGHTS TO CONFRONTATION AND DUE PROCESS OF LAW BY ADMITTING HEARSAY TESTIMONY FROM THE STATE'S EXPERT, ROBERT BIDWELL, WHO DID NOT EXAMINE THE CHILD VICTIMS FOR TREATMENT OR DIAGNOSTIC PURPOSES AS REQUIRED BY RULE 803(4), AND WHO WAS THEN PERMITTED TO IMPROPERLY VOUCH FOR THE CREDIBILITY OF THE TWO ALLEGED CHILD VICTIMS?

II.   DID THE STATE TRIAL COURT VIOLATE SMITH'S FIFTH, SIXTH, AND FOURTEENTH AMENDMENT RIGHTS WHEN IT PERMITTED THE STATE TO INTRODUCE EVIDENCE AND MAKE ARGUMENT TO THE JURY AS TO ACTS OF THE TWO CHILD VICTIMS WHICH IT ALLEGED CONSTITUTED EVIDENCE OF "SEXUALIZED BEHAVIOR" WITHOUT AN EXPERT HAVING TESTIFIED THAT SUCH BEHAVIOR CONSTITUTED ANY EVIDENCE OF "SEXUALIZED BEHAVIOR?"

III.  DID THE STATE COURT IMPROPERLY IMPOSE FIVE CONSECUTIVE LIFE SENTENCES WITHOUT A PROPER ANALYSIS OF HAWAII'S SENTENCING LAWS, IN VIOLATION OF SMITH'S FEDERAL DUE PROCESS RIGHTS?

IV.   DID THE STATE COURT IMPROPERLY IMPOSE FIVE EXTENDED TERMS OF IMPRISONMENT IN VIOLATION OF APPRENDI'S MANDATE THAT ALL FACTUAL FINDINGS THAT SERVE TO INCREASE A DEFENDANT'S PUNISHMENT BEYOND A STATUTE'S MAXIMUM MUST BE FOUND BY A JURY?

## STATEMENT OF THE CASE

On January 7, 1993, the State of Hawaii obtained an indictment charging Petitioner Regina Smith and Francis Nakamura with sexual assault against Alisha Perry and Jana Perry, Smith's minor daughters. Smith was charged with committing five counts of Sexual Assault in the First Degree, in violation of Hawaii Revised Statutes (H.R.S.) Section 707-730(1)(b), by placing her mouth on children vaginas (Counts 1 and 13), placing children's mouths on her vagina (Counts 2 and 14), placing her fingers in Alisha's vagina (Count 3), and five counts of Sexual Assault in the Third Degree in violation of H.R.S. § 707-732(1)(b), by placing children's hands on her vagina (Counts 4 and 15), by placing her hand on children's breasts (Count 5 and 17), and by placing her hand on Jana's vagina (Count 16).

Prior to trial Smith filed a motion in limine seeking to exclude any testimony by expert witnesses who would testify as to the credibility of the children when these incidents were reported to them or incidents were related to them, and any testimony as to whether or not a child would fabricate allegations of sexual abuse. [Tr. 9/7/93 at p. 53].[1]  In reply to Smith's motion, the government stated that it would not have an expert witness testify as to the credibility of the children or vouch for the credibility of the children.  [Tr. 9/7/93 at pp. 58-59].  On September 7, 1993, the trial

---

[1]  "Tr." refers to the transcript of record by date and page number.

court granted Smith's motions in limine and held that there would be an exclusion of any specific testimony dealing with credibility of the child witnesses and conclusionary opinions that the abuse did occur and that the child victims' report of abuse was truthful and believable. [Tr. 9/7/93 at pp. 62-63].

Jury trial commenced on September 7, 1993. On September 29, 1993, after deliberating for two days, the jury found Smith guilty as charged.

On November 29, 1993, the trial court granted the prosecutor's motion to sentence Smith to extended terms as a multiple offender and sentenced Smith to life imprisonment with the possibility of parole on each of the First Degree Sexual Assault charges, to be served consecutively, and ten years of imprisonment to be served for each of the Third Degree Sexual Assault charges, to be served concurrently with all other sentences. [Tr. 11/29/93 at pp. 27-30]. No motion was filed asking the sentencing court to run the sentences consecutively.

On November 15, 1994, Smith appealed the judgment of the lower court to the Supreme Court of Hawaii. In her appeal, Smith raised five (5) issues. First, Smith contended that children's alleged subsequent "sexualized" behavior was conditional upon expert testimony establishing that the behavior was probative of sexual abuse and the lower court erred in admitting the evidence in the absence of such testimony. Second, Smith argued that complainant's hearsay statements elicited by Dr. Bidwell that Smith had sexually abused them were not admissible under

Hawaii Rule of Evidence 803(b)(4) as statements made for purposes of medical treatment or diagnosis. Third, Smith appealed the lower court's improper admission of Dr. Bidwell's opinion regarding the children's hearsay statements that Smith sexually abused them on the basis that the admission unfairly prejudiced Smith's right to a fair trial. Fourth, Smith challenged the lower court's failure to instruct the jury that Smith could not be found guilty of Sexual Assault in the Third Degree based on evidence that she touched the children's sexual or intimate parts in the course of normal care and hygiene. Lastly, Smith alleged the lower court abused its discretion when it extended Smith's maximum sentences and sentenced her to five consecutive life terms of imprisonment.

On January 13, 1997, the Supreme Court of Hawaii, without filing a written opinion, affirmed Smith's conviction. On January 23, 1997, Smith filed a Motion for Reconsideration which was denied on January 30, 1997.

On July 3, 2002, after various other proceedings in this case, both in federal and in state court, Smith filed a petition pursuant to Haw. R. Penal P. 40 challenging the manner in which the extended terms of imprisonment were imposed. Specifically, as dictated by the United States Supreme Court's decision in Apprendi v. New Jersey, 530 U.S. 466 (2000), Smith alleged that the factual bases for the extended term of incarceration were found by the sentencing judge and not by a jury. On August 6, 2002, the state responded, arguing *on the merits.* The state did not raise

any issue claiming that <u>Apprendi</u> or its reasoning was not retroactive to Smith's claim.

On March 20, 2003, the Circuit Court of the First Circuit for the State of Hawaii issued its Findings of Fact and Conclusions of Law. The court denied Smith's petition *on the merits*. The court, specifically citing to <u>Apprendi</u>, held that <u>Apprendi</u>'s reasoning did not apply to Hawaii's extended term sentencing scheme and upheld the sentence.

Smith timely appealed the Circuit Court's decision on March 25, 2003, again citing to <u>Apprendi</u> and its reasoning. On October 10, 2003, the state filed its Answering Brief. Once again, the state chose to answer Smith's claims on the merits. Once again, the state did not raise or argue that <u>Apprendi</u> did not apply retroactively to Smith's challenge.

On February 2, 2004, the Hawaii Supreme Court issued its second Summary Disposition Order in this case, denying without a written opinion Smith's Rule 40 appeal.

## JURISDICTION

This Court has jurisdiction to entertain an application for writ of habeas corpus on behalf of a person in state custody under a judgment of a state court pursuant to 28 U.S.C. § 2254.

## BAIL STATUS

Smith is presently incarcerated on the instant offense and is serving her sentence in Otter Creek Correctional Center in Wheelwright, Kentucky.

## STANDARD OF REVIEW

To grant habeas relief, this Court must find that the state courts' resolution of her federal claim(s) was either contrary to or an unreasonable application of clearly established federal law.  See 28 U.S.C. § 2254(d)(1).  In addition, when analyzing trial errors, the United States Supreme Court, in Brecht v. Abrahamson, 507 U.S. 619 (1993), held that when reviewing state *trial* errors, the federal courts must apply the harmless error standard set forth in Kotteakos v. United States, 328 U.S. 750, 776 (1946).  That is, the court must determine whether the error "had a substantial and injurious effort or influence in determining the jury's verdict. Id. at 776.

Smith notes that the <u>Brecht</u> standard of review does not apply to Smith's alleged non-trial errors. <u>Brecht</u>, 507 U.S. at 637 (did error have an injurious effect or influence in determining *the jury's* verdict); <u>see also</u> <u>Early v. Packer</u>, 537 U.S. 3, 10 (2003). As the Ninth Circuit recently noted, an error that "occur[s] at sentencing," as opposed to "during trial[,]... is not a trial-type error that would affect a jury's verdict. <u>Williams v. Roe</u>, 421 F.3d 883, 887 (9th Cr. 2005). As such, a sentencing error is not "a 'trial-type' error subject to <u>Brecht</u> harmless error analysis." <u>Id.</u>

Moreover, even when applying the <u>Brecht</u> "harmless error" analysis, a habeas petitioner is entitled to receive the benefit of any doubt about whether the error was harmful. If, that is, this Court's review of the state court record leaves it in "grave doubt" about whether or not Smith was actually prejudiced by the state courts' error(s), Smith "must win." <u>See</u> <u>O'Neal v. McAninch</u>, 513 U.S. 432, 436 (1995). As the Supreme Court stated:

> Normally a record review will permit a judge to make up his or her mind about the matter. And indeed a judge has an obligation to do so. But we consider here the legal rule that governs the special circumstance in which record review leaves the conscientious judge in grave doubt about the likely effect of an error on the jury's verdict. (By "grave doubt" we mean that, in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error.) We conclude that the uncertain judge should treat the error, not as if it were harmless, but as if it affected the verdict (<u>i.e.</u>

as if it had a "substantial and injurious effect or influence in determining the jury's verdict").

Id. at 435.

## STATEMENT OF THE FACTS

**I.     INTRODUCTION**

On September 29, 1993, Smith was convicted by a state jury in the Circuit Court of the First Circuit, State of Hawaii of five counts of First Degree Sexual Assault and five counts of Third Degree Sexual Assault.  At the time of her conviction, Smith was approximately twenty-one years old.  Smith received and is currently serving life imprisonment with the possibility of parole for each of the First Degree Sexual Assault charges, to be served consecutively, and ten years of imprisonment to be served for each of the Third Degree Sexual Assault charges, to be served concurrently with all other sentences for said conviction.

Smith, along with her boyfriend Francis Nakamura, was charged with sexually assaulting Smith's two minor children, Alisha and Jana, between August 16, 1990, and July 20, 1990, at various locations where they had lived.  The children, the children's foster mother, and Robert Bidwell, M.D., amongst others, testified on behalf of the prosecution.  Smith and Nakamura testified on their own behalf.  Other then the testimonies of the children, there was little if any physical or circumstantial evidence of Smith's guilt.

The record indicates that prior to trial, Smith was tentatively offered a sentence of probation if she plead guilty and testified against her co-defendant/boyfriend, Francis Nakamura.  [Tr. 9/14/03 at pp. 5-7].  Instead, Smith

chose to exercise her constitutional right to a trial by her peers. Upon conviction, the sentencing court imposed, in part, five consecutive life sentences. Had Smith accepted the state's offer, the trial would still have commenced as against Nakamura and the children would still, most likely, have had to testify in that trial. Having chosen to go to trial, Smith, who had apparently only one prior adult petty misdemeanor conviction for prostitution, received the harshest penalty allowable under state law. [See State Presentence Investigation Report at p. 8].[2]

In this petition for writ of habeas corpus, Smith contends that her state court conviction was obtained in violation of her United States Constitutional right to due process of law and her Sixth Amendment right to confront witnesses against her. In addition, Smith contends that the imposition by the judge of consecutive sentences, as well as the imposition of an enhanced sentence, was improper in violation of her constitutional due process rights.

---

[2]  At sentencing, Smith contested that she was convicted of this one petty misdemeanor charge. Smith alleged that her sister had used her name and social security number when arrested and that she, herself, had never been arrested or convicted for prostitution. The sentencing court did not resolve the validity of this issue either way - so it is unclear from the record whether Smith even had this one petty misdemeanor conviction prior to being sentenced to five consecutive life terms. [Tr. 11/29/93 at pp. 7-8].

## II.     BACKGROUND HISTORY OF SMITH

The facts of Smith's background are unfortunate.  Smith was raised by an abusive parent, Jane Pacheco, which resulted in Smith herself being put into foster care when she was a child and later being placed in a detention home by her mother for running away.  Pacheco had a record of alcohol abuse and child abuse.  Smith was only thirteen years old when she had Alisha in 1986 and fifteen years old when she had Jana, the two alleged victims in the state prosecution.  [Tr. 6/23/93 at pp. 10, 13, 16].  Due to her young age, Smith's mother, Pacheco, took custody of the children as soon as they were born.  [Tr. 6/23/93 at pp. 14, 16].

On August 8, 1990, Child Protective Services ("CPS") removed Alisha and Jana from Pacheco's custody.  [Tr. 9/20/93 at pp. 60, 68, 71].  The children were removed from Pacheco's care because Pacheco had taken the children to a bar and left them unattended while she was drinking.  [Tr. 9/20/93 at p. 74].  A CPS home study also concluded that Pacheco suffered from some form of mental retardation and organic brain syndrome.  The study found that Pacheco tended to fabricate and had left the children with various other caretakers while she had custody of the two children.  [Tr. 9/20/93 at pp. 61, 65-67].  CPS records also showed that Pacheco had poor relationships with unreliable men and that the children did not want to see her when she requested visits.  [Tr. 9/20/93 at pp. 61, 85-86].

11

On August 16, 1990, CPS, through the courts, placed Alisha and Jana in Smith's custody. [Tr. 9/29/93 at pp. 56, 68]. At the time Smith took custody of the children she was living with Nakamura and their eleven month old daughter, Vandalee. Smith was also expecting another child. [Tr. 9/23/93 at pp. 22-24]. This was the first time Smith was responsible for caring for Alisha and Jana since they were born.

At some point, Nakamura lost his job and the family was forced to live in Tent City at Aala Park. [Tr. 9/22/93 at p. 124; Tr. 9/23/93 at p. 58]. While they were living in the park, Alisha and Jana would sometimes stay with Smith's sister, Vivian, and her boyfriend, Larry Palaylay. [Tr. 9/22/93 at pp. 91, 95, 125, 147]. Vivian and Palaylay cared for the children on several occasions. [Tr. 9/22/93 at pp. 94, 103, 100-101]. As an alternative to living in the park, Nakamura, Smith and the children would also live in their car. [Tr. 9/22/93 at pp. 125-126].

While living together, Smith and Nakamura had sexual relations with each other, which included oral sex. [Tr. 9/23/93 at pp. 38-39]. They had sexual relations in Alisha and Jana's presence while the girls were asleep. [Tr. 9/22/93 at p. 139]. Smith testified that it was possible the children could have been awake during these sexual encounters with her boyfriend. [Tr. 9/23/93 at p. 39]. Smith and Nakamura testified that they watched adult videos at night when the children were sleeping, however, it also could have been possible that the children could have

12

viewed the videos. [Tr. 9/23/93 at pp. 37-38]. The videos depicted women making love, men and women making love, females masturbating with dildos, and acts of oral sex. Id. Smith testified that Vivian and Palaylay also watched adult videos. [Tr. 9/23/93 at p. 37].

On July 20, 1991, CPS resumed custody of Alisha and Jana. [Tr. 9/20/93 at pp. 56, 74]. There were no allegations or concerns regarding sexual abuse at the time CPS services were re-instituted. [Tr. 9/20/93 at 75]. On September 25, 1991, the children were placed with their foster parent, Denise Mazepa. On October 9, 1991, Mazepa took Alisha and Jana to the Children's Advocacy Center after she observed Jana repeatedly rubbing soap over her vaginal area while she was in the bathtub. [Tr. 9/17/93 at pp. 51-52].

## III.  TRIAL TESTIMONY

### A.  The Testimony Of The Child Witnesses

At the time of the alleged offense, Alisha and Jana were five and three years old, respectively. By the time the case came to trial, the children were only seven and five years old and had been in the care of their foster mother, Denise Mazepa continually for two years. The children's testimony revealed that less than one month after moving in with Mazepa, they began calling her and her husband "mom" and "dad." [Tr. 9/17/93 at p. 89]. Their testimony revealed that Mazepa treated the children very well by providing them toys, clothes and presents, things

that they never had before.  [Tr. 9/16/93 at pp. 85-86; Tr. 9/17/93 at pp. 14-16].  Both Alisha and Jana testified that they did not like Smith and Nakamura.  In fact, the children often referred to Smith, their natural mother, as either "Regina" or "ugly mommy." [Tr. 9/16/93 at p. 119; Tr. 9/17/93 at pp. 89, 123].

The evidence revealed that prior to trial the allegations of sexual abuse had been extensively discussed with the children.  Various prosecutors, the victim witness advocate, personnel from the Child Advocacy, and Mazepa all discussed in detail the alleged allegations with the children.  [Tr. 9/15/93 at pp. 200-203; 208-210; Tr. 9/16/93 at pp. 34-37, 151-155].  When asked if these people encouraged her to tell as much as possible about the alleged offenses, Alisha replied "yes."  [Tr. 9/15/93 at pp. 209-211].  Alisha also stated that she wanted to make the prosecutor and her foster parents happy by what she said in court.  [Tr. 9/16/93 at pp. 40-41].  During examination, Jana confirmed that when she talked with her mom and the prosecutor, they told her she could put Nakamura in jail and that she wanted to put him in jail. [Tr. 9/17/93 at p. 29].

With the use of blatantly leading questions throughout direct examination of the two children, the prosecutor was able to elicit testimony from the children that Smith sexually abused them as alleged in the indictment.  [Tr. 9/15/93 at pp. 123-124, 130-136; Tr. 9/16/93 at pp. 120-124].  However, the prosecutor's leading technique did not always produce the answer he was seeking.  When the

14

prosecutor attempted to elicit testimony from Alisha as to whether someone had told her not to tell about the alleged abuse, Alisha initially testified in the negative. [Tr. 9/15/93 at p. 144]. At this point the prosecutor called for a recess. After the prosecutor had an opportunity to review the questions with Alisha in the witness room, she returned to the stand and testified that Nakamura had told her not to tell about the alleged abuse. [Tr. 9/15/93 at p. 147].

On several different occasions, defense counsel was able to impeach the children. Both Alisha and Jana testified untruthfully and in direct contradiction to other witnesses' testimony of their behavior. Both Mazepa and Dr. Bidwell (a doctor hired by the Sex Abuse Treatment Center to examine Alisha and Jana) testified that Alisha and Jana used the term "cho-cho" for vagina, "boto" for making love, and "ding-ding" for penis. [Tr. 9/20/93 at p. 34; Tr. 9/17/93 at pp. 62-63, 68, 80, 62-163]. Mazepa, however, testified to correcting the children by teaching them the "proper" names for a person's private parts. [Tr. 9/17/93 at pp. 68, 80]. The children, however, after being questioned about the names for a person's private parts, both responded that they never used terms like "cho-cho," "ding-ding" and "boto." [Tr. 9/16/93 at pp. 83, 101; Tr. 9/15/93 at pp. 207-208; Tr. 9/17/93 at p. 29].

Dr. Bidwell also testified that the children stated they had watched Smith and Nakamura having sexual relations. [Tr. 9/17/93 at pp. 97, 129]. In fact, according to Dr. Bidwell, Alisha's greatest concern was having witnessed Smith and

Nakamura having sexual relations. [Tr. 9/17/93 at pp. 97, 129]. Mazepa also stated that both children talked extensively about seeing adult videos. [Tr. 9/20/93 at p. 34]. Both children, however, during their separate testimonies, denied ever seeing Smith and Nakamura having sexual relations or watching adult videos. [Tr. 9/15/93 at pp. 206-207; Tr. 9/16/93 at pp. 54, 66, 84; Tr. 9/17/93 at pp. 30-31, 92].

### B.    The Testimony Of Dr. Bidwell

The court qualified Dr. Bidwell to testify as an expert in the field of medicine with a specialty in adolescent medicine and sexual assault. [Tr. 9/21/93 at p. 83]. After Dr. Bidwell was qualified, the testimony proved that he was a "hired gun" for the prosecution. The facts prove that Dr. Bidwell was employed by the Sex Abuse Treatment Center ("SATC") to provide medical legal evaluations of patients who come into the hospital with a history of sexual abuse. [Tr. 9/21/93 at p. 71]. During voir dire examination, Dr. Bidwell further testified that he attended seminars on how to provide legal testimony and that his role was to provide legal testimony. [Tr. 9/21/93 at pp. 75, 81, 83]. Specifically, Dr. Bidwell testified that he completed training in the use of working with the legal system in Hawaii and working with the police department for the express purpose of gathering medical legal evidence. [Tr. 9/21/93 at p. 75]. Dr. Bidwell explained that the purposes of examinations at SATC are to do good medical legal evaluations. [Tr. 9/21/93 at p. 83]. Lastly,

Dr. Bidwell stated that he was paid $125.00 per hour by the prosecution for his testimony. [Tr. 9/21/93 at p. 125].

The court ruled Dr. Bidwell's testimony was admissible as "statements for purpose of medical diagnosis or treatment" under Rule 803(b)(4) of Hawaii Rules of Evidence. [Tr. 9/21/93 at pp. 92-93]. The court issued a cautionary instruction on the medical examination rule, however, the instruction merely prohibited the jury from considering "any so-called expert medical opinion on the believability or credibility of a patient" as follows:

> The jury will be instructed to know that the current state of the law and in the State of Hawaii is that we are prohibited from entertaining or hearing any expert medical opinion as to a victim or a child victim's credibility in a case of such child sex abuse cases. Please remember that the defendants are presumed innocent unless and until they are proven guilty beyond a reasonable doubt.
>
> I wish to issue this cautionary instruction to the jury in the light of my overruling the defense objection to preclude the subsequent testimony on what the independent medical findings might have been with respect to the patient in question. So as not to confuse you, you are prohibited from considering any so-called expert medical opinion on the believability of a patient, in this case Alisha and subsequently perhaps Jana.
>
> However, I am allowing the question under what we call the 803(b)(4) exception to the hearsay rule which specifically permits the witness to testify to what statements were made for the purposes of his diagnosis or

17

his treatment of the patient in question.    So that's specifically for purposes of medical diagnosis or treatment.

[Tr. 9/21/93 at pp. 94-95].

Nevertheless, the court allowed Dr. Bidwell to testify, over objection, to hearsay statements by Alisha and Jana describing not only the alleged incidents of sexual abuse, but also identifying Smith and Nakamura as the offenders.  As to both children, Dr. Bidwell testified that they told him that Nakamura got into bed with them, touched and put his finger in their vaginas, put his penis in Jana's vagina and Smith had made them lick Smith's vagina, and vice versa.  [Tr. 9/21/93 at pp. 96, 99, 110, 111, 114].  Dr. Bidwell defined these hearsay accounts of sexual abuse as Alisha and Jana's "medical history."  Id.

Dr. Bidwell's testified that, in terms of his medical findings, Alisha and Jana's genitals were normal and their hymens were intact.  [Tr. 9/21/93 at pp. 101, 113, 120, 131].  Dr. Bidwell did describe a small thickening of the tissue in front of Alisha's hymen ring as a scar, however, it was not possible to determine when the scar was incurred.  [Tr. 9/21/93 at pp. 102, 105, 157].  He went on to testify, however, that this injury that he had observed on Alisha could be consistent with someone placing a penis into the vagina (even though no penile penetration was alleged by Alisha).  [Tr. 9/21/93 at p. 110].  In response to prosecution questions, Dr. Bidwell rejected other possible causes for the scar, stating that the scar was not consistent with

18

masturbation ("very unusual for a child to do that"), nor a child putting objects in her vagina, and further, that he did not believe it would be caused by sitting, for example, on the arm of a padded chair.  [Tr. 9/21/93 at pp. 108-09].  Dr. Bidwell also confirmed that the things he described regarding the "scar and other behavior" are "true to a reasonable degree of medical certainty."  [Tr 9/21/93 at p. 110].

As to Jana, Dr. Bidwell's medical examination revealed that there was no physical evidence that she had been sexually abused.  [Tr. 9/21/93 at p. 120].  Dr. Bidwell was unable to conclude with a reasonable degree of medical probability whether Jana had been sexually touched or penetrated.  [Tr. 9/21/93 at p. 115].

Despite the court's ruling and cautionary instruction, Dr. Bidwell was allowed to state that the children's medical histories were "consistent" with the findings of his medical examinations even though the children's medical examinations did not actually reveal any evidence of sexual abuse apart from the old scar found on Alisha's hyman ring.  [Tr. 9/21/93 at pp. 107, 149].  Alisha's statement of licking or touching by Smith did not involve any act of penetration.  Nevertheless, Dr. Bidwell was allowed to make a generalizations that *all* of Alisha's and Jana's hearsay statements were consistent with their examination.  Specifically as to Jana, Dr. Bidwell testified that "there could be partial penetration of the vagina by the penis" but that it was "[h]ard to say."  [Tr. 9/21/93 at pp. 115-16].  Dr. Bidwell also cast doubt on the lack of physical findings in Jana, by testifying that while he found

19

no scar, it is more difficult to find in a fibriated hymen, which Jana had, especially if the scar was small.  [Tr. 9/21/93 at p. 113].

In addition, Dr. Bidwell testified that the "social worker gets primarily history, but we confirm that with the patient, it's just standard practice."  [Tr. 9/21/93 at p. 111].   Nothing in the record indicates how or to what extent Dr. Bidwell "confirmed" the information obtained by the social worker upon which he apparently based almost all of his testimony given that there was almost no physical evidence to support his "medical" conclusions.  Because there were no physical findings of sexual abuse other than Alisha's scar, it appears that at least part of, if not the entire basis for Dr. Bidwell's alleged "medical" opinions, was the medical history (the hearsay statements) of the girls as provided to him by, perhaps, the girls themselves or more likely by others (the social worker) who did not testify at the trial.  For example, he testified that Jana had complained of vaginal bleeding in the past, but that is was not a current problem.  But he went on to say "but she did have vaginal bleeding" even though there was no medical evidence found of such an event during his examination. [Tr. 9/21/93 at p. 112].  The record does not reflect that the state court attempted to determine whether Dr. Bidwell's opinion that the children's medical histories were "consistent" with the findings of his alleged medical examinations was based on hearsay information.

### C.    The Testimony of Mazepa/Foster Mother

The prosecution proffered Beth Kurren ("Kurren"), the children's therapist, to testify that "seemingly bizarre behavior" by the children which occurred after the report of sexual abuse was made, was "acting out" behavior which was a sign of sexual abuse. [Tr. 9/15/93 at 10, 12]. After the defense objected to the testimony of Kurren because she was not named as a witness and her records had not been produced in discovery, the prosecutor struck Kurren as a witness. [Tr. 9/15/93 at pp. 10, 82-84; Tr. 9/16/93 at pp. 64-65]. However, the striking of Kurren did not come until <u>after</u> opening argument and <u>after</u> the prosecutor commented in opening argument that the jury would hear of the children's sexualized behavior. [Tr. 9/15/93 at p. 45].

Despite the prosecutor's decision to strike Kurren, the lower court permitted the prosecution, over defense counsel objection, to elicit testimony from Mazepa that after the report of sexual abuse had been made, she observed Jana touching Alisha's vagina while they were dressing, Jana rubbing herself on an armchair, putting a little toy figurine in her vagina while in the bathtub, and Jana fondling herself and Mazepa's daughter. [Tr. 9/17/93 at pp. 69-71]. Mazepa also testified that Alisha and Jana had nightmares and problems with bed-wetting. [Tr. 9/17/93 at pp. 76-78]. The prosecution did not produce any expert to testify that

the behavior described by Mazepa was in any way the result of, related to, or caused by sexual abuse.

Despite offering no evidence to explain or to tie these behaviors to any abnormal behavior, much less to tie these alleged behaviors to the actions of Smith, the state court permitted the prosecutor to repeatedly state in his opening and closing argument, over objection, that the children's behavior was evidence of "sexualized behavior" as further proof that they had been sexually abused by Smith and Nakamura. [Tr. 9/15/93 at 45; Tr. 9/24/93 at pp. 71-72, 77]. Of course, since these comments were made during opening and closing arguments of counsel for the prosecution, they were not subject to cross-examination.

### D.    Smith and Nakamura's Testimony

Both Smith and Nakamura testified that they never sexually abused Alisha or Jana. [Tr. 9/22/93 at pp. 12-1332; Tr. 9/23/93 at pp. 40-42]. Smith said that she loved Alisha and Jana and expressed feeling hurt because they were saying untrue things. She was happy to see that the children were being provided for, however, she was upset that she could not be the one to provide for them. [Tr. 9/23/93 at pp. 39-40]. When asked if she had sexually abused her children Smith replied in the negative saying that such an act would be disgusting. [Tr. 9/23/93 at p. 41]. Smith testified that Alisha and Jana were her children, and she wouldn't allow anyone to hurt them and would put Nakamura in jail if she believed for one moment

that he had abused the girls. [Tr. 9/23/93 at p. 44]. Nakamura testified that Alisha and Jana were "just babies" and he would never molest a child. [Tr. 9/22/93 at pp. 133-134]. Nakamura also stated that he did not observe Smith sexually abusing the children and he did not have any indication to think that they had been sexually abused. Id.

**E.    The Sentencing Hearing**

The state moved, in writing, for an extended term of imprisonment pursuant to H.R.S. § § 706-661 and 706-662(4). Specifically, the state based this request on the fact that, since Smith was convicted on multiple felony counts and because of the length of time she could receive were the sentences imposed consecutively, she was eligible for an extended term within the meaning of H.R.S. § 706-662(4)(a). Being eligible, due to these factors, the state submitted that Smith should receive an extended term of imprisonment because:

> Regina Smith has displayed a cruel and callous disregard for the safety and welfare of others both physically and psychologically. Regina Smith repeatedly sexually assaulted Jana and Alisha Perry who were both under the age of five years old when the abuse occurred. She abused her position of trust in order to engage in sexual acts including vaginal and oral penetration. As such, she poses and will continue to pose a significant danger to the public.

[State's Motion for Extended Term of Imprisonment filed on November 23, 1993].

No where in the motion or in any pleading did the state ask for consecutive sentences,

which the sentencing court had discretion to impose pursuant to H.R.S. §§ 706-668.5 and 706-606 so long as the court considered various factors.  Moreover, despite implying in its motion that Smith was a danger to the community, the state did not move for an extended term of incarceration pursuant to H.R.S. § 706-662(3), which permits such a sentence if a defendant is found to be "a dangerous person whose imprisonment for an extended term is necessary for protection of the public."

At sentencing, the state court imposed both extended terms of imprisonment *and* ordered that such sentences be made to run consecutively to one another, resulting in five consecutive life sentences.

> ..., it is proper for this Court to grant the Motion for Extended Term and it is hereby granted.  This is based on the factors considered by the Court to include the defendant's apparent poor prognosis for positive behavioral changes; secondly, the overall need to insure public safety; thirdly, her utter lack of victim empathy which further will be a danger to the community inasmuch as she has failed to appreciate the imminent or serious threat she poses to members of the community, especially children; her extensive history and admission of substance abuse that causes her to be more prone to acting impulsively.  Further, the trauma and the emotional and irreparable injury to the very youthful victims who were her children.  Further, her flagrant abuse of her trust as mother to these children.  And lastly, her inability to have served or met her duty as the lawful parent of these children.
>
> The Court, as to the counts in question, Counts 1, 2, 3, 13 and 14, which are the Sex Assault in the First Degree, the extended term will be from the 20 years to the life

imprisonment with the possibility of parole.  Those terms the Court deems will be running consecutively.

[Tr. 11/29/93 at pp. 27-29].

The sentencing court went on to state:

Ms. Smith, after the Court has weighed all of the factors, I am basing the decision of the Court as not being an unduly excessive penalty or punishment, which I believe is just given the factual allegations that were proven beyond a reasonable doubt in this courtroom.  I would like the record to indicate that they represent an outrage to the moral sense of our community and also shock the conscience of the community.  And it is in that light that I do not believe the life terms that are being imposed are excessive and that the key factors considered by the Court are the nature of the offenses and the harm, the irreparable harm done to the victims and the danger you pose to the community.

[Tr. 11/29/93 at pp. 29-30].  At no time did the sentencing court review or discuss the sentencing factors listed under H.R.S. § 706-606, which is required under H.R.S. § 706-668.5(2) if the sentencing court, in the exercise of its discretion, wishes to impose consecutive sentences.  Under Hawaii law, it is clear that the imposition of consecutive sentences under H.R.S. § 706-668.5 requires a distinct and separate legal analysis from that employed when imposing an extended term of incarceration pursuant to H.R.S. § 706-662.  The record demonstrates that no such analysis was conducted.  Rather, the only analysis that was undertaken by the sentencing court was expressly done in regards to granting the state's extended term request and, as such,

25

did not comport with the requirements of H.R.S. § 706-606 which requires a separate process for imposing a consecutive sentence.

### F.    Brief Appellate History/Direct Appeal

On direct appeal, Smith challenged, among other grounds, the evidentiary propriety of Dr. Bidwell's testimony and that of Ms. Mazepa. In addition, Smith challenged the legality of the consecutive life sentences, arguing that the sentencing court did not properly conduct an analysis of H.R.S. § 706-606 before imposing consecutive sentences.

On January 13, 1997, in a summary disposition order, the Hawaii Supreme Court, denied her appeal. [See Summary Disposition Order No. 97-1]. Accordingly, there is no written opinion issued by any Hawaii state appellate court which this Court can review to determine why the state court upheld Smith's conviction and sentence, other than the original rulings of the trial and sentencing court. As such, there is no "reasoned decision" from which this Court can review the state court's decision to uphold Smith's conviction and sentence. This Court, therefore, must conduct its own "independent review of the record" to ascertain whether the state court's rulings were objectively unreasonable. Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003)("As we cannot attribute reason to a silent opinion, we have no source other than the record upon which to base our analysis.").

### G.    Brief Appellate Review/Second Rule 40 Petition

On July 3, 2002, Smith filed a petition pursuant to Haw. R. Penal P. 40, challenging the manner in which the extended terms of imprisonment were imposed. Specifically, as dictated by the United States Supreme Court's decision in Apprendi v. New Jersey, 530 U.S. 466 (2000), Smith alleged that the factual basis for the extended term of incarceration were found by the sentencing judge and not by a jury. On August 6, 2002, the state responded, arguing, *on the merits*, that Hawaii's sentencing scheme for the imposition of extended terms was different than that found unconstitutional under Apprendi and, therefore, was not invalid under the United States Supreme Court's analysis.  The state did not raise any issue claiming that Apprendi or its reasoning was not retroactive to Smith's claim.

On March 20, 2003, the Circuit Court of the First Circuit for the State of Hawaii issued its Findings of Fact and Conclusions of Law.  The court denied Smith's petition *on the merits*.  The court, specifically citing to Apprendi, held that Apprendi's reasoning did not apply to Hawaii's extended term sentencing scheme and upheld the sentence.

Smith timely appealed the Circuit Court's decision on March 25, 2003. Citing to Apprendi and its reasoning, Smith alleged that the Hawaii extended term sentencing scheme was unconstitutional and that the Hawaii Supreme Court decisions ruling that Apprendi did not apply to Hawaii's extended term sentencing scheme were

27

an incorrect interpretation and application of <u>Apprendi</u>.  On October 10, 2003, the state filed its Answering Brief.  Again, on the merits, the state argued that Hawaii's extended term sentencing scheme survived an <u>Apprendi</u> challenge.  Once again, the state did not raise or argue that <u>Apprendi</u> did not apply retroactively to Smith's challenge.

On February 2, 2004, the Hawaii Supreme Court issued its second Summary Disposition Order in this case, denying without an written opinion Smith's Rule 40 appeal.

**ARGUMENT**

I. **THE STATE TRIAL COURT VIOLATED SMITH'S FIFTH, SIXTH, AND FOURTEENTH AMENDMENT RIGHT TO CONFRONTATION AND DUE PROCESS OF LAW BY ADMITTING HEARSAY TESTIMONY WHICH VOUCHED FOR THE CREDIBILITY OF THE TWO CHILD VICTIMS BY A PROSECUTION WITNESS WHO DID NOT EXAMINE THE CHILDREN FOR TREATMENT PURPOSES**

The Confrontation Clause of the Sixth Amendment of the United States Constitution limits the conditions under which hearsay evidence can be admitted at trial. Compliance with the Confrontation Clause requires that hearsay statements, to be admissible, must either fall within a "firmly rooted hearsay exception" or be supported by particularized guarantees of trustworthiness. Idaho v. Wright, 497 U.S. 805 (1990).

At trial, the prosecution proffered Dr. Bidwell's testimony for the purpose of medical treatment or diagnosis under H.R.E. 803(4). [Tr. 9/21/93 at p. 87]. Hawaii Rule of Evidence 803(4), which is identical to its federal counterpart, admits as an exception to the hearsay rule:

> ...statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

Haw. R. Evid. 803(4). Cf. Fed. R. Evid. 803(4). Even though Dr. Bidwell did not conduct his examination for purposes of "treatment" and the "diagnosis" was for the

29

express purpose of testifying at trial, the trial court allowed Dr. Bidwell to testify as to the results of his medical examination which included all of the statement made by the children to him during the examination under the medical examination hearsay exception rule. [Tr. 9/21/93 at p. 92]. The trial court attempted, however, to prohibit the prosecution from eliciting any direct conclusionary opinions by the doctor that the abuse occurred, and that the children's reported abuse was truthful and believable. Id. Nevertheless, during direct examination, in addition to allowing testimony of the children's statement as to what physically occurred, Dr. Bidwell was allowed to make conclusionary statements that the medical history received by the children was consistent with his medical findings. [Tr. 9/21/93 at p. 106]. In addition, Dr. Bidwell was permitted to testify as to what the child witnesses informed him happened and, even more devastating to the defense, he was also permitted to testify that the two children told him Smith and her boyfriend had committed the alleged sexual acts upon them. [Tr. 9/21/93 at pp. 96, 111]. It is Smith's position that the trial court committed reversible error in admitting any, or even part of, these hearsay statements.

While it has been determined that the medical examination exception is a "firmly rooted" hearsay exception for purposes of the Confrontation Clause, a trial court must still make the determination that the hearsay statement qualifies under said exception. White v. Illinois, 502 U.S. 346, 502 (1992). For a hearsay statement to be admissible under the medical examination exception, a court must determine that

the statement was both "made for the purpose of medical diagnosis or treatment" and was "reasonably pertinent to diagnosis or treatment." <u>United States v. George</u>, 960 F.2d 97, 100 (9th Cir. 1992).

In the instant case, the state trial court found that the children's statements regarding the nature of the sexual abuse and the identity of the perpetrators made to the prosecution's hired medical expert, Dr. Robert Bidwell, fell within the medical diagnosis or treatment exception to the rule against hearsay. [Tr 9/21/93 at pp. 92-93]. Dr. Bidwell testified to the childrens' hearsay statements that were solicited by a social worker that related allegations of sexual abuse and specifically identified Smith as the person responsible for sexually abusing them. [Tr 9/21/93 at pp. 96, 111]. Dr. Bidwell also offered his expert opinion that the children's hearsay accounts of sexual abuse by Smith were consistent with his medical findings and/or did not contradict his medical findings, despite the fact that there was almost no physical evidence found during the alleged "medical" examination conducted by Dr. Bidwell. [Tr 9/21/93 at pp. 107, 115]. Although the state trial court found that Dr. Bidwell's testimony fell under the medical examination exception, Smith submits that the trial court misapplied the analysis and failed to consider issues of trustworthiness in contradiction of clearly established federal law regarding the introduction of hearsay statements.

In this respect, the state trial court erred on a number of different levels. First, the trial court overlooked the fact that Dr. Bidwell was trained and hired to conduct a "medical examination" of the children for the sole and express purpose of providing legal testimony in the criminal case; therefore, his testimony does not fall within the medical examination exception in the first instance. In fact, the record is completely devoid of any evidence that Dr. Bidwell's medical examination was used in any manner to "treat" the children or that the children were informed prior to his examination that he was there as a doctor for purposes of "treatment" or "diagnosis."

Second, as a result, even if a person such as Dr. Bidwell could testify in the first instance, his testimony as to what the children said was inadmissable because the hiring of a medical legal expert for the sole purpose of providing testimony in a criminal trial draws the conclusion that either all or some of the statements made by the children to Dr. Bidwell were not supported by particularized guarantees of trustworthiness. See United States v. Barrett, 8 F.3d 1296 (8th Cir. 1993) (in order to admit hearsay statements under exception for medical diagnosis or treatment, in cases involving very young children who do not seek medical treatment by themselves but instead are brought to physician by someone else, there must be evidence that child understood physician's role in order to trigger motivation to provide truthful information.) Given that, due to the lack of corroborating evidence, the credibility of the two child witnesses was the key to the prosecution's case,

Dr. Bidwell's testimony which effectively vouched for the credibility of the children was devastating to the defense.

Third, even if Dr. Bidwell could testify to certain hearsay statements made by the children in the course of his "medical evaluation," this does not mean that he could testify to *all* of the hearsay statements made by the children. In specific, absent the presence of certain facts not present in this case, Dr. Bidwell should not have been permitted to testify as to who the children claimed committed the alleged acts of sexual abuse. Such testimony has generally been held to *not* constitute relevant evidence under the "medical examination" hearsay exception and, in turn, to improperly bolster the credibility of the child witnesses. Here, Dr. Bidwell was erroneously permitted to testify that Smith and Nakamura had sexually abused them *and that such statements by the children were consistent with the results of Dr. Bidwell's medical examination.*

Accordingly, the admission of these various distinct hearsay testimony violated Smith's constitutional right of confrontation.

**A.    Dr. Bidwell Did Not Provide "Medical Treatment" Or "Diagnosis" To The Children Within The Meaning Of Rule 803(4).**

The facts of this case demonstrate the prosecution disguised Dr. Bidwell's testimony under the medical examination exception for the purpose of admitting inadmissable evidence. The record shows that Dr. Bidwell did not

33

administer any medical treatment, physical or emotional, to the children. Nor does the record reflect that Dr. Bidwell made any medical recommendations or referrals for said victims. Instead, the facts prove that Dr. Bidwell was employed by the Sex Abuse Treatment Center ("SATC") to provide medical legal evaluations of patients who come into the hospital with an alleged history of sexual abuse. [Tr. 9/21/93 at p. 71]. During voir dire examination, Dr. Bidwell further testified that he attended seminars on how to provide legal testimony and that his role was to provide legal testimony. [Tr. 9/21/93 at pp. 75, 81, 83]. Specifically, Dr. Bidwell testified that he completed training in the use of working with the legal system in Hawaii and working with the police department for the express purpose of gathering medical legal evidence. [Tr. 9/21/93 at p. 75]. Dr. Bidwell testified that the purposes of examinations at SATC are to do good medical legal evaluations. [Tr. 9/21/93 at p. 83]. Lastly, Dr. Bidwell stated that he was paid $125.00 per hour by the prosecution for his testimony. [Tr. 9/21/93 at p. 125].

In essence, Dr. Bidwell was nothing less than a hired prosecution witness whose sole purpose was to get into evidence the hearsay statements of the child witnesses and then, by means of his alleged medical expertise, offer up his opinion that the examinations were consistent with what the children had told him occurred. How, of course, the medical examination could provide evidence which was either consistent with sexual acts for which there was no medical evidence (fondling and

34

oral sex) as well as providing "evidence" as to the identity of who had allegedly committed the sexual acts is unknown and was never explained by the prosecution or Dr. Bidwell. Nevertheless, the trial court permitted Dr. Bidwell not only to recite this information he obtained from the children to the jury, but also most damaging, to claim that the hearsay statements made by the children were "consistent with his medical examination." In essence, that the statements made by the children were "true" because they were consistent with his medical findings.

The specific issue of whether a hired medical expert can provide hearsay statements of alleged victims under the medical examination exception in the first instance (apart from the question of whether if permissible, what statements can then be admitted) has not been addressed by the Ninth Circuit.[3] However, there is Ninth Circuit case law that provides guidance on how this issue should be determined in this jurisdiction. In Webb v. Lewis, 44 F.3d 1387 (9th Cir. 1994), Webb filed a habeas corpus petition alleging that the videotaped interview of the victim conducted by the social worker was inadmissible under the hearsay exception for medical

---

[3] In 2002, the Hawaii Supreme Court expressly held, in State v. Yamada, 99 Haw. 542 (2002), that the hearsay exception for statements made for purposes of medical diagnosis or treatment includes statements reasonably pertinent to diagnosis, even if made in anticipation of litigation. Smith submits, however, that this *state* court interpretation of Rule 803(4) violates clearly established federal law because it fails to properly analyze trustworthiness and confrontation concerns that are at the core of all federal hearsay rules.

diagnosis or treatment. The evidence in <u>Webb</u> demonstrated, as here, that the child victim was examined at the Center for Child Protection by a physician specializing in child abuse cases and often consulted by law enforcement and child protective services. <u>Webb</u>, 44 F.3d at 1391. The state's entire case connecting Webb to the injuries found by the physician was made up of hearsay statements reported by a social worker.

In arguing that the videotape was properly admitted evidence, the state, in <u>Webb</u>, submitted that the social worker engaged in medical diagnosis or treatment and thus the testimony fell under the diagnosis or treatment hearsay exception. The state attempted to argue that the social worker's interview was preparatory to the medical examination by the hired physician who relied on said interview to conduct the medical examination. The Ninth Circuit, in reversing Webb's conviction, held that the social worker's interview of the victim was not a medical procedure. <u>Webb</u>, 44 F.3d at 1390. Moreover, the Ninth Circuit held that because the physician was being consulted by the state and conducted her examination for law enforcement purposes, she was not prescribing for the victim as her patient. <u>Id</u>. at 1390-1391. In further analyzing the issue, the Ninth Circuit held that a victim who is brought to an abuse center at the request of the prosecuting authorities does not go to said center to seek treatment. <u>Id</u>. In fact, the Ninth Circuit stated that to argue that the victim witness protection program is a "therapy program" is to engage in fantasy. <u>Id</u>.

In the instant case, the facts demonstrate that Dr. Bidwell was a "hired gun" for the prosecution. Nothing in the trial record indicates that Dr. Bidwell examined the children for treatment, rather, his involvement in the case was for legal diagnosis. Moreover, nothing in the record indicates that the children thought they were being examined by Dr. Bidwell for treatment purposes.

The professional objectivity of a physician responsible for treatment is unquestionably far greater than that of a witness employed and paid to testify as an expert. A physician responsible for treatment will have the best interest of the child in consideration. This fact is diminished when the prosecution pays for testimony by an expert who did not treat the children. Certainly an expert trained in providing legal testimony knows what evidence will be solicited by the prosecution and may tailor his testimony and examination to arrive at such a conclusion. In fact in this instance, Dr. Bidwell even testified that he only confirmed statements made by the children to the social worker, he was trained by law enforcement officials as to how to obtain a "proper medical history" and even admitted to asking the alleged victims who committed the offense even though as a doctor he recognized that this fact served no medical purpose. [Tr. 9/21/93 at p. 161]. Based upon the unreliability of a hired legal expert, allowing such hearsay testimony, particularly as offered up in this case, constitutes a total farce of the medical examination exception to the hearsay rule and engages, as the Ninth Circuit has stated, in "fantasy." By contrast, the state

37

could have attempted to produce the victims' actual treating therapist, Beth Kurren, for the possible admission of the hearsay statements. The prosecution, however, after making preparations to have Ms. Kurren testify and even mentioning it in their opening statement to the jury, eventually withdrew Ms. Kurren as a witness and failed to provide the defense with any of her records. [Tr. 9/16/93 at p. 64]. In her place, Dr. Bidwell, the hired medical expert, testified.

The trial record clearly demonstrates that Dr. Bidwell examined the children solely for purposes of testifying in court as to a diagnosis. Evidence Rule 803(4) requires that the *medical* diagnosis be for a purpose. Logically, given that the rule is designed expressly for medical evaluations, that "purpose" would be for *medical* treatment. However, in this case, based upon the record, the purpose was solely for legal testimony. Allowing Dr. Bidwell to present hearsay evidence under this disguise undermines the basis of the hearsay exception. As recognized by the Sixth Circuit in United States v. Kappell, 418 F.3d 550, 556-57 (6th Cir. 2005), "[t]he critical inquiry under Rule 803(4) . . . is whether [psychotherapist] undertook her interviews for the primary purpose of medical diagnosis, rather than for some other purpose, such as determining whether to notify state authorities of suspected abuse...or obtaining evidence."

For example, no court would allow, in a criminal trial, the testimony of a doctor who was given a police report and was asked to examine the victims and

38

provide testimony consistent with the conclusions in the investigative report while at the same time, simply because the individual is a "doctor," be permitted to inform the jury of the hearsay statements contained in the report or regurgitated at the alleged "medical" examination by the alleged victims.

The facts of this case are no different. Dr. Bidwell worked in conjunction with law enforcement through the SATC program. SATC is known to be a victim advocacy program. In fact child sex abuse protocol requires that a child who is alleging sexual abused be brought to SATC for examination. Accordingly, it can be concluded that Dr. Bidwell, the prosecution's hired medical legal expert, did not examine the alleged victims for the purpose of medical diagnosis or treatment. Accordingly, on this basis Dr. Bidwell's testimony as to the declarations of the children should have been excluded in total.

**B.    Even if Dr. Bidwell Could Testify In The First Instance Under Rule 803(4), He Should Not Have Been Permitted To Testify As To The Hearsay Statements Of The Children As The State Failed To Adduce Evidence As To Their Trustworthiness.**

Even if this Court determines that the medical examination exception applies to Dr. Bidwell in the first instance, permitting him to testify as a physician even though his information was obtained solely for the purpose of testifying, this Court should find that his testimony was limited to the results of his medical diagnosis only and that it violated Smith's constitutional rights for the state trial court

39

to have permitted into evidence all or some of the hearsay statements made by the children. Most importantly, Dr. Bidwell should not have been permitted to state that the results of his "examination" were "consistent" with what the children had said as well as stating that the children had specifically informed him that Smith was the culprit.

In <u>Webb</u>, the physician consulted by law enforcement officials was limited by the Ninth Circuit to testifying as to only the results of her examination. Her testimony did not go beyond her medical conclusions. The limitations placed on the physician in <u>Webb</u> should also be applied in the instant case. Dr. Bidwell should have been limited to presenting the conclusions of his examination. The facts of this case demonstrate that Dr. Bidwell's testimony far exceeded his medical findings and thus violated Smith's constitutional rights. In fact, Dr. Bidwell's testimony so generalized the medical findings that he was able to directly and improperly vouch for the credibility of the children's entire testimony, not only that portion which he could medically confirm.

The Ninth Circuit has repeatedly held that credibility is for the jury to determine. <u>United States v. Awkard</u>, 597 F.2d 667, 671 (9th Cir. 1979); citing, <u>United States v. Barnard</u>, 490 F.2d 907, 912 (9th Cir. 1974). Opinion testimony on credibility is limited to character, all other opinions on credibility are for the jurors. <u>Id</u>. It is inappropriate to have an expert witness bolster the credibility of a witness.

United States v. Ravel, 930 F.2d 721 (9th Cir. 1991). The jury is the lie detector in the courtroom. Awkard, 597 F.2d at 671; citing, Barnard, 490 F.2d at 912.

The Ninth Circuit, in United States v. Binder, 769 F.2d 595 (1985), overruled on other grounds by United States v. Morales, 109 F.3d 1031, 1035 n.1 (9th Cir. 1997), specifically held that an expert's testimony was erroneously admitted to show credibility of the abused children. In Binder, the petitioner appealed his conviction on four counts of child molestation and sexual conduct with a minor. Binder claimed that the trial court erred when it admitted expert psychological and psychiatric testimony that the complaining witnesses could distinguish truth from falsehood. In holding for Binder, the Ninth Circuit held that expert witnesses should not be permitted to testify to issues that invade the province of the jury. Id., at 602. Credibility is to be decided by the jury. Id. Similarly, the United States Supreme Court in Idaho v. Wright, 497 U.S. 805, 824 (1990), reasoned that the corroboration of a child's allegations of sexual abuse by medical evidence of abuse sheds no light on the reliability of the child's allegations regarding the identity of the abuser. The Court noted that there was a very real danger that a jury will rely on partial corroboration to mistakenly infer the trustworthiness of the entire statement. Id

The Eighth Circuit, which has specifically addressed the issues of whether a hired medical examiner can provide hearsay statements under the medical examination rule, has placed specific guidelines of when the admission of said

41

evidence is possible.  In Ring v. Erickson, 983 F.2d 818 (8th Cir. 1993), Ring

appealed his conviction in a Minnesota state court on four counts of criminal sexual

conduct for sexually abusing two minors.  In his habeas petition, Ring challenged the

admission of two videotaped interviews of the victim claiming the admission violated

his Sixth Amendment right to be confronted by witnesses against him.  The statement

challenged by Ring was the videotaped statement made by the child victim to a

doctor.  The lower court upheld the admission of the hearsay statement under the

medical examination exception.

In reversing Ring's conviction, the Eighth Circuit held that child did not

seek medical treatment and there was no evidence suggesting that at the time of the

interview the child victim knew the doctor was, in fact, a doctor.  Ring, 983 F.2d at

820.  In Ring the child victim was three years old at the time of the alleged abuse.  In

supporting its holding, the Eighth Circuit articulated the basis for the medical

examination exception.  The principal reason why 803(4) is a traditional hearsay

exception automatically carrying the indicia-of-reliability label is because of the

selfish-motive doctrine.  Id.  This exception is based on the belief that a person

seeking medical treatment is unlikely to lie to a doctor she wants to treat her, since

it is in her best interest to tell the truth.  Id., citing, White v. Illinois, 502 U.S. 346

(1992).  The court in Ring found that the underlying basis of reliability is not present

in a case such as this one, where not only did the patient not seek the doctor's help

42

but there is no evidence that she even knew she was talking to a doctor. Id. On this basis, the Eighth Circuit, held that the child victim's statements to the doctor did not fall within the firmly rooted hearsay exception. Id.

The Eighth Circuit in United States v. Azure, 801 F.2d 336 (8th Cir. 1986), reviewed the issue of whether a pediatrician may give his opinion as to the truth of the story of the victim of child sexual abuse. In Azure, over objections by the defense, the pediatrician was allowed to testify that the child victim was believable and that he could "see no reason why she would not be telling the truth in this matter." Id., at 339. The trial court ruled the pediatrician's testimony was admissible under evidentiary rule 702 as expert opinion. The Eighth Circuit, in reversing the trial court, applied Ninth Circuit law. The Azure court ruled that the effect of receiving such testimony, however, may have several negative results: First, it may cause juries to surrender their own common sense in weighing testimony; and second, it may produce a trial within a trial on what is collateral but still an important matter. Id. at 340; citing Awkard, 597 F.2d at 671. In reversing the decision of the trial court, the Azure court held that credibility in the case was a very important issue. Being a key issue, the bolstering by the pediatrician amounted to reversible error. Azure, 801 F.2d at 341.

The cases of United States v. Hadley, 98 F.2d 848 (9th Cir. 1990), and United States v. Bighead, 128 F.3d 1329 (9th Cir. 1997), on the other hand,

43

demonstrate the proper use of evidence by a doctor regarding symptoms or statements by a child witness which support a doctor's conclusion that child abuse occurred.  In Hadley, the explanatory expert witness testimony was ruled not an abuse of discretion, distinguishing between expert testimony about *general behavior* characteristics as opposed to expert testimony that the *particular* children could be believed, which is not permissible.  The Ninth Circuit held that expert psychiatric testimony as to *general* behavior characteristics that may be exhibited in sexually abused children did not improperly bolster the children's credibility:  "Because this general testimony merely assisted the trier of fact in understanding the evidence, Dr. Rosenzweig did not improperly bolster the children's testimony."  Id. at 852-53 (citation and quotation marks omitted).

In Bighead the expert's testimony about typical characteristics of child sexual abuse victims was admissible in the prosecution for sexual abuse of a minor.  The Ninth Circuit ruled that the testimony did not improperly buttress the victim's testimony, in that the expert testified only about a *class* of victims generally and not the victim's *particular* testimony.  Moreover, the testimony had significant probative value, in that it rehabilitated the victim's credibility after she was cross-examined about reasons why she delayed reporting abuse and inconsistencies in her testimony.

In the case-at-bar, the record shows that there was no evidence whatsoever that Dr. Bidwell identified himself as a doctor to the children or that the

44

children wanted medical treatment.  In the instant case, as in the <u>Ring</u> case, the

children were very young, did not complain of or seek medical treatment, and there

was no evidence that the children knew the person interviewing them was a doctor.

These facts demonstrate that there is no underlying basis of reliability since none of

the guidelines discussed in circuit opinions were followed in this instance.   In fact,

a thorough review of Dr. Bidwell's testimony demonstrates that no evidence was

adduced by the state which would assure the trustworthiness of the children's hearsay

statements such that they could be admitted under Rule 803(4) under federal case

law.[4]  On this basis, Dr. Bidwell's entire testimony as to what the child victims stated

---

[4]  In <u>Idaho v. Wright</u>, 497 U.S. 805, 818 (1990), the Supreme Court discussed, apart from the requirements of Rule 803(4) and in the context of the residual hearsay clause, what factors should be considered in deciding whether there was a "showing of particular guarantees of trustworthiness" as to warrant the introduction of a hearsay statement in general.  In analyzing this question, a court must look to the totality of circumstances "that surround the making of the statement and that render the declarant particularly worthy of belief.  <u>Id</u>. at 819.  Moreover, the guarantees of trustworthiness must be at least as reliable as evidence admitted under a firmly rooted hearsay exception.  <u>Id</u>. at 821.  While the Court, in <u>Wright</u>, declined to list what would constitute the necessary guarantees, it gave a list of factors that could appropriately be considered by the trial court: "use of terminology unexpected of a child of similar age"; "spontaneity and consistent repetition"; "mental state of declarant"; and  "lack of motive to fabricate."  <u>Webb v. Lewis</u>, 44 F.3d 1387, 1391 (9th Cir. 1994), citing, <u>Wright</u>, 497 U.S. at 821-822.  The Supreme Court also emphasized that it is possible that where there was prior interrogation or prompting or manipulation by adults, spontaneity was an inaccurate indicator of trustworthiness. <u>Wright</u>, 497 U.S. at 826-827.

Here, without analyzing each factor in detail, it is sufficient to note that the record shows that the children, who were 3 and 5 at the time of the alleged offense

during the "medical examination" was inadmissible and should have been excluded by the trial court.

In its Answering Brief to Smith's direct appeal, the state relied on several Hawaii Supreme Court opinions to support the trial court's finding that Bidwell's testimony was admissible. None of these cases, were they even controlling, support the trial court's evidentiary ruling. Indeed, applicable Hawaii state law demonstrates that it was error to have admitted the children's hearsay statements to Dr. Bidwell based upon the record presented at trial.

In State v. Kim, 645 P.2d 1330 (Haw. 1982), the Supreme Court of Hawaii allowed an expert witness to attest to the credibility of a sexual abuse victim. Specifically, it allowed the child psychiatrist who had interviewed the victim to testify that the complainant's conduct, account of the incident, and mental and emotional conditions approximated that of *other* child rape victims he had interviewed. Id. at 607. On direct appeal, the state relied heavily upon the Kim decision to justify Dr. Bidwell's testimony, although the state failed to address or acknowledge the fact that, in Kim, the testimony was permitted because it was based upon a comparison to

and 5 and 7 when they testified in court, were subject to repeated prompting by the foster mother, the prosecutor, the victim witness advocate, and personnel from the Child Advocacy Center to tell the details of the alleged assault. [Tr. 9/16/93 at pp. 96-99]. Indeed, it took no less than four interviews before Alisha said anything about sexual abuse. [Tr. 9/17/93 at pp. 96-99; Tr. 9/20/93 at p. 25].

*other* child rape victims and not based solely on the credibility of the particular child victim as was the case here.

While it appears that the Supreme Court of Hawaii may have opened the door to expert testimony in this area in the <u>Kim</u> decision, it is important to note that three years *before* Smith's trial, the Hawaii Supreme Court, in <u>State v. Batangan</u>, 799 P.2d 48 (1990), overruled <u>Kim</u>.  In <u>Batangan</u>, a clinical psychologist, with a sub-specialty in the treatment of sexually abused children, evaluated complainant and testified to what complainant had related to him regarding the incidents of sexual abuse.  The psychologist also testified about the behavior of child sex abuse victims in general.  Finally, the psychologist testified that complainant was believable and that she had been abused by defendant.  Defendant objected but the trial court determined that such testimony was admissible under <u>Kim</u>.  The Supreme Court vacated the conviction, holding that admission of the psychologist's testimony directly opining on the truthfulness of victim's testimony constituted reversible error:

> The pertinent consideration is whether the expert testimony will assist the jury without unduly prejudicing the defendant. . . . [C]onclusory opinions that abuse did occur and that the child victim's report of abuse is truthful and believable is of no assistance to the jury, and therefore, should not be admitted.  Such testimony is precluded by H.R.E. Rule 702.
> . . . .
> As in most child sexual abuse cases, where "the only evidence consists of the victim's accusation and the defendant's denial, expert testimony on the question of

who to believe is nothing more than advice to jurors on how to decide the case." Moran, 151 Ariz. at 383, 728 P.2d at 253. The expert's use of words such as "truthful" and "believable" is not talismanic. But where the *effect* of the expert's opinion is "the same as directly opining on the truthfulness of the complaining witness," Myers, 382 N.W.2d at 97, such testimony invades the province of the jury.

Batangan 71 Haw. at 558-559 (Emphasis added).

Here, Dr. Bidwell's examination of the girls was normal. However, he cast doubt on various other explanations for Alisha's scar, leaving the jury with the impression that sexual abuse was likely the only reasonable cause of the scar. Most importantly, and most damaging to the defense, Dr. Bidwell's testimony that the results of his "medical" exams were "consistent" with the girls' medical histories necessarily means that he relied on their statements, and is, in effect, an impermissible opinion as to the truthfulness of their hearsay statements. As such, under both federal and state law, these statements should not have been permitted into evidence.

A second case relied heavily upon by the state during the direct appeal was State v. Rinehart, 819 P.2d 1122 (Haw. 1991). As in Kim, the court in Rinehart allowed the expert to state that the child victim's statements and behavior were consistent with the characteristics of a child who had been sexually assaulted. Id. As such, the expert's testimony did not comment directly on the child's credibility. Id. The expert in Rinehart, however, during his testimony never revealed what the child

48

victim said during the medical evaluation.  Id.  Rather, he testified as to the victim's behavior and concluded that the behavior was consistent with a child who had been sexually abused.  Again, as in Kim, a comparison to other alleged sexually assaulted victims.

In the instant case, while it may appear at a superficial blush that Dr. Bidwell's testimony stayed within the parameters outlined in the now overruled Kim decision but the still applicable Rinehart case, a close review of the Dr. Bidwell's testimony reveals it's flaws.  Dr. Bidwell stated that his examination of Alisha revealed that the labiamanora was normal and the hymen had no scarring. [Tr. 9/21/93 at pp. 101-102].  The hymen ring, however, showed abnormal tissue which could be described as scar tissue.  Id.  This scarring could have occurred by the insertion of an object into the vagina.  Other than this one piece of medical evidence, there was no other medical finding by Dr. Bidwell from his examination of Alisha and Jana.  Nevertheless, during his medical examination, Dr. Bidwell solicited the following statements from Alisha to which he was permitted to testify to in court: (1) her mother's boyfriend Francis got into bed with her and her sister and touched their cho-chos, which is their vagina, (2) he also put his finger in her cho-cho, (3) and that she was made by her mother to lick her mother's cho-cho.  [Tr. 9/21/93 at p. 96]. The testimony revealed, however, that in order for a scar to result, there would have to have been some form of penetration.  [Tr. 9/21/93 at pp. 108, 110, 168, 180-181].

49

During direct examination, Dr. Bidwell was not only permitted to recount all that the children had said, but was also allowed to conclude that Alisha's scar was consistent with "her medical history," an alleged "medical history" that included <u>all</u> of her statements regarding what had occurred, not just the act which may have resulted in the scar being formed. [Tr. 9/21/93 at p. 107]. Alisha's statement's of licking or touching by her mother or her mother's boyfriend did not involve any act of penetration. Thus, regardless of the accurateness of his testimony, the trial court erred when it allowed Dr. Bidwell to make a sweeping conclusion that simply as a result of finding scar tissue during the examination of Alisha, all of her hearsay statements were therefore consistent with all of her medical history. While Dr. Bidwell may have used the word "consistent" to have his testimony fall within the parameters of <u>Kim</u> and <u>Rinehart</u>, his testimony in actuality greatly exceeded the court's limitations.

As with Alisha, Dr. Bidwell's testimony of Jana's "consistency" violated even the <u>Kim</u> and <u>Rinehart</u> parameters. Dr. Bidwell's examination revealed that there was no evidence of trauma whatsoever. [Tr. 9/21/93 at p. 149]. Despite a finding of no trauma, Dr. Bidwell was allowed to testify to the following statements made by Jana during the examination: (1) Francis got into bed with her and touched her cho-cho; (2) put his fingers in her cho-cho; (3) made her lick her mother's cho-cho; (4) he put his ding-ding in her cho-cho; and (5) he made her put her mouth on his

ding-ding. [Tr. 9/21/93 at p. 111]. Over an objection, the trial court once again allowed Dr. Bidwell to testify that Jana's account, or "medical history" as he put it, that Smith sexually abused her was consistent with his medical examination. [Tr. 9/21/93 at p. 115]. All this regardless of the fact that the medical examination revealed nothing.

Based on the foregoing analysis, Smith contends that the <u>Kim</u> and <u>Rinehart</u> cases are irrelevant to her petition, having been overruled or distinguished in whole or part. Rather, an analysis of these two decisions demonstrate just how far astray Dr. Bidwell's testimony in this case went from proper admissible evidence. Here, Dr. Bidwell was allowed to make sweeping conclusions that the medical history, which identified the perpetrators and their actions, supported his medical findings. By so permitting, the court allowed Dr. Bidwell not only to vouch for the credibility of the child witness but also permitted into evidence otherwise inadmissable hearsay testimony which further acted to vouch for the credibility of the witness. It is on this basis, Smith contends, that the hearsay admissions of Dr. Bidwell as well as his "medical conclusion" were improperly admitted, denying Smith her constitutional right to confrontation and a fair trial. Dr. Bidwell's generalization of his medical examination, besides being inadmissible in the first instance, impermissibly vouched for the credibility of the children, the key witnesses for the prosecution.

51

In the instant case, Dr. Bidwell's testimony had the same effect as bolstering the credibility of the child victims. Dr. Bidwell's false generalized findings that the examination were consistent with the patients' medical history undermined any exception to the hearsay rule and was clearly inadmissible under evidentiary case law because it went to the credibility of the children. Although Dr. Bidwell never explicitly stated that he found the children to be believable, his opinion necessarily inferred such a statement and improperly bolstered the children's credibility. Accordingly, Dr. Bidwell's testimony went far beyond legally permitted medical diagnosis testimony and was improperly admitted to the extreme prejudice of Smith.

### C.     Given The Trial Record, It Was Entirely Improper For Dr. Bidwell To Testify As To The Hearsay Statements Of The Children As To The Identities Of Who Had Committed The Offense.

During his testimony, Dr. Bidwell was permitted to specifically testify as to the hearsay statements of the children identifying Smith and co-defendant Nakamura as the perpetrators of the sexual assault. [Tr. 9/21/93 at pp. 96, 99, 110, 111, 114]. Smith submits that this testimony, given the record produced at trial by the state, was entirely inappropriate and served only to bolster or vouch for the credibility of the two child witnesses. While courts have ruled there may be instances where such testimony is permitted, such statements are only admissible where such

hearsay statements disclosing the identity of a sexual abuser were made for medical diagnosis or treatment and only where the physician made clear to the victim that the inquiry into the identity of the abuser was important to diagnosis and treatment, and the victim manifested such an understanding.  Here, an examination of the record and of case law clearly demonstrates that this was not one of those situations.

For example, in United States v. Beaulieu, 194 F.3d 918 (8th Cir. 1999), a child sex abuse case in which the child testified, the Eighth Circuit held:

> [A] declarant's statements relating the identity of the individual allegedly responsible for [her] injuries or condition 'would seldom, if ever,' be reasonably pertinent to treatment or diagnosis." United States v. Renville, 779 F.2d 430, 436 (8th Cir.1985) (quoting United States v. Iron Shell, 633 F.2d 77, 84 (8th Cir.1980)). . . . Statements by a child abuse victim to a physician identifying the abuser are admissible only when the prosecution shows the victim's motive in making the statement was consistent with the purpose of promoting treatment- *"'where the physician makes clear to the victim that the inquiry into the identity of the abuser is important to diagnosis and treatment, and the victim manifests such an understanding.'* " Olesen v. Class, 164 F.3d 1096, 1098 (8th Cir.1999) (quoting Renville, 779 F.2d at 436).

Id. at 920-921 (emphasis added).[5]  Because there was no evidence in the record that the nurse or psychologist explained to the complainant child that the identity of her

---

[5]  While the court recognized that identifying an abuser who is in the victim's immediate household may be pertinent to treatment or diagnosis, this was not at issue here where the social worker was already apprised of the situation and the children in foster care by the time of the evaluation.

abuser was important to diagnosis or treatment, the <u>Beaulieu</u> court ruled that "the improper admission of [the child's] statements to her mother, friend, nurse, and psychologist warrant reversal because the rulings *affect the substantial rights* of Beaulieu and had more than a slight influence on the verdict." <u>Id.</u> at 921 (emphasis added). <u>See also</u> <u>United States v. Barrett</u>, 8 F.3d 1296 (8th Cir. 1993) (in order to admit hearsay statements under exception for medical diagnosis or treatment, in cases involving very young children who do not seek medical treatment by themselves but instead are brought to physician by someone else, there must be evidence that child understood physician's role in order to trigger motivation to provide truthful information).[6]

In Smith's case, nothing in the record indicates that Dr. Bidwell told the children that the identity of the abuser was important to diagnosis and treatment, and the children manifested such an understanding. As such, the hearsay testimony was erroneously admitted. Indeed, Dr. Bidwell, in his own testimony, admits that knowledge of the alleged perpetrator was not necessary for his medical examination.

---

[6] In Smith's direct appeal, the state attempted to argue that Dr. Bidwell needed to know the identity of the abuser in order to determine if the children were out of the abusive environment. However, such a "purpose" does not fall within the confines of Rule 803(4). <u>See</u> <u>People v. Ignacio</u>, 10 F.3d 608, 613 (9th Cir. 1993) (The Ninth Circuit held that the record did not show that the statement to a social worker as to who perpetrated the sexual assault was for medical treatment, as the testimony demonstrated that the statement was solicited to ensure the child's safety).

Specifically, Dr. Bidwell testified he would probably not go beyond asking whether sexual abuse had occurred because he would not need to know who did it. [Tr. 9/21/93 at p. 161].  In reality, given that the social worker had already obtained statements from the children as to what had occurred, there was no need for Dr. Bidwell to inquire himself but for the fact that he had been so instructed and trained by law enforcement officials and by the victim advocacy center.  Accordingly, based upon Dr. Bidwell's own admissions, his testimony clearly falls outside the medical examination exception articulated in 803(4) because the statements were not reasonably pertinent to diagnosis or treatment.  They were, however, pertinent to Dr. Bidwell's main objective, which was not medical diagnosis or treatment but rather to conduct an examination and to solicit hearsay information for the specific purpose of assisting law enforcement.

Smith submits, therefore, that the introduction of this evidence, which was not only error in itself but also served a second impermissible purpose of vouching for the children's testimony, was contrary to firmly established federal law and warrants reversal of her conviction.

### D.    The Admission Of Dr. Bidwell's Testimony Undermined The Fundamental Fairness Of The Verdict.

The error in this case is predicated upon the federal constitution.  The United States Supreme Court in Brecht v. Abrahamson, 507 U.S. 619 (1993), held

that when reviewing state trial errors, the federal courts must apply the harmless error standard set forth in <u>Kotteakos v. United States</u>, 750, 776 (1946). That is, the court must determine whether the error "had a substantial and injurious effort or influence in determining the jury's verdict. <u>Id</u>. at 776. Additionally, in <u>O'Neal v. McAninch</u>, 513 U.S. 432 (1995), the Supreme Court held that when a federal judge in a habeas proceeding is in grave doubt about whether a trial error of federal law had "substantial and injurious effect or influence in determining the jury's verdict," that error is not harmless. Accordingly, based upon the errors committed in this case, Smith submits that she must prevail and her conviction must be set aside and remanded for a new trial.

In the case at bar the inclusion of Dr. Bidwell's testimony obviously contributed substantially to the verdict. The relevant evidence against Smith was not overwhelming by any means and was largely if not exclusively based upon the credibility of the two children. The physical evidence was completely inconclusive as to whether the children had or had not been abused. The only substantive evidence that Smith had sexually abused the children was the children's own testimony, as improperly buttressed by the improper testimony in whole or in part of Dr. Bidwell. The prosecutor, in closing argument, admitted that this case boiled down to the credibility of the children. [Tr. 9/24/93 at p. 17]. In fact, and to highlight the considerable importance of Dr. Bidwell's testimony, the prosecutor himself

repeatedly used Dr. Bidwell's opinion of the consistency of the medical evidence and the children's statements as a central point to prove the children's credibility. [Tr. 9/24/93 at pp. 78, 86].

Without Dr. Bidwell testifying as to the credibility of the children, children who were 3 and 5 when the alleged sexual assaults were committed and 5 and 7 when they sat before the jury and testified after having been repeatedly coached by their foster mother, the prosecutor, the victim advocate, and by personnel at the Child Advocacy Center, the state's case was hardly overwhelming against Smith. Since the medical findings were inconclusive, the evidence at trial amounted to that of the children's word against Smith's. Thus, anything that damaged Smith's credibility in the eyes of the jury or which enhanced the credibility of the children would necessarily be significant and contribute unfairly and disproportionately to her conviction.

Courts have consistently refused to find harmless error where, as here, the case goes to the jury essentially on the victims' word against the defendant. See United States v. Alston, 551 F.2d 315, 320 (D.C. Cir. 1976) (Appellate court could not say, beyond a reasonable doubt, that the jury was not swayed by the error where the case principally went to the jury on victims' word against defendant's.). Furthermore, the error here cannot be harmless because the other evidence of guilt was hardly overwhelming. See, e.g. Mauricio v. Duckworth, 840 F.2d 454, 459 (7th

57

Cir. 1988) (Other evidence of guilt must be "overwhelming" before error may be found harmless); United States v. Simmons, 414 F.2d 800, 801 (9th Cir. 1969) ("In view of the weakness of the government's case," error not harmless); Hinman v. McCarthy, 676 F.2d 343, 352 (9th Cir. 1984) (case "not so strong" as to make error harmless). Indeed, to satisfy its burden of proving beyond a reasonable doubt that the constitutional error complained of did not contribute to the conviction, the state must do more than demonstrate by circumstantial evidence that defendant's guilt exists. Rather, the case against a defendant must be overwhelming to the point that "a more compelling case of guilt would be difficult to imagine." United States ex rel. Williams v. Lane, 645 F.Supp. 740, 744 (N.D. Ill. 1986), aff'd, 826 F.2d 654 (7th Cir. 1987) (citations omitted).

The case of Snowden v. Singletary, 135 F.3d 732 (11th Cir. 1998), is of particular significance due to its striking similarity to the facts presented here. The testimony at issue was in regards to an expert's interview with the only child victim (out of three) who testified at trial. The only physical evidence that the child may have been abused was that one of the children had been treated for an ailment which could be transmitted sexually, but also by other means. (This fact is even more than the physical evidence presented in Smith's case). The prosecutor stressed the significance of the expert's opinion about the credibility of the child victim, which was that 99.5% of children who report sexual abuse are telling the truth. The expert

also stated that "there was no evidence that the girl made up the entire story." The court held that this testimony improperly vouched for the credibility of the child victim *and* rendered the trial fundamentally unfair. As the appellate court stated; "[p]ermitting an expert to vouch forcefully for the children's credibility in this case was a 'crucial, critical, highly significant factor.'" Id. at 739.

Here, Dr. Bidwell not only was permitted to testify as to hearsay statements made by the children during his "exam," which could only serve the purpose of bolstering their trial testimony, he also was able to opine that their statements were "consistent" with his implied medical conclusion of "child abuse" even though there was no physical evidence adduced from his exam to support such a finding. As such, Dr. Bidwell indirectly but not so subtly vouched for the credibility of both child victims by stating that their hearsay statements were consistent with his medical examination . . . simply because they said so and, one must infer, he had no reason to disbelieve them. We know Dr. Bidwell "believed" the children's hearsay statements because, during his testimony, he stated that he had relied upon their medical history - their statements - in forming his conclusions. [Tr. 9/21/93 at p. 86]. Thus, since their statements were "consistent" with his medical findings (of which there was almost no direct physical evidence of any sexual assault having occurred whatsoever), the inescapable conclusion one is left with is that the children's hearsay statements were, in fact, true.

59

In conclusion, because the State had a weak case and because the error here greatly impacted upon Smith's credibility and enhanced the credibility of the children, the evidentiary error was prejudicial to the extreme. Thus, there can be little doubt that the state court committed error in this case and that this error was contrary to and/or an unreasonable application of clearly established federal law regarding the right to confrontation and due process of law. Douglas v. Alabama, 380 U.S. 415, 418 (1965) (primary interest secured by the right of confrontation is the right to cross-examination); see also California v. Green, 399 U.S. 149, 157 (1970); Davis v. Alaska, 415 U.S. 308, 315 (1974). Moreover, if this Court's review of the state court record leaves it in "grave doubt" about whether or not Smith was actually prejudiced by the state courts' error(s), Smith "must win." See O'Neal v. McAninch, 513 U.S. 432, 436 (1995). Therefore, this Court should vacate Smith's conviction and order that the State of Hawaii afford Smith a new trial.

II.   **IT WAS REVERSIBLE ERROR TO PERMIT INTO EVIDENCE THE ALLEGED "ACTING OUT" BEHAVIOR OF THE CHILD WITNESSES AND TO PERMIT THE PROSECUTOR TO ARGUE THAT SUCH ACTS CONSTITUTED EVIDENCE OF SEXUAL ABUSE WITHOUT EXPERT TESTIMONY CHARACTERIZING THE BEHAVIOR AS SUCH**

Prior to trial, the state made known its intent to call Ms. Beth Kurren as an expert witness in the field of child sexual abuse. Ms. Kurren was the children's therapist. Dr. Kurren was proffered for the purpose of testifying that several events

relating to the children witnessed by Mazepa, the foster parent, constituted "acting out" behavior which was, in fact, signs of sexual abuse.  [Tr. 9/15/93 at pp. 10, 12]. Mazepa claimed that soon after the children were placed in her care, she observed Jana touching Alisha's vagina while they were dressing, Jana rubbing herself on an armchair, putting a little toy figurine in her vagina and Jana fondling herself as well as Mazepa's daughter.  [Tr. 9/17/93 at pp. 69-71].  In addition, Mazepa noted that the children were having nightmares and problems with bed-wetting.  [Tr. 9/17/93 at pp. 76-78].  Ms. Kurren's expert testimony, as the prosecution opined, would serve to explain this "seemingly bizarre behavior" by the children and place the acts within the context of behavior consistent with children who had been sexually abused.  The defense objected to any such testimony and objected to Mazepa being permitted to testify to the alleged acts in the first instance.

When trial commenced, the state was uncertain, due to having failed to provide necessary pretrial discovery to the defense on this issue, whether it would actually go forward and present Ms. Kurren's testimony to the jury during the trial. Despite this uncertainty, the trial court permitted the state to make reference to the alleged "sexual acts" observed by Mazepa but prohibited the state from mentioning the expert testimony of Ms. Kurren.  [Tr. 9/15/93 at p.23].

During the state's opening statement, the state did, in fact, recount the children's behavior witnessed by Mazepa.  In so doing, the prosecutor characterized

such acts as "sexualized behavior." [Tr. 9/15/93 at p. 45]. Moreover, although not specifically mentioning any expert testimony which would serve to characterize the behavior as consistent with sexual abuse, the prosecutor informed the jury that the children were merely acting out their experiences, "as children act out the things that happen to them, the things that they experience." [Id.].

After opening statements were complete, the state decided that it did not wish to comply with its discovery obligations regarding Ms. Kurren's proposed testimony and served formal notice to the court that it was striking her name from the witness list. [Tr. 9/16/93 at pp. 64-65]. Nevertheless, despite the absence of any expert witness to explain the alleged "sexualized behavior" witnessed by Mazepa, over defense objection she was permitted to testify to the children's behavior. The prosecution failed to offer any expert testimony during the trial to explain, one way or another, the significance of the behavior witnessed by Mazepa.

While Smith submits that the admission of these facts without the subsequent admission of evidence which would make this testimony relevant to the issues in dispute at trial constitutes reversible error in and of itself, the prosecutor then magnified the error beyond repair by "testifying" during closing argument to evidence that was never put before the jury. Despite the complete lack of expert testimony to explain the children's behavior, in closing the prosecutor repeatedly characterized the behavior as constituting "sexualized behavior" consistent with the

children having been sexually abused.  [Tr. 9/24/93 at pp. 71-72, 77].  For example, the prosecutor made the following argument in closing:

> Nightmares, testified that Alisha had nightmares, consistent, ladies and gentlemen, with someone who has been sexually assaulted.  Disruptive sleep patterns.

[Tr. 9/24/93 at p. 71].  Later, in the same vein, the prosecutor made the following argument as to the bed-wetting:  ". . . Bed wetting . . . Use your reason and common sense, bed wetting, nightmares, sexualized behavior."  [Tr. 9/24/93 at p. 77].

Smith submits that absent expert testimony which would characterize and explain the children's behavior allegedly witnessed by Mazepa, it was reversible error for Mazepa to have been permitted to testify to the acts in the first place and certainly reversible error for the prosecution to have been able to argue to the jury, as his own expert, both in his opening statement and in closing argument, that the acts constituted "sexualized behavior" consistent with child abuse.  There is nothing in anyone's "common sense" that would lead a juror to the conclusion that "bed-wetting" and "nightmares" constituted evidence of "sexualized behavior."  Because the only direct evidence in this case of Smith's guilt was the testimony of the two children themselves, their credibility was paramount.  Any other evidence, therefore, which would support their credibility was critical.  It is for this reason that Mazepa's testimony as to the children's behavior, as unilaterally characterized by the

63

prosecution as direct evidence of child abuse, was of such import and magnitude that

it prejudiced Smith's right to receive a fair trial and requires reversal of her conviction.

In effect, by failing, if not intentionally not introducing the otherwise required expert testimony which would have rendered Mazepa's testimony relevant, the prosecutor denied Smith her right of confrontation. Smith could not cross-examine the prosecutor when he stood before the jury in closing argument and simply claimed, repeatedly, that the behavior testified to by Mazepa constituted evidence of "sexualized behavior." There was no evidence introduced that the behaviors testified to by Mazepa could only be a result of improper sexual contact, much less that the behaviors were, in fact, the result of improper sexual contact. Such testimony would have existed had the state actually presented an expert witness subject to cross. By failing to present such a witness, the state got to have its cake and eat it too - by simply testifying during closing argument that the behavior *had to be evidence of sexualized behavior* while denying Smith any opportunity, through cross, to test this conclusion.

Smith submits that had the state gone ahead and introduced expert testimony regarding child behavior which evidenced sexual abuse, such as that exhibited by the two children here, such testimony would have been perfectly admissible. United States v. Tsinnijinnie, 91 F.3d 1285, 1289 (9th Cir. 1996); United

States v. Binder, 769 F.2d 595, 602 (9th Cir. 1985).  In fact, Smith submits that such

expert testimony must have been introduced by the state in this case in order to permit

either the testimony of Mazepa as to these acts in the first instance and/or to permit

the arguments made to the jury by the prosecutor.  Without such expert testimony

tying the behavior to the charges, the evidence and arguments were irrelevant,

inadmissible, and extremely prejudicial.

   Fed. R. Evid. 702 permits a qualified expert to testify if the expert's

testimony relates to "specialized knowledge [that] will assist the trier of fact to

understand the evidence or to determine a fact in issue . . ."  Testimony is admissible

under Rule 702 if the subject matter at issue is beyond the common knowledge of the

average layman.  United States v. Peralta, 941 F.2d 1003, 1009 (9th Cir. 1991).  Lay

opinion, on the other hand, is governed by Rule 701 which provides for a witness's

testimony which is limited to those opinions or inferences which are rationally based

on the mere perception of the witness and helpful to a clear understanding of the

testimony.

   As previously noted, expert testimony in the field of child sexual abuse

which describes behavior which is consistent with having been sexually abused has

been widely accepted by the courts exactly because to understand such behavior

necessarily requires "specialized knowledge."  For example, in Tsinnijinnie, an expert

on child sex abuse was permitted to testify about the prior physical abuse of the child to explain why the child may have delayed in reporting the crime. The Ninth Circuit found that such testimony was not offered to bolster the credibility of the child victim but rather to explain certain aspects of the child's subsequent behavior. As such, the expert's testimony was necessary to explain the child's behavior because it required "specialized knowledge" and could not be simply gleamed or argued from a lay person's perspective.

Similarly, in another context, the Ninth Circuit permitted an expert to testify concerning the "Stockholm Syndrome" to explain and put into context the behavior of the victim "after she was kidnaped and held hostage" in light of the argument by the defense that her post-kidnaping actions were inconsistent with actually having been kidnaped. Peralta, 941 F.2d at 1010. In United States v. Figueroa-Lopez, 125 F.3d 1241 (9th Cir. 1997), the Ninth Circuit found that it was absolutely required for the government to qualify a drug agent as an expert in order for the agent to testify that certain conduct by the defendant was consistent with that of "an experienced drug trafficker." In discussing the difference between lay opinion testimony versus that of expert opinion testimony, the Ninth Circuit found that in the drug context, the agent must necessarily be qualified as an expert rather than be permitted to testify as a lay witness because the agent's "observations . . . are not

'common enough' to 'require such a limited amount of expertise." Id. at 1245. In

further discussing this issue, the Ninth Circuit made the following pertinent remarks:

> Surely a civilian bystander, or for that matter a raw DEA
> recruit would not be allowed to interpret for the jury
> Lopez's behavior in the parking lot on May 25, 1995 as
> that of an 'experienced' trafficker merely because that
> person was an eyewitness to the same.

Id. at 1246. In other words, without such expert testimony, the alleged acts take on

no significance whatsoever and must, in order to be admissible into evidence, be

interpreted by an expert to become relevant to the case. Certainly, as the Ninth

Circuit clearly stated in Figueroa-Lopez, a lay person would not even be permitted

by a trial court to venture such an opinion exactly because to make such an opinion

required "specialized knowledge" in order to put the behavior into context and thus

make it relevant to the case.

    The Hawaii Supreme Court has followed suit with such reasoning. In

Almeida v. Correa, 51 Haw. 594, 465 P.2d 564 (1970), the court found that it was

reversible error to admit evidence which permitted the jury to make inferences

regarding an issue in controversy in the absence of expert testimony where such

expert testimony was necessary to establish the relevance of the evidence. In Correa,

the Hawaii Supreme Court was reviewing a situation where, in a paternity suit, the

defendant's alleged child had simply been exhibited to the jury so that the jury could

draw its own conclusions as to whether the child exhibited facial features similar to that of the defendant.  The court found that based upon scientific evidence, no such correlation could be made and thus such lay evidence was improper absent expert testimony.  In so finding, the court stated that given the fact that no nexus could be proven, the child could not be exhibited to the jury at all.

> If only an expert can inform the jury of any resemblance between parent and child, it follows that the exhibition of a child to a jury would be useless in determining paternity. The only way an exhibition might possibly be justified would be as an aid to the expert in pointing out the reasons for his findings or opinions.

Id. at 602-603, 570.

In a child sex abuse case, it is clear from case law that a jury simply does not have within its common knowledge or experience the means to identify child behavior as having been caused by or evidencing sexual abuse without the assistance of an expert.  That is exactly why courts look with favor in such cases to expert testimony.  Here, however, despite the lack of any expert testimony at all to explain the significance of the children's behavior, the prosecution was not only permitted to introduce the behavior to the jury for whatever and in whatever manner the jury might interpret it, but the prosecution went further and became his own expert witness when he argued to the jury, both in opening statement and in closing argument, that the

actions of the children as described by Mazepa were indeed "sexualized behavior" consistent with sexual abuse. For example, how could the prosecutor characterize and link the children's "nightmares" and "bed-wetting" with evidence of sexual abuse without an expert having so testified? Certainly such events have a multitude of possible causes which are entirely unrelated to sexual abuse.[7] It is for exactly this reason that, absent expert testimony, behavioral evidence standing on its own may not only be inadmissible because it is not relevant, but highly inflammatory and prejudicial if left to the speculation, conjecture and passions of an uniformed jury. See Owen v. Burcham, 100 Idaho 441, 599 P.2d 1012, 1019 (Idaho 1979) (It is well-established that inferences may be drawn only from facts in evidence and an inference is unreasonable if it permits the jury to base its verdict on mere speculation or conjuncture).

Here, it cannot be seriously argued that the behavior of the children, as testified to by Mazepa, could be interpreted to be consistent with acting out due to

---

[7] See John E.B. Myers, J.D., et al., Expert Testimony in Child Sexual Abuse Litigation, Nebraska Law Review, Vol. 68, No. 1&2, 1, 62 ("many reactions have been observed in sexually abused children, including anxiety, regression, sleep disturbance, acting out, depression, nightmares, and enuresis, to name just a few. An examination for these behaviors quickly reveals that they are also associated with a wide range of psychological problems that nothing to do with sexual abuse."); See also Melvin Lewis (Ed.), Child and Adolescent Psychiatry: A Comprehensive Testbook, 1991, p. 202 (Young girls often learn to employ "indirect techniques, using legs, thighs, toes or rocking horses to self-stimulate.").

having been sexually abused without the testimony of an expert witness qualified to make such a determination.  Ms. Kurren, or even Dr. Bidwell, could have made such a connection but the state declined to call Ms. Kurren and failed to ask Dr. Bidwell for such testimony.[8]  Rather, in arguing to the jury that the behavior of the children constituted relevant evidence of child abuse, the prosecutor himself became the expert without having subjected himself to cross examination.  Not only was such an argument improper, it also served to deprive Smith of her constitutional right to cross examination as she was given no opportunity to cross examine the alleged expert opinion of the prosecutor.

Given the magnitude of the errors herein complained of and its clear prejudicial impact on the verdict, Smith submits that this Court find error and that such error was of such import as to require a reversal of her conviction in as contrary to or an unreasonable application of clearly established federal law regarding the right to confrontation and due process clauses.  Douglas v. Alabama, 380 U.S. 415, 418 (1965) (primary interest secured by the right of confrontation is the right to cross-examination); see also California v. Green, 399 U.S. 149, 157 (1970); Davis v. Alaska, 415 U.S. 308, 315 (1974).

---

[8] Dr. Bidwell was qualified by the court as an expert in sexual abuse.  But the record indicates that the children never discussed with him the behavior testified to by Mazepa nor was he asked to render his opinion as to the significance of these acts.

III.   THE SENTENCING COURT IMPROPERLY IMPOSED CONSECUTIVE LIFE SENTENCES WITHOUT FOLLOWING HAWAII STATE PROCEDURES AND STATUTES DETAILING WHEN AND HOW SUCH A SENTENCE CAN BE IMPOSED, IN VIOLATION OF SMITH'S FEDERAL DUE PROCESS RIGHTS

The state court record shows that prior to sentencing, the state filed a motion seeking the sentencing court to impose an extended term sentence. The prosecution, however, did not file any motion seeking the court to impose a consecutive sentence. These two issues are not the same under Hawaii law and rely on distinct statutes. Hawaii's extended term statute can be found at H.R.S. § 706-662 while Hawaii's consecutive sentence statute is located at H.R.S. § 706-668.5. Hawaii's consecutive sentence statute, in turn, requires a sentencing court to conduct a factual analysis under H.R.S. § 706-606 before imposing a consecutive sentence. The record here shows that the issue of a consecutive sentence arose for the first time in passing when, during the defense attorney's argument as to why the sentencing court should not impose an extended term of imprisonment, the attorney stated in passing that, were the court to impose an extended term, the court should not make such terms consecutive. [Tr. 11/29/93 at pp. 23-34]. The record shows that the court itself never even discussed the legality or correctness of consecutive sentences until the court simply pronounced the actual sentence. After upholding the state's request for an extended term under H.R.S. § 706-662, and stating reasons why *that* finding

was proper, the sentencing court imposed a term of 20 years to life as to each of the counts 1, 2, 3, 13 and 14.   [Tr. 11/29/93 at pp. 28-29].   Then, without further comment or citation to any statutory authority, the sentencing court simply stated that "[t]hose terms the Court deems will be running consecutively."   [Tr. 11/29/93 at p. 29].  Before leaving the bench, the sentencing court then made a brief statement as to why the court felt the life sentences were appropriate but said nothing as to why consecutive sentences were necessary.   [Tr. 11/29/93 at pp. 29-30].

Smith submits that the manner that the sentencing court imposed consecutive life sentences in this case violates her federal due process rights as the sentencing court utterly failed to comply with state procedural law which afforded her due process protections before the state court could impose such a sentence.   It is clearly established federal law that once a state has imposed upon itself procedural rules and regulations relating to how and when it will deprive one of its citizens of their liberty, that citizen has a due process and liberty interest and the state must follow those rules and regulations.   See Evitts v. Lucey, 469 U.S. 387, 400-401 (1985) (When state opts to act in a field where its action has significant discretionary elements, it must nonetheless act in accord with dictates of the Constitution and, in particular, in accord with the due process clause.); Morrissey v. Brewer, 408 U.S. 471, 481-484 (1972) (State has great discretion in setting policies governing parole

73

decisions, but it must nonetheless make those decisions in accord with the due process clause.).

H.R.S. § 706-668.5(1) states, in pertinent part, that "[i]f multiple terms of imprisonment are imposed on a defendant at the same time, . . . the terms may run concurrently or consecutively."  Subsection (2) then *requires* the sentencing court to "consider the factors set forth in section 706-606."  H.R.S. § 706-606 provides a list of factors the sentencing court must consider before deciding to impose a consecutive sentence.

> ### § 706-606.  Factors to be considered in imposing a sentence.
>
> The court, in determining the particular sentence to be imposed, shall consider:
>
> (1)    The nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2)    The need for the sentence imposed:
>
>       (a)    To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
>       (b)    To afford adequate deterrence to criminal conduct;
>
>       (c)    To protect the public from further crimes of the defendant; and

74

(d)     To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3)     The kinds of sentences available; and

(4)     The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

H.R.S. § 706-606.

Here, the record is devoid of any consideration of these factors by the sentencing court as to why the court thought it was necessary to impose consecutive sentences pursuant to *any* Hawaii statute, must less the factors expressly laid out in § 706-606. Accordingly, the record demonstrates that the sentencing court utterly failed to afford Smith with her due process rights under both the federal constitution as well as under Hawaii law.

At one point during Smith's sentencing hearing, in considering and granting *the state's motion for extended term*, the court made the following statement:

> The Court, accordingly, having reviewed the presentence report, the arguments of counsel and the specific sentencing alternatives posed to the Court and advocated by both counsel for the prosecution and defense counsel, will conclude that, first of all, *it is proper for this Court to grant the Motion for Extended Term and it is hereby granted. This is based on the factors considered by the Court to include* the defendant's apparent poor prognosis for positive behavioral changes; secondly, the overall need

75

to insure public safety; thirdly, her utter lack of victim empathy which further will be a danger to the community inasmuch as she has failed to appreciate the imminent or serious threat she poses to members of the community, especially children; her extensive history and admission of substance abuse that causes her to be more prone to acting impulsively.  Further, the trauma and the emotional and irreparable injury to the very youthful victims who were her children.  Further, her flagrant abuse of her trust as mother to these children.  And lastly, her inability to have served or met her duty as the lawful parent of these children.

[Tr. 11/29/93 at p. 28 (emphasis added)].  It is clear not only from the context in which the sentencing court made these remarks and the fact that the court specifically stated, in making these remarks, that the reasons cited where given to justify the court's imposition of extended terms, that the court was not undertaking an analysis under § 706-606 for purposes of imposing consecutive sentences.  The comments by the sentencing court were, in fact, required to be found before granting the state's request for an extended term of incarceration as the Hawaii statutes mandate that a sentencing court state its reasons for imposing such a sentence.  Thus, in Smith's case, Hawaii law required two distinct processes to be undertaken by the sentencing court; the first to state, on the record its reasons why it was imposing an extended term and the second to conduct an analysis of the § 706-606 factors to determine whether concurrent or consecutive sentences should be imposed.  Here, the record

shows beyond any doubt by the very words used by the court that the sentencing court did not undertake this two step process; "*it is proper for this Court to grant the Motion for Extended Term and it is hereby granted. This is based on the factors considered by the Court to include . . . .*" Thereafter, the court listed its reasons for imposing the extended term sentence. Not once did the court mention § 706-606 or that it was considering any of the factors listed in that sentencing statute. The record also clearly shows that the court did not even indicate to the parties that it was going to impose consecutive sentences and provide counsel with an opportunity to argue the § 706-606 factors. Rather, the record simply and clearly demonstrates that the sentencing court simply pronounced that the five life sentences were to run consecutively.

Nevertheless, even if the sentencing court's statement could be considered some sort of analysis and consideration of the factors listed in § 706-606, the court's analysis was fatally incomplete. First, the court's sweeping conclusion that Smith posed a "danger to the community," without the benefit of any expert testimony or psychological evaluation, was procedurally improper.[9] Even under the

---

[9] Even the sentencing court's use of the phrase "danger to the community" indicates that it did not conduct a proper analysis under § 706-606 as that phrase is not employed in § 706-606 but rather in § 706-662(3)'s extended term language for violent offenders when discussing whether a defendant is a "danger to others."

provisions of § H.R.S. 706-662, the extended term statute, a sentencing court is required to have conducted a psychiatric or psychological evaluation of the defendant before a person can be sentenced as "a dangerous person whose imprisonment for an extended term is necessary for the protection of the public." See State v. Kamae, 56 Haw. 628 (1976) (holding extended sentencing procedure should be construed in harmony with due process requirements). It is of interest to note that the state did not ask that Smith receive an extended term of incarceration under § 706-662(3), which requires such an examination by the court before a defendant is found to be a "dangerous person." Yet, without any evidence other than the conviction itself, the sentencing court found that Smith constituted "a danger to the community" such that consecutive life sentences were required. And mind you, not just one consecutive life term, but five.

Had the court actually conducted a proper analysis of the 706-606 factors, the sentencing court would have found that Smith, at the age of 21 when convicted and 19 when the alleged offenses occurred, had no serious prior criminal record; that she herself was victimized as a child, having been abused by her mother and having received no proper social upbringing. That Smith became pregnant at the age of thirteen and the mother of four children by the age of eighteen. That Smith had never actually raised either of the victims until the family court took them away from

78

Smith's mother and returned them to Smith, knowing full well of her background and living situation. Or the fact that there had been discussion between the prosecutor and Smith for a sentence of probation had she agreed to plead and testify against her boyfriend by the very prosecutor who was now seeking enhanced sentences but not necessarily consecutive life sentences. Apparently, having elected to go to trial changed the circumstances in the eyes of the court from possible probation to five consecutive life sentences.

Moreover, the sentencing court was required to consider the effectiveness of providing Smith with correctional treatment, i.e., educational, vocational, medical care, and drug care in determining the length of the sentence. H.R.S. § 706-606(2)(d). At best, the sentencing court pointed to Smith's alleged drug history as a reason for imposing five consecutive life sentences. However, it is commonly accepted that substance abusers, under the right stimulus, can be rehabilitated. Smith, who had never undergone in-patient drug treatment, was never afforded the opportunity to demonstrate whether she was, or was not, amenable to such treatment that would effectively change her life and make her much less likely to commit any violent crime again, as was reflective of her past criminal record, or lack thereof, in the first instance. Thus, if the sentencing court's assumption that Smith's substance abuse contributed to her criminal behavior was correct, then the

prognosis for Smith to avoid such criminal behavior in the future was very favorable were she to actually be afforded proper drug counseling and treatment. The record reflects no discussion, no analysis by the sentencing court of any of these factors or alternatives.

Finally, what ultimately demonstrates the sentencing court's complete failure to properly consider the § 706-606 factors and its violation of Smith's federal due process rights was the court's imposition of five consecutive life sentences. Not one, not two, not even three, but five consecutive life sentences. The court did not discuss why a sentence of 20 years was not enough, much less why even one consecutive sentences was required, much less two, or five for that matter. Smith submits that the sentence itself per se demonstrates that this Court should vacate the consecutive sentences imposed by the Hawaii court and remand for a new sentencing hearing where all of the § 706-606 factors can be properly considered and argument had by counsel.

While none of these factors explains or excuse why Smith did what she was convicted of, they do go directly to the sentencing factors expressed in § 706-606 which the sentencing court was mandated to analysis when imposing consecutive or concurrent sentences.

Smith submits that none of these factors were considered by the court because the court failed to conduct a full and proper inquiry under § 706-606. The record, in fact, indicates no real consideration by the sentencing court as to alternative sentences and the factors listed in § 706-606, other than the court's simple talismatic recitation of the fact that it was aware of the alternative sentences it could impose. Just as this Court is required under 18 U.S.C. § 3553(a) to state its reasons on the record, so does Hawaii's § 706-606 statute. As this Court is aware, the Ninth Circuit has made it clear that it is not simply enough for a sentencing court to announce that it was aware of and had considered the factors contained in § 3553(a). Rather, due process requires that the record contain a detailed recitation of each factor and the court's consideration of each. Here, the sentencing court simply stated that it was aware of its "specific sentencing alternatives" in the context of granting the state's extended term motion without mention of or any analysis of any of the sentencing factors contained in § 706-606. As such, the sentencing procedure employed in Smith's case was procedurally defective under both Hawaii law and federal law and was contrary to and an unreasonable application of clearly established federal law.[10]

---

[10] Smith submits that she need not meet, in this argument or the subsequent Apprendi based challenge, Brecht's "actual prejudice" standard as Brecht does not apply to sentencing errors. The Brecht standard applies only to "trial error," not sentencing errors. As the Ninth Circuit recently noted, an error that "occur[s] at sentencing," as opposed to "during trial[,]...is not a trial-type error that would affect

 See Evitts v. Lucey, 469 U.S. 387, 400-401 (1985) (When state opts to act in a field where its actions has significant discretionary elements, it must nonetheless act in accord with dictates of the Constitution and, in particular, in accord with the due process clause.); Morrissey v. Brewer, 408 U.S. 471, 481-484 (1972) (State has great discretion in setting policies governing parole decisions, but it must nonetheless make those decisions in accord with the due process clause.); see also Halbert v. Michigan, 125 S. Ct. 2582, 2586-87 (2005) (while state has no obligation to provide appellate counsel, once it provides such a right it must comport with due process concerns).

**IV.  IT WAS IMPROPER FOR THE SENTENCING COURT TO IMPOSE AN EXTENDED TERM OF IMPRISONMENT PURSUANT TO H.R.S. § 706-662(4), BECAUSE THE SENTENCING JUDGE HAD TO MAKE A FACTUAL FINDING THAT AN EXTENDED TERM OF IMPRISONMENT WAS "NECESSARY FOR PROTECTION OF THE PUBLIC," A FACT THAT WAS NOT PRESENTED TO NOR FOUND BY THE JURY**

The five offenses for which Smith received consecutive extended-term sentences were all class-A felony offenses.  See Haw. Rev. Stat. §§ 707-730(1)(b). A class-A felony is ordinarily punishable by a maximum indeterminate 20-year term

---

a jury's verdict." Williams v. Roe, 421 F.3d 883, 887 (9th Cir. 2005).  Nevertheless, even if Smith must demonstrate "actual prejudice," such a standard is easily met here considering Smith was looking at a sentence of 20 years incarceration as to each of the sexual abuse counts as opposed to five consecutive life sentences.  Instead, the sentencing court imposed the absolute maximum sentence she could have received on the five sexual abuse counts.

of imprisonment without the possibility of parole. See Haw. Rev. Stat. § 706-659. State law allows a state circuit court to "extend" this maximum indeterminate term to life imprisonment if, "after the conviction of the defendant," Haw. Rev. Stat. § 706-664, the State establishes, at "'a separate criminal proceeding apart from the trial of the underlying substantive offense,'" State v. Kaua, 72 P.3d 473, 481 (Haw. 2003) (hereafter referred to as Kaua I) (quoting State v. Kamae, 548 P.2d 632, 637 (Haw. 1976)), that at least one of several enumerated criteria applies. See Haw. Rev. Stat. §§ 706-661 and 706-662.

        Extended-term sentencing is a two-step process in Hawaii. See Kaua v. Frank, 436 F.3d 1057, 1059-1062 (9th Cir. 2006) ( hereafter referred to as Kaua III). The Hawaii Supreme Court, that is, has consistently construed Hawaii's extended-term sentencing scheme as *mandating* that the state circuit court make two *separate* findings before it may impose an extended-term sentence. See State v. Rivera, 102 P.3d 1044, 1058 (Haw. 2004) (reaffirming that the Hawaii Supreme Court's precedent "set[s] out a two-step process in which a sentencing court must engage in order to impose an extended term sentence"); Kaua I, 72 P.3d at 481-483; State v. Tafoya, 982 P.2d 890, 899-900 (Haw. 1999); State v. Schroeder, 880 P.2d 192, 202-203 (Haw. 1994); State v. Huelsman, 588 P.2d 394, 398-399 (Haw. 1978); see also Kaua III, 436 F.3d at 1060-1061.

First, the state circuit court must find that the defendant is a member of at least one of the classes of defendants defined in Haw. Rev. Stat. § 706-662 -- for example, that the defendant is a "multiple offender" because he is being sentenced on multiple felony offenses or because, if run consecutively, his ordinary terms would exceed an extended term.  See Rivera, 102 P.3d at 1058; Kaua I, 72 P.3d at 481.

Second, the state circuit court must find that an extended-term sentence is necessary for "the protection of the public."  See Rivera, 102 P.3d at 1058 ("the second step requires the sentencing court to determine whether the defendant's commitment for an extended term is necessary for protection of the public" (quotation marks and citation omitted)); id. at 1060 ("[a]dmittedly, a sentencing court's imposition of an extended term sentence requires the determination that it is 'necessary for the protection of the public'" (quoting Haw. Rev. Stat. § 706-662)); Kaua I, 72 P.3d at  481; State v. Okumura, 894 P.2d 80, 109-110 (Haw. 1995); Huelsman, 588 P.2d at 398; see also Kaua III, 436 F.3d at 1060-1061.  This second step, moreover, as the Ninth Circuit has already held in Kaua III, requires that the state circuit court expressly make extra-verdict factual findings.  See Kaua III, 436 F.3d at 1060-1061 (noting that the public-protection finding "requires the court to find facts outside of those found by the jury that expose the defendant to an increased sentence" (citing Kaua I, 72 P.3d at 484-485)).

Absent either the step-one classification finding *or* the step-two public-protection finding, an extended-term sentence cannot be imposed.  As the Hawaii Supreme Court itself has noted and as the Ninth Circuit has emphasized:

> After the first step of th[e] process has been completed and the defendant has been found by the court to be within the class of offenders specified by the particular subsection [invoked by the State], the court *must determine* … that the defendant's commitment for an extended term is necessary for the protection of the public.

Kaua III, 436 F.3d at 1061 n. 24 (quoting Okumura, 894 P.2d at 110) (ellipsis in Okumura; internal quotation marks omitted and emphasis added in Kaua III).  Indeed, a state circuit court's failure to make a public-protection finding -- or express supporting factual findings on the record -- requires that an extended-term sentence be vacated, if not reversed.  See Okumura, 894 P.2d at 109-111.

In the case-at-bar, just as in Kaua, it was the sentencing court who determined that Smith's sentence should be enhanced under H.R.S. § 706-669.5, finding, as a fact, that such a sentence was ''necessary for the protection of the public.''

In Smith's second Rule 40 petition filed on August 6, 2002, Smith challenged the constitutionality of Hawaii's extended term sentencing scheme, alleging that it violated her federal due process rights when a judge, not a jury, made

85

the second factual determination under Hawaii's extended term law that such an increased sentence was "necessary for the protection of the public."  On August 6, 2002, the state responded, arguing, *on the merits*, that Hawaii's sentencing scheme for the imposition of extended terms was different than that found unconstitutional under Apprendi and, therefore, was not invalid under the United States Supreme Court's analysis.  The state did not raise an issue claiming that Apprendi or its reasoning was not retroactive to Smith's claim.  Rather, the state made a tactical decision and sought to distinguish Hawaii's extended term sentencing scheme from that found unconstitutional in Apprendi.

On March 20, 2003, the Circuit Court of the First Circuit for the State of Hawaii issued its Findings of Fact and Conclusions of Law.  The court denied Smith's petition *on the merits*.  The court, specifically citing to Apprendi, held that Apprendi's reasoning did not apply to Hawaii's extended term sentencing scheme and upheld the sentence.  It appeared, therefore, that the state had made a correct tactical decision to take Smith's claim on the merits rather than to try and have it procedurally dismissed by a claim that Apprendi did not apply retroactively.

Smith timely appealed the Circuit Court's decision on March 25, 2003.  Citing to Apprendi, Smith alleged that the Hawaii extended term sentencing scheme was unconstitutional and that the Hawaii Supreme Court prior rulings that Apprendi

86

did not apply to Hawaii's extended term sentencing scheme were an incorrect interpretation and application of Apprendi.  On October 10, 2003, the state filed its Answering Brief.  For a second time, the state made a tactical decision to address Smith's Apprendi claim on the merits.  Again, the state argued that Hawaii's extended term sentencing scheme survived an Apprendi challenge.  Once again, the state did not raise or argue that Apprendi did not apply retroactively to Smith's challenge.

On February 2, 2004, the Hawaii Supreme Court issued its second Summary Disposition Order in this case, denying without a written opinion, Smith's Rule 40 appeal.

Here, however, unlike Smith's direct appeal, there is a written decision which this Court can look to determine the State court's reasoning - the Circuit Court's memorandum.

Without going into a recitation of the long and tortured history of Hawaii's case law on this issue, suffice it to say that the Ninth Circuit, in Kaua III, fully addressed Hawaii's case law and specifically, and in no uncertain terms, repudiated its logic and found the Hawaii extended term sentencing scheme to violate the dictates of Apprendi.  As Kaua III is binding upon this Court, this Court must grant Smith's claim that the imposition of the life sentences under Hawaii's extended term statute in this instance violated her federal constitutional rights mandating that

87

she be resentenced.  This Court has already, in two memorandum orders, held that the Ninth Circuit's decision in <u>Kaua III</u> overrules the Hawaii Supreme Court's case law which has, to this very day, sought to distinguish <u>Apprendi</u> and uphold the Hawaii extended term sentencing scheme as reflected in § 706-662.  <u>See</u> <u>Jess v. Peyton</u>, CV No. 04-00601 JMS/BMK (D. Hawaii); <u>Kamana'o v. Peyton</u>, CV No. 05-00681 SOM/KSC (D. Hawaii).

        Moreover, this Court should not find because <u>Apprendi</u> may not apply retroactively to Smith's habeas petition, she is not entitled to relief.  The appellate record demonstrates beyond any doubt that the state made a tactical decision to take Smith's <u>Apprendi</u> claim on the merits, rather than attempt to defeat it by simply claiming that <u>Apprendi</u> was not retroactive.  The state made this decision not once, but twice, over more than a years period of time.  The law of retroactivity is not new. It is a well-established federal principle of law commonly employed by states throughout the nation to defeat habeas petitions filed by state prisoners based upon new federal law.  Here, the state simply chose not to take this approach but to address the merits of Smith's <u>Apprendi</u> claim.  Moreover, the state court chose to do the same. The Circuit Court addressed Smith's claim on the merits and when Smith appeal, the Hawaii Supreme Court, instead of offering up its own reason as to why Smith's petition should be denied, summarily denied her appeal and affirmed the Circuit

Court's ruling.  Thus, this Court should deem that the state has waived any such claim and/or this Court decline to entertain such a theory on its own accord.

In <u>Van Lynn</u>, the Ninth Circuit refused an invitation by the state to ignore the actual basis of a state court's decision in favor of entertaining some other reason for denying a habeas petitioner relief.  <u>See Van Lynn v. Farmon</u>, 347 F.3d 735, 737, 741 (9th Cir. 2003).  In no uncertain terms, the Ninth Circuit held that a federal court may not "avoid granting [a] writ pursuant to 28 USC § 2254(d)(1) by positing an alternative reason for the state court's denial of [a petitioner's federal claim] that is entirely distinct from the reason given by the state court, even if [that] different reason might have justified the state court's action."  <u>Id.</u> at 737.  The Ninth Circuit therefore

> decline[d] Warden Farmon's invitation to (1) disregard the fact that the state court applied a legal principle regarding competency to waive counsel that contradicts the governing law set forth [in United States Supreme Court precedent]; (2) invent an alternative rationale for the state court's decision which requires application of an entirely different and unrelated legal principle (one regarding timeliness); and then (3) review the trial court's decision as if it had been made pursuant to that alternative rationale. Nothing in the statute suggests that such a tack is permissible, and we conclude that it is not.
>
>          ....

89

> Thus, … where a state court holds, as it did here, that a defendant is not competent to represent herself based on the application of a legal principle that contradicts the governing legal principle on competency set forth in clearly established Supreme Court case law, *a federal court may not avoid granting habeas relief by positing an alternative reason for the state court's decision that might have enabled the state court to reach the same result, where the record reveals that the state court did not base its decision on that alternative reason.*

Id. at 741 (emphasis added).

Moreover,  in Kaua III, the Ninth Circuit expressly held as much: "Because our review is limited to the 'reason[s] given by the [Hawaii] court,'" we cannot adopt the State's 'alternative reason[s]' for affirming the Hawaii Supreme Court's decision" in Kaua I.  Kaua III, 436 F.3d at 1061 (some brackets added and some in original).

Accordingly, this Court must, due to no fault of this Court but rather based upon the *repeated*, *knowing*, and *tactical* decisions made by the state, as well as the rulings of the state courts in addressing Smith's Rule 40 petition on the merits, reach the merits of Smith's Apprendi claim here.  In so doing, this Court must, as directed by the Ninth Circuit's decision in Kaua III, find that Hawaii's extended term sentencing scheme is unconstitutional under Apprendi and grant Smith a new sentencing hearing without the application of the extended term law until such time

90

as Hawaii changes it's sentencing law to comport with the due process requirements of <u>Apprendi</u>.

## **CONCLUSION**

Based on the foregoing, Smith respectfully requests that this Court grant the Petition for Writ of Habeas Corpus on all grounds or any ground individually and either afford Smith with a new trial and/or vacate her sentence and permit her to be sentenced anew.

DATED:  Honolulu, Hawaii, August 9, 2006.


/s/ Alexander Silvert
ALEXANDER SILVERT
Attorney for Petitioner
REGINA SMITH

91

## CERTIFICATE OF SERVICE

I, ALEXANDER SILVERT, hereby certify that on the date and by the method of service noted below, a true and correct copy of the foregoing was served on the following at their last known addresses on August 9, 2006:

Served by First Class Mail:

MARK J. BENNETT, Attorney General
Department of the Attorney General
425 Queen Street
Honolulu, Hawaii  96813

DANIEL H. SHIMIZU
Deputy Prosecuting Attorney
Department of the Prosecuting Attorney
1060 Richards Street
Honolulu, Hawaii  96813

Attorneys for Respondents


 /s/ Alexander Silvert
ALEXANDER SILVERT
Attorney for Petitioner
REGINA SMITH