PETER B. CARLISLE   2209
Prosecuting Attorney
DANIEL H. SHIMIZU   4300
Deputy Prosecuting Attorney
City and County of Honolulu
1060 Richards Street
Honolulu, Hawaii  96813
Telephone:  527-6501

Attorneys for State of Hawaii

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| REGINA SMITH, | )  CIVIL NO.  04-00091 HG-KSC |
| | ) |
| Petitioner, | )  SECOND MEMORANDUM OF LAW |
| | )  IN OPPOSITION TO PETITION FOR |
| vs. | )  WRIT OF HABEAS CORPUS; |
| | )  EXHIBIT "OO"; CERTIFICATE OF |
| JOHN F. PEYTON, JR., Director, | )  SERVICE |
| Department of Public Safety, State of | ) |
| Hawaii and MILLICENT NEWTON | ) |
| EMBRY, Warden, Mabel Bassett | ) |
| Correctional Center, | ) |
| | ) |
| Respondents. | ) |
| | ) |

**SECOND MEMORANDUM OF LAW IN OPPOSITION
TO THE PETITION FOR WRIT OF HABEAS CORPUS**

**EXHIBIT "OO"**

and

**CERTIFICATE OF SERVICE**

DHS:rir

## <u>TABLE OF CONTENTS</u>

*Page*

I.   STATEMENT OF THE CASE ........................................................1

  A.   Indictment...............................................................1

  B.   Motions in Limine .................................................2

  C.   Trial Proceedings...................................................3

  D.   Sentencing ...........................................................36

  E.   Direct appeal.........................................................39

  F.   First Rule 40 proceedings....................................40

  G.   Second Rule 40 proceeding.................................43

  H.   Instant Habeas proceeding ...............................44

II.  STANDARD OF REVIEW.......................................................48

III. ARGUMENT

  A.   THE TRIAL COURT'S RULING ADMITTING BIDWELL'S
       TESTIMONY RECOUNTING THE COMPLAINANTS'
       MEDICAL HISTORY WAS NOT CONTRARY TO, OR
       INVOLVED AN UNREASONABLE APPLICATION OF
       CLEARLY ESTABLISHED FEDERAL LAW, AS
       DETERMINED BY THE SUPREME COURT OF THE
       UNITED STATES .............................................................51

       1.   Introduction.............................................................51

i

2.      The trial court's ruling admitting Bidwell's
        testimony recounting the complainants'
        medical history did not violate Petitioner's
        confrontation rights ................................................52

3.      The trial court's rulings admitting Bidwell's
        testimony recounting the girls' medical
        histories and that the histories were consistent
        with his examination findings did not render
        Petitioner's trial fundamentally unfair ......................56

B.      THE TRIAL COURT'S RULINGS ADMITTING MAZEPA'S
        TESTIMONY AS TO HER OBSERVATIONS OF THE
        GIRLS' "ACTING OUT BEHAVIOR" AND PERMITTING
        THE PROSECUTOR TO REFER TO THE OBSERVED
        BEHAVIOR IN REBUTTAL ARGUMENT WERE NOT
        CONTRARY TO, OR INVOLVE AN UNREASONABLE
        APPLICATION OF CLEARLY ESTABLISHED FEDERAL
        LAW, AS DETERMINED BY THE SUPREME COURT OF
        THE UNITED STATES ..................................................71

1.      Introduction ...........................................................71

2.      The trial court's ruling admitting Mazepa's
        testimony as to her observations of the girls'
        "acting out behavior" did not render
        Petitioner's trial fundamentally unfair ......................71

3.      The trial court's ruling permitting the State to refer
        to the girls' "acting out behavior" in rebuttal
        argument did not so infect the trial with unfairness
        as to make the resulting conviction a denial of due
        process ...................................................................86

C.      THE TRIAL COURT DID NOT VIOLATE PETITIONER'S
        RIGHT TO DUE PROCESS WHEN IT SENTENCED HER
        TO CONSECUTIVE TERMS OF IMPRISONMENT ......................91

D.     THE HAWAII SUPREME COURT'S DECISION
        AFFIRMING THE DENIAL OF PETITIONER'S
        2ND RULE 40 PETITION WAS NOT CONTRARY
        TO, OR INVOLVE AN UNREASONABLE APPLICATION
        OF, CLEARLY ESTABLISHED FEDERAL LAW, AS
        DETERMINED BY THE SUPREME COURT OF THE
        UNITED STATES ..........................................................................100

IV.     CONCLUSION...........................................................................111

EXHIBIT "OO"

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

*Page*

*CASES*

**Adaway v. State**
    902 So.2d 746 (Fla. 2005) ...............................................................84

**Almeida v. Correa**
    51 Haw. 594, 465 P.2d 564 (1970)........................................... 84-85

**Apprendi v. New Jersey**
    530 U.S. 466 (2000)............................................ 43-44, 100-101, 103-104, 110

**Bradshaw v. Richey**
    __ U.S. __, 126 S.Ct. 602 (2005) ........................................57, 109

**California v. Green**
    399 U.S. 149 (1970)...................................................... 54-55

**Ceja v. Steward**
    97 F.3d 1246 (9th Cir. 1996) .......................................................89

**Coy v. Iowa**
    487 U.S. 1012 (1988).............................................................53

**Crawford v. Washington**
    541 U.S. 36 (2004).............................................................55

**Darden v. Wainwright**
    477 U.S. 168 (1986)........................................................89, 91

**Day v. Mcdonough**
    __ U.S. __, 126 S.Ct. 1675, 164 L.Ed.2d 376 (2006) ...............................103

**Dowling v. United States**
    493 U.S. 342 (1990)........................................................59, 76

**Downs v. Hoyt**
    232 F.3d 1031 (9th Cir. 2000) ..................................................102

**Early v. Packer**
    537 U.S. 3 (2002)...............................................................50

**Estelle v. McGuire**
    502 U.S. 62 (1991)........................................................58, 69

**Gray v. Netherland**
    518 U.S. 152 (1996)...........................................................101

**Greer v. Miller**
    483 U.S. 756 (1987)............................................................89

**Griffith v. Kentucky**
    479 U.S. 314 (1987)..........................................................101

**Idaho v. Wright**
   497 U.S. 805 (1990)..................................................................53, 62
**James v. Borg**
   24 F.3d 20 (9th Cir. 1994) .................................................................90
**Jammal v. Van De Kamp**
   926 F.2d 918 (9th Cir. 1991) ..........................................69, 76, 85
**Jeffers v. Lewis**
   38 F.3d 411 (9th Cir. 1994) ...............................................................92
**Johnson v. United States**
   520 U.S. 461 (1997)..............................................................92, 100
**Kaua v. Frank**
   350 F.Supp.2d 848 (D. Hawaii 2004)........................................106
**Kaua v. Frank**
   436 F.3d 1057 (9th Cir. 2006) .................................... 100, 106-108
**Kealohapauole v. Shimoda**
   800 F.2d 1463 (9th Cir.) .................................................................85
**Langford v. Day**
   110 F.3d 1380 (9th Cir. 1996), *cert. denied* 522 U.S. 881 (1997) ...............92
**Lindh v. Murphy**
   521 U.S. 320 (1997)..........................................................................48
**Lockyer v. Andrade**
   538 U.S. 63 (2003).............................................................................50
**Marshall v. Lonberger**
   459 U.S. 422 (1983)..........................................................................69
**Middleton v. Cupp**
   768 F.2d 1083 (9th Cir. 1985) .......................................................58
**Morgan v. Foretich**
   846 F.2d 941 (4th Cir. 1988) .........................................................63
**Mullaney v. Wilbur**
   421 U.S. 684 (1975).......................................................... 50, 109-110
**Ohio v. Roberts**
   448 U.S. 56 (1980)............................................................................62
**Ortiz-Sandoval v. Gomez**
   81 F.3d 891 (9th Cir. 1996) ......................................................77, 91
**Padilla v. Terhune**
   309 F.3d 614 (9th Cir. 2002) .......................................................102
**People v. Peterson**
   537 N.W.2d 857 (Mich. 1995) .......................................................81
**People of Territory of Guam v. Ignacio**
   10 F.3d 608 (9th Cir. 1993) ...........................................................63

v

**Poland v. Stewart**
    169 F.3d 573 (9th Cir. 1998) ........................................................98
**Punches v. State**
    944 P.2d 1131 (Wyo. 1997)...........................................................67
**Reynolds v. Cambra**
    290 F.3d 1029 (9th Cir. 2002) ....................................................102
**State v. Batangan**
    71 Haw. 552, 799 P.2d 48, (1990)....................................24, 68, 82
**State v. Carvalho**
    101 Hawaii 97, 63 P.3d 405 (App. 2002)...................................103
**State v. Gomes**
    107 Hawaii 308, 113 P.3d 184 (Sup. 2005) ...............................102
**State v. Huelsman**
    60 Haw. 71, 588 P.2d 394 (1979)...............................................104
**State v. Kaua**
    102 Hawaii 1, 72 P.3d 473 (Sup. 2003) .................... 104-106, 110
**State v. Morris**
    72 Haw. 527, 825 P.2d 1051 (1992).......................................23, 68
**State v. Rivera**
    106 Hawaii 146, 102 P.3d 1044 (Sup. 2004),
    *cert denied,* __ U.S.__, 126 S.Ct. 45, 163 L.Ed.2d 78 (2005) ........... 109-110
**State v. Schroeder**
    76 Hawaii 517, 880 P.2d 192 (Sup. 1994) .................................104
**State v. Sinagoga**
    81 Hawaii 421, 918 P.2d 228 (Sup. 1996) ...................................98
**State v. Vinge**
    81 Hawaii 309, 916 P.2d 1210 (Sup. 1996) .................................94
**State v. White**
    110 Hawaii 79, 129 P.3d 1107 (Sup. 2006) ...............................109
**State v. Yamada**
    99 Hawaii 542, 57 P.3d 467 (Sup. 2002) .....................................57
**Teague v. Lane**
    489 U.S. 288 (1989)....................................................................101
**United States v. Cherry**
    938 F.2d 748 (7th Cir. 1991) .......................................................63
**United States v. Cotton**
    535 U.S. 625 (2002)......................................................................92
**United States v. George**
    960 F.2d 97 (9th Cir. 1992) ....................................................63, 65

**United States v. Iron Shell**
    633 F.2d 77 (8th Cir. 1980) .......................................................................57
**United States v. Joe**
    8 F.3d 1488 (10th Cir. 1993) ...................................................................65
**United States v. Juvenile**
    347 F.3d 778 (9th Cir. 2003) ...................................................................84
**United States v. Lester**
    749 F.2d 1288 (9th Cir. 1984) .................................................................89
**United States v. Owens**
    484 U.S. 554 (1988)................................................................................55
**United States v. Peralta**
    941 F.2d 1003 (9th Cir. 1991) .................................................................82
**United States v. Renville**
    779 F.2d 430 (8th Cir. 1985) ...................................................................63
**United States v. Sanchez-Cervantes**
    282 F.2d 664 (9th Cir. 2002), *cert denied* 537 U.S. 939,
    123 S.Ct. 48, 154 L.Ed.2d 243 (2002).....................................................101
**United States v. Tsinnijinnie**
    91 F.3d 1285 (9th Cir. 1996) ...................................................................81
**United States v. Valdez-Soto**
    31 F.3d 1467 (9th Cir. 1994) cert. denied, 514 U.S. 1113 (1995) ...............56
**United States v. Washington**
    969 F.2d 752 (9th Cir. 1992) ...................................................................102
**United States v. Young**
    470 U.S. 1 (1984).............................................................................. 89-90
**Walters v. Maass**
    45 F.3d 1355 (9th Cir. 1995) .........................................................59, 70, 76
**Weaver v. Thompson**
    197 F.3d 359 (9th Cir. 1999) ...................................................................102
**White v. Illinois**
    502 U.S. 346 (1992)......................................................................... 62-63
**Williams v. Taylor**
    529 U.S. 362 (2000)........................................................................ 49-50
**Woodford v. Garceau**
    538 U.S. 202 (2003)................................................................................48
**Woodford v. Visciotti**
    537 U.S. 19 (2002).................................................................................50
**Zafiro v. United States**
    506 U.S. 534 (1993)........................................................................69, 91

## CONSTITUTIONS

**U.S. Const.**
 Sixth Amendment ........................................................................111
 Fourteenth Amendment ................................................................111

## RULES

**Federal Rules of Evidence**
 Rule 803(4) ...................................................................................57
**Hawai`i Rules of Evidence**
 Rule 701 .................................................................................14, 77
 Rule 803(b)(4) .................................................. 23, 52, 56-58, 66
**Hawaii Rules of Penal Procedure**
 Rule 16(b) ................................................................................4, 72
 Rule 35 (2001) ............................................................................104
 Rule 40 .................................................................................40, 43
 Rule 40(a)(3) ................................................................................41

## STATUTES

**Hawai`i Revised Statutes**
 Section 706-606 .................................................... 91-93, 95, 98
 Section 706-606(1) .......................................................................98
 Section 706-606(2)(a) ..................................................................98
 Section 706-606(2)(c) ..................................................................98
 Section 706-606(3) .......................................................................98
 Section 706-668.5 .................................................... 91-92, 94
 Section 706-662(4) .................................................... 109-110
 Section 706-662(4)(a) ...........................................................37, 103
 Section 706-662(4)(b) ...........................................................37, 103
 Section 707-730(1)(b).....................................................................1
 Section 707-732(1)(b).....................................................................2
**28 U.S.C.**
 Section 2254(d).............................................................................48
 Section 2254(d)(1).............................. 49, 54, 56, 70, 86, 91, 110
 Section 2254(e)(1) .......................................................................60

## MISCELLANEOUS

John E.B. Myers et al., Expert Testimony in Child Sexual Abuse Litigation,
 **Nebraska Law Review** Vol. 68, No. 1 & 2 (1989)................................ 84-85

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| REGINA SMITH, | ) CIVIL NO.  04-00091 HG-KSC |
| | ) |
| Petitioner, | ) SECOND MEMORANDUM OF LAW |
| | ) IN OPPOSITION TO PETITION FOR |
| vs. | ) WRIT OF HABEAS CORPUS |
| | ) |
| JOHN F. PEYTON, JR., Director, | ) |
| Department of Public Safety, State of | ) |
| Hawaii and MILLICENT NEWTON | ) |
| EMBRY, Warden, Mabel Bassett | ) |
| Correctional Center, | ) |
| | ) |
| Respondents. | ) |
| _____ | ) |

**SECOND MEMORANDUM OF LAW IN OPPOSITION
TO THE PETITION FOR WRIT OF HABEAS CORPUS**

**I.**

**STATEMENT OF THE CASE**

**A.    Indictment.**

On January 7, 1993, Petitioner Regina Smith ("Petitioner") was charged via

grand jury indictment in F.C. Cr. No. 93-0001 with five counts of Sexual Assault

in the First Degree, in violation of **Hawaii Revised Statutes** ("**H.R.S.**") **§ 707-**

**730(1)(b)** and five counts of Sexual Assault in the Third Degree, in violation of

DHS:rir

**H.R.S. § 707-732(1)(b)**.  See Exhibit ("Exh.") A.[1]  Five of the counts named

Petitioner's daughter, Alisha Perry ("Alisha"), as the complainant; the remaining

five counts named another daughter, Jana Perry ("Jana"), as the complainant.[2]  Id.

Co-Defendant Francis Nakamura, Jr. ("Nakamura") was also charged in the

same indictment with committing various offenses against Alisha and Jana.  Id.

Nakamura was charged with eight counts of Sexual Assault in the First Degree

(Counts 6-9 and 18-21), four counts of Sexual Assault in the Third Degree (Counts

10-11 and 22-23), and two counts of Kidnapping (Counts 12 and 24).  Id.

**B.    Motions in Limine.**

Petitioner's Motion in Limine #2 sought to prohibit expert witness testimony

"as to the credibility of the children when these incidents were reported to them,

and any testimony as to whether or not a child would make something like this up

or would not make something like this up."  Transcript of Proceedings on

---

[1]  Except for the Transcript of Proceedings held on September 27, 1993 ("TR9/27/93"), attached hereto as Exhibit OO, all exhibits and transcripts cited herein are attached to the Answer to Petition for Writ of Habeas Corpus ("Answer") filed on June 1, 2004.

[2]  Counts 1, 2, 3, 13, and 14 charged Petitioner with first degree sexual assault by placing Petitioner's mouth on Alisha's vagina, by placing Alisha's mouth on Petitioner's vagina; by inserting Petitioner's finger into Alisha's vagina, by placing Petitioner's mouth on Jana's vagina, and by placing Jana's mouth on Petitioner's vagina, respectively.  See Exh. A.  Counts 4, 5, 15, 16, and 17 charged Petitioner with third degree sexual assault by placing Alisha's hand on Petitioner's vagina, by placing Petitioner's hand on Alisha's vagina, by placing Jana's hand on Petitioner's vagina, by placing Petitioner's hand on Jana's vagina, and by placing Petitioner's hand on Jana's breast, respectively.  Id.

September 7, 1993 ("TR9/7/93")[3] at 53-54.  The State stated that if its expert,

"Miss Kurren ["Kurren"] testifies, the only thing she would testify as to is that

she's a psychologist, that she deals with children, that acting-out behavior is

consistent or can be explained by sexual abuse." Id. at 59.  Noting that the State

had not provided any discovery as to "what incidences that Dr. Kurren would

testify about the acting out behavior[,]" Petitioner asked for "an exclusion or

prohibition from having Dr. Kurren testify as to that." Id. at 60.  The trial court

ruled that:  (1) "any specific testimony dealing with the credibility of the child

witnesses in this case" was excluded; and (2) expert testimony "explaining, quote,

seemingly bizarre, unquote, behavior" of the children would be permitted. Id. at

62.

### C.    Trial Proceedings.

Prior to opening statements being given, Nakamura moved to preclude

Kurren from testifying because Kurren's reports had not been provided in

discovery.  TR9/15/93 at 6-7.  He also stated that he would be moving for a

mistrial if the State made any mention during opening statement "that there's a

tearing of the hymen of Alisha Perry and that there's possibly, maybe probably,

scar tissue there." Id. at 8.  Nakamura argued that such evidence was irrelevant

because:  (1) Alisha's injuries could not be connected to Nakamura or Petitioner;

---

[3] Hereafter transcript references will take this format.

and (2) nothing in the discovery indicated "that the scar tissue and the tearing

occurred because of sexual penetration to a reasonable degree of medical

probability." Id. at 8-9. Petitioner joined in Nakamura's "motions." Id. at 18.

While acknowledging that Kurren's records had not been provided to the

defense,[4] the State argued that it would not be eliciting any evidence that Kurren

was the children's therapist. Id. at 10. Instead, "[Kurren] would be proffered as an

expert in the area of sex abuse to talk specifically about the phenomena of

explaining seemingly bizarre behavior, the acting out which the Perry girls did in

this case, the touching of the vaginas of each other, and that sort of thing." Id. at

12. The State also asked for a preliminary ruling that medical evidence of Alisha's

injuries was admissible as Nakamura's arguments went to the weight of the

evidence, not its admissibility. Id. at 13-14.

The trial court agreed with the State that Nakamura's arguments regarding

medical evidence of Alisha's injuries went to the weight of the evidence and not its

admissibility. Id. at 21. However, the trial court later ruled that: (1) the State

would be prohibited "from introducing any [expert medical] testimony that is

based exclusively upon the so-called hearsay statements of the purported

victims[;]" and (2) the State would be permitted to introduce "medical testimony

---

[4] The State categorically denied ever having Kurren's records in its possession. TR9/15/93 at 81-82. The State, therefore, had no duty to provide the records to the defense. See **Hawaii Rules of Penal Procedure** ("**H.R.P.P.**") **Rule 16(b)**.

that may be in part based on independent medical findings upon the appropriate physical examination having been done." Id. at 35-36.

The trial court reserved ruling on the motion to preclude Kurren from testifying. Id. at 20. However, the court ordered "the State to turn over all relevant clinical records of Ms. Kurren ... in her treatment of the two alleged victims[.]" Id. at 82. It also ruled that the Kurren would not be permitted to testify until "defense counsel[] have had an opportunity to review [the] records." Id. The State later struck Kurren as a witness. TR9/16/93 at 64.

Sworn testimony in Petitioner's trial began on September 15, 1993. TR9/15/93 at 99. Witnesses established that from August 16, 1990, to July 20, 1991, Alisha and Jana lived with Petitioner and Nakamura, her common law husband. TR9/15/93 at 150-51; TR9/16/93 at 119, 136-37; TR9/20/93 at 56-57. Alisha had been born on September 30, 1986; Jana on February 24, 1988. TR9/17/93 at 49.

Alisha, Jana, Petitioner, and Nakamura lived together as a family, along with Petitioner and Nakamura's two children, Vandalee Nakamura ("Vandalee") and Anthony Nakamura ("Anthony"). TR9/15/93 at 123, 157; TR9/16/93 at 138; TR9/20/93 at 51. They resided at Aala Park, hotels, and the homes of friends and relatives. TR9/15/93 at 151-52; TR9/16/93 at 138. The family slept together. TR9/16/93 at 54.

5

Alisha testified that during the time she lived with Petitioner and Nakamura, Petitioner put her fingers into Alisha's vagina.[5]  TR9/15/93 at 137.  Petitioner also put her mouth on Alisha's vagina and made Alisha put her mouth on Petitioner's vagina.  Id. at 138-39.  Petitioner also put her hands on Alisha's chest and made Alisha touch Petitioner's vagina with her hand.  Id. at 142, 148.

Alisha indicated that Nakamura touched her vagina with his fingers.  Id. at 128, 130.  Nakamura placed his fingers, penis, and toe into Alisha's vagina.  Id. at 130-32, 154-55.  Nakamura placed his penis into Alisha's mouth and touched her chest with his hands.  Id. at 132, 134, 140-41, 154-55.

Alisha said that Petitioner's vagina "smelled bad" when Petitioner made Alisha put her mouth there.  Id. at 138.  Alisha also described how it felt "yuck" and made her choke when Nakamura put his private part into her mouth.  Id. at 134, 136.  It also hurt when Nakamura put his penis in Alisha vagina.  Id. at 136.

Alisha stated that some acts of sexual abuse took place in a hotel after Anthony had been born.  TR9/15/93 at 153-55; TR9/16/93 at 52-53, 55, 57-59. Some acts of sexual abuse occurred at Aala Park.  TR9/16/93 at 53, 58-59.  Alisha recognized a hotel room that a detective took her to as one that she had stayed in with Petitioner and Nakamura.  TR9/15/93 at 157-62, 167-68.  Alisha said that

---

[5]  Using State's Exhibits 6 and 7 for identification as demonstrative aids, the State established that Alisha's "private part" was her vagina and Nakamura's "private part" was his penis.  See TR9/15/93 at 127-34.

State's Exhibit 12, a photograph of a room at the Pacific Marina Hotel, looked "a little bit" like the room in which she had stayed with Nakamura and Petitioner. TR9/15/93 at 182-83; 187; TR9/20/93 at 122.

Alisha found it very difficult to testify. Id. at 169-70, 177-78. Nakamura had told Alisha not to tell anyone what he had done to her, saying something bad would happen. Id. at 171, 178-79. Alisha said that she was scared because Nakamura and Petitioner were in the courtroom. Id. at 177.

Jana testified after Alisha. TR9/16/93 at 109. Jana testified that Petitioner "used to be [her] mother" and that Nakamura "used to be [her] father." Id. at 119. Jana said that: (1) Petitioner placed her mouth and hand on Jana's vagina; (2) Petitioner made Jana put her mouth and hand on Petitioner's vagina; and (3) Petitioner placed her hand on Jana's chest . Id. at 123-25.

Jana said that Nakamura touched her vagina with his hands and finger. Id. at 120. Nakamura put his finger, penis, and toe in Jana's vagina. Id. at 121. Nakamura also placed his penis inside Jana's mouth and his mouth on her vagina.[6] Id. at 121-22. Jana indicated that some acts of sexual abuse occurred at Aala Park; others at a hotel. Id. at 139-40, 159-60. Jana recognized State's Exhibits 20 and 23 as photographs depicting "the cage" at Aala Park where some of the sexual abuse took place. TR9/16/93 at 140, 143-44; TR9/20/93 at 119-21, 143, 145.

---

[6] Jana testified that Nakamura put his mouth on her "private." TR9/16/93 at 122. She later explained that "private" meant vagina. Id. at 149.

7

Jana said that it burned when Petitioner made her put her mouth on
Petitioner's vagina and when Nakamura put his penis in her mouth.  TR9/16/93 at
147-48.  Jana described Nakamura's penis in her vagina as "[y]uck[,] [y]ucky."  Id.
at 148.  She also said that it smelled bad when she put her mouth on Petitioner's
vagina.  TR9/17/93 at 28.

On cross-examination, Nakamura repeatedly asked Alisha how many times
she had talked to her foster mother, her foster father, and other adults about the
sexual assaults.  TR9/15/93 at 192-97, 199-202, 207-11; TR9/16/93 at 32-37.  He
then implied that Alisha had made up her story of sexual abuse to please the adults,
asking Alisha if she wanted to make the adults happy by her testimony.  TR9/16/93
at 39-41.  Responding to Nakamura, Alisha denied ever seeing Nakamura "touch
his private parts with [Petitioner's] private parts ... [or] with [Petitioner's]
mouth[.]"  Id. at 66.

Petitioner suggested that Alisha had fabricated the sexual abuse allegations
so that she could remain with her foster parents rather than being returned to
Petitioner and Nakamura.  See id. at 84-88, 93-95.  Petitioner established that
Alisha's foster parents took her to the beach, played with her in the pool, threw
birthday parties for her, and gave her cake and presents, while Petitioner and
Nakamura did none of those things.  Id. at 85-88, 90-91.  She also established that:

(1) Alisha was happy with her foster parents and hoped to be adopted by them; and
(2) Alisha had not told about the abuse until her fourth interview. Id. at 93-95, 99.

Nakamura examined Jana as to how often she had discussed the sexual abuse with her foster parents and the other adults. Id. at 152-55. He then suggested that Jana's reporting of the sexual abuse was motivated by a desire to please the adults, including her foster mother and father. Id. at 156-58. In response to Nakamura, Jana denied: (1) ever seeing Nakamura placing his penis in Petitioner's vagina or Nakamura's penis touching Petitioner's vagina; (2) seeing Nakamura and Petitioner "making love" in a car or at the park; (3) Nakamura making her or Vandalee suck Anthony's penis; (4) Petitioner placing Anthony's penis in her vagina; and (5) that anyone told her that State's Exhibit 20 was a picture of the "cage." Id. at 168, 171-73. However, Jana admitted that she had lied to her foster parents and her teachers. Id. at 174-75.

As with Alisha, Petitioner suggested through her questions that Jana was making up her story of sexual abuse so that she could remain with her foster parents, asking Jana if her foster parents were nice to her and if she liked calling them mommy and daddy. TR9/17/93 at 10-11. Petitioner elicited that Jana's foster parents had bought a Christmas tree, bought her presents, held a birthday party for her, and took her on outings, activities that Petitioner and Nakamura

9

never did.  Id. at 13-15.  She also established that Jana did not want to go back to

Petitioner and that she wanted to put Nakamura in jail.  Id. at 29.

       In response to Petitioner, Jana denied ever seeing:  (1) Nakamura "making

love" to Petitioner; (2) Nakamura and Petitioner with their clothes off; (3)

Nakamura placing his penis in Petitioner's mouth; (4) Nakamura placing his penis

in Petitioner's vagina; or (5) men and women on television without their clothes.

Id. at 17-19.  Jana admitted to lying to her foster parents, Petitioner, and

Nakamura.  Id. at 20.

       Denise Mazepa ("Mazepa"), the girls' foster mother, testified that on

October 9, 1991, two weeks after Alisha and Jana were placed in her home, she

noticed Jana rubbing her vagina with a bar of soap for an excessive period of time

while she was giving the girls a bath.  Id. at 51-52.  Mazepa said to Jana, "Jana,

you don't need to use that much soap, sweetheart, like that."  Id. at 51.  Jana said

something to Mazepa and Alisha got a very frightened look on her face.[7]  Id. at 59-

60.  According to Mazepa, it appeared that Alisha had become frightened by what

Jana had said.  Id. at 61.

_____

       [7]  Mazepa was prevented from testifying as to what Jana told her by
Nakamura's hearsay objection.  TR9/17/93 at 51-52.  However, Mazepa testified
that after hearing Jana's response, she asked Jana "what else [Nakamura] told her
to do."  Id. at 52.  This answer was struck by the trial court.  Id.

After consoling Alisha, Mazepa contacted Child Protective Services ("CPS") and the Sex Abuse Treatment Center ("SATC"). Id. at 62. The CPS caseworker scheduled an appointment with the Children's Advocacy Center ("CAC") and the girls went for a medical exam at Kapiolani Medical Center for Women and Children ("KMC") on October 22, 1991. TR9/17/93 at 62-64; TR9/21/93 at 153-154. The girls "were nervous" before the examination and Mazepa said that she "tried to prepare them a little bit of why [they] needed to do this." TR9/17/93 at 64. The girls also went to a number of meetings at the CAC. Id. at 64. Mazepa testified that she had taught Alisha and Jana the proper names for their "private parts" such as penis, vagina, and breasts. Id. at 67-68.

After the initial bathing incident, Mazepa observed other incidents involving Alisha and Jana.[8] Id. at 69. On October 12, 1991, Mazepa heard a giggle and entered the girls' room to investigate. Id. Mazepa saw Alisha sitting on the floor, her legs straddling Jana. Id. Both girls were naked and Jana was touching Alisha's vagina. Id. Mazepa also observed: (1) Jana touching Alisha's vagina during a bath on November 3, 1991; (2) Jana sitting on the arm of a recliner, gyrating repeatedly, on November 12, 1991; (3) Jana putting a McDonald's "Happy Meals" figurine into her vagina on November 25, 1991; (4) Jana fondling herself while watching television on December 2, and 5, 1991; (5) Jana taking Mazepa's one-

---

[8] Nakamura requested a running objection to the other incidents on the ground of relevance. TR9/17/93 at 69.

and-a-half year old daughter's hand and placing it on Jana's crotch on December 11, 1991; and (6) Jana putting her hand on Mazepa's daughter's crotch "a couple days later[.]" Id. at 69-71.

Mazepa kept written notes of the incidents because "[a]s a foster parent, [she was] to write down certain instances. [She] was very shocked at observing the behavior because of [her] previous experience. [She] had never seen this before with children." Id. at 72. Mazepa had been a foster parent for almost five years, caring for sixteen children during that period, and had been a licensed day-care provider for over five years before that. Id. at 47, 72. Mazepa also noted that the girls were fearful when they went to bed, overly concerned with making sure the doors and windows were locked, and suffered "lots of nightmares." Id. at 76-77. Mazepa also testified that Jana began wetting her bed after sharing her experiences at the CAC. Id. at 77-78.

While being cross-examined by Nakamura, Mazepa confirmed that when the children first came to her home, Alisha had been "mean and demanding" and that Jana was "a handful[.]" Id. at 81. She also acknowledged that the girls could remain with her "until [she] wish[ed] otherwise" and that they tried hard to remain in her and her husband's "good graces." Id. at 81-82.

On cross-examination by Petitioner, Mazepa confirmed that the girls began calling her, "mommy," and her husband, "daddy," less than a month after arriving

12

in their home.  Id. at 89.  She also acknowledged that the girls had referred to

Petitioner as "ugly mommy."  Id.  However, Mazepa disagreed with Petitioner that

Alisha had never claimed between September 1991 and December 1991 that

Nakamura had stuck his big toe in her vagina.  Id. at 92.  Petitioner asked if the

claim was in Mazepa's written notes and Mazepa said that she would have to

check.  Id.  With Petitioner's assent, the trial court excused Mazepa to review her

notes over the weekend.  Id. at 93-94.  The court excused the jury until September

20, 1993.  Id.

After the jury had been excused, Nakamura moved to strike that portion of

Mazepa's testimony dealing with "the alleged acting out behavior of the

children[,]" arguing that the testimony was irrelevant and more prejudicial than

probative.  Id. at 97.  He also moved for a mistrial, asserting that the "acting out"

evidence should not have been admitted.  Id.  However, Nakamura requested that

the trial court reserve ruling on his motion for mistrial until the State had

concluded its case.  Id.  Petitioner joined in Nakamura's motions.  Id. at 98-99.

The State countered that the evidence was relevant and that it was for the

jury to decide whether the children's described behaviors were "normal" or not.

Id. at 99.  The trial court denied the motion to strike, stating that the evidence was

relevant, the jury could attach whatever weight it felt was appropriate to the

evidence, and that "under [**Hawaii Rules of Evidence** ("**H.R.E.**") **Rule 701**],[9] ...

Mazepa, as a lay witness, is entitled to offer her testimony if it's based on firsthand

knowledge and is relevant." Id. at 102-03.

Petitioner revisited the trial court's ruling on September 20, 1993.

TR9/20/93 at 3.  Petitioner argued that the "acting out behavior of Alisha and Jana"

was not relevant to the case as "[t]here's been no showing or nexus between the

acting behavior and the fact of consequence which [t]hat they were sexually

assaulted or sexual[ly] abused."  Id.  She also argued that even if the testimony was

relevant, the prejudicial effect outweighed its probative value.  Id.

The State responded  that the "acting out behavior" was relevant and that "it

[was] within a lay person's ability to be able to determine that [the] behavior is not

what is to be expected of children of a tender age[.]"  Id. at 4.  It also pointed out

that

> The acting out behaviors that they displayed are consistent with the
> specific behaviors that they claim were performed on them.  In other
> words, they said [Petitioner] and [Nakamura] touched them, touched
> their privates and this was the behavior that they were expressing to
> each other or toward themselves and toward other children.

Id.  The State disagreed that "the prejudicial effect [of the evidence] outweigh[ed]

it probative value."  Id. at 4.  It argued that "it's relevant behavior.  It goes to the

---

[9]  **H.R.E. Rule 701** provides:  "If the witness is not testifying as an expert,
the witness' testimony in the form of opinions or inferences which are (1)
rationally based on the perception of the witness, and (2) helpful to a clear
understanding of the witness' testimony or the determination of a fact in issue."

circumstances of disclosure.  It combats the defense theory ... that the children have been coached, that the children have repeatedly been told to do things." Id. at 4-5.

After the court heard argument from Nakamura, Petitioner moved for a mistrial. Id. at 5.  The trial court reaffirmed its prior ruling with regard to striking the evidence and denied Petitioner's motion for mistrial. Id.

When Petitioner's cross-examination of Mazepa resumed, she testified that she had been able to locate a reference in her notes where she had written that Nakamura had used his fingers and toes on Alisha. Id. at 18.  She also acknowledged that she had written that Jana was a "follower" and "would try to follow Alisha or ... listen to Alisha as to what she was told to do[.]" Id. at 22-23.

On redirect examination, Mazepa testified that on October 28, 1991, Alisha had reported that Nakamura placed his toe in her vagina. Id. at 24.  She also denied ever pushing Alisha or Jana to provide information, stating that the girls "would always ask [her] if they [could] talk to [her]." Id. at 29.

CPS supervisor Kathy Reeber ("Reeber") testified that Petitioner was Alisha's and Jana's mother. TR9/20/93 at 49, 51.  She also said that Vandalee and Anthony were the girls' siblings. Id. at 51.  According to the Vandalee's and Anthony's birth certificates, Nakamura was their father. Id.  Anthony had been born on November 27, 1990. Id. at 55.

Reeber testified that Alisha and Jana had been in the State's custody on August 16, 1990, and were returned to Petitioner on that date. Id. at 56, 59. Alisha and Jana were taken back from Petitioner into CPS custody on July 20, 1991. Id. According to CPS' records, Petitioner and Nakamura "lived together ... essentially as common law husband and wife." Id. at 57. Alisha, Jana, Vandalee, and Anthony lived with Nakamura and Petitioner. Id.

On cross-examination, Nakamura established that: (1) Petitioner's mother, Jane Pacheco ("Pacheco"), had physical custody of the girls prior to August 16, 1990; and (2) CPS had permanent custody of Jana and Alisha since November 4, 1992. TR9/20/93 at 59; TR9/22/93 at 81. Nakamura questioned Reeber as to her "safe home guidelines" report that referred to Pacheco's "psychological profile makeup." TR9/20/93 at 62-65. According to the report, Pacheco suffered from "some form of mental retardation," "organic brain syndrome," and "conceptional vagueness." Id. at 65-66. It also indicated that Pacheco "sniffed" paint, tended to fabricate, and had "homicidal or suicidal impulses." Id. at 66-67. Petitioner established that: (1) Alisha and Jana had been taken into CPS custody from Pacheco on August 8, 1990, because Pacheco had left the girls unattended in a bar and Petitioner could not be located; and (2) the girls were again taken into CPS custody on July 20, 1991, because Pacheco had been jailed and Petitioner could not be found. Id. at 71, 74.

On redirect examination, Reeber testified that she received a telephone call

from someone identifying herself as Petitioner on November 4, 1991. Id. at 80-83.

Reeber had called Petitioner's sister, Vivian Smith ("Smith"), earlier that day and

asked for Smith's help in contacting Petitioner. Id. at 82-83. With regard to the

conversation with the person identifying herself as Petitioner, Reeber testified:

> The conversation consisted of a couple of things. One was I
> asked her if she was aware that [Alisha and Jana] were in the custody
> of [CPS] because this was our first conversation with her since July of
> [1991], and she said she was aware of that. I asked her to come see
> me, she said she didn't want to. I asked her to work with me about the
> girls. She said she didn't want them back. And I asked her if she was
> aware that the girls had been making some statements concerning
> [Nakamura] and she said that she did, yes....

Id. at 84-85.

On recross-examination by Nakamura, Reeber agreed that: (1) the girls had

not wanted to see Pacheco even though Pacheco had asked to see them; and (2) she

had written that Jana was not in touch with reality. Id. at 85-86. Petitioner was

able to establish that: (1) Reeber did not know if she had actually spoken to

Petitioner; and (2) the person who identified herself as Petitioner became angry

and claimed the girls were lying when told of the accusations made against

Nakamura. Id. at 87-88. On re-redirect, Reeber testified that she had written that

Jana had been observed playing aggressively and sticking objects into her vagina.

Id. at 101.

Honolulu Police Department ("HPD") detective Keith Lima ("Lima")
testified that he assisted in the police investigation of Petitioner and Nakamura. Id.
at 103-04. Lima stated that he met Alisha, Jana, and their foster father ("Frank") at
the Best Western Plaza Hotel ("Plaza Hotel"), located at 3253 North Nimitz
Highway, on September 4, 1993. TR9/20/93 at 105, 110, 123; TR9/22/93 at 41.
Later that same day, he met the girls and Frank at the Pacific Marina Inn ("Pacific
Marina") located at 2628 Waiwai Loop. TR9/20/93 at 107. Lima met the girls at
the hotels "[t]o locate the offenses, where the victims claimed that [the] offenses
took place." Id. at 105-06. Both hotels were near the airport. Id. at 106, 108.

Lima indicated that while accompanying Alisha at the Pacific Marina,
Alisha stopped at one point and refused to proceed any further. Id. at 109-10.
Lima had to get Frank to accompany them before Alisha would enter a hotel room.
Id. at 110-11. At Alisha's request, Lima and Frank rearranged the furniture in the
room. Id. at 111. Lima took photographs of the room at the Pacific Marina and of
an Aala Park restroom with metal iron gates that had a "cage-like appearance[.]"
Id. at 112, 119-24, 143, 145.

Gary Takamoto ("Takamoto") testified that he was the custodian of records
for Pacific Marina. Id. at 164-165. According the Pacific Marina's records, a
"Francis Nakamura" had rented a hotel room for a one-night stay on March 12,
1991. Id. at 189.

Dr. Robert Bidwell ("Bidwell") testified that he: (1) was a pediatrician with a sub-specialty in adolescent medicine; (2) was employed as the director of adolescent medicine at KMC; (3) was also an associate professor of pediatrics at the John A. Burns School of Medicine at the University of Hawaii; (4) graduated from the University of Minnesota medical school in 1981; (5) completed his pediatric residency at KMC from 1981 to 1986 and then a two-year fellowship in adolescent medicine at the University of Washington; (6) had been licensed to practice medicine in the state of Hawaii since 1981; (7) was board certified by the American Academy of Pediatrics in 1987; and (8) was a member of the Society of Adolescent Medicine. TR9/21/93 at 68-70.

Bidwell first became associated with the SATC in 1985 or 1986 "as a resident involved in performing sex abuse evaluations[.]" Id. at 71. After his two-year fellowship, Bidwell "rejoined the [SATC] as one of their physicians doing examination[s]." Id. at 71. He described his duties as a SATC physician as

> primarily [consisting of] do[ing] medical legal evaluations of patients who come into the hospital with a history of sex abuse.
>
> There are two parts to the program as far as the acute care. There are the emergency cases that come into the emergency room and [Bidwell was] one of the doctors that works with those cases. There are also -- whenever abuse has occurred more than 72 hours before notification of the authorities, then [the patients are] scheduled with [the] sex abuse clinic[.]

Id.

Bidwell testified that he:  (1) was "one of the [SATC] doctors that works only in pediatrics which depending on the time of the day includes [patients] up to 18 years of age[;]" (2) had performed between 100 to 120 examinations of alleged sex abuse victims; and (3) had previously testified as an expert in the sub-specialty area of sex assault about twelve times.  Id. at 72-73.  With regard to training he received in the area of sexual assault, Bidwell stated:

> In order to become a physician with the [SATC] you need to go through a training process which involves meeting with the director of the section, the medical director of the [SATC] and going through the specifics of the physical examination, history taking.
>
> In my case specifically with regard to pediatric patients, the laboratory evaluation of patients.  We have regular meetings, physician's meetings that update us on a new knowledge about sexual assault both in pediatrics and adult medicine, those occur anywhere from three to five times a year.
>
> We have gone through training in the use of -- in working with the legal system in Hawaii and working with the police department. As I mentioned in the gathering of medical legal evidence on the use of colposcope and cameras, those sorts of things, those are on an ongoing basis.
>
> * * * *
>
> [The meetings] were specifically tailored to sexual assault and specifically tailored to the need of physicians working in that area.

Id. at 74-75.  Bidwell also stated that he had attended "two larger seminars here in Hawaii ... where experts have been brought in from the West Coast to talk about their experiences with sexual assault where they see thousands and thousands of

cases in order to upgrade our practice here." Id. at 76.  One of the seminars dealt

with pediatric sexual abuse and the other with using a colposcope.  Id. at 81.

Bidwell also noted that he had attended a seminar where the primary topic

discussed was "what kind of infectious disease cultures do [physicians] get in

[their] evaluations."  Id. at 81.

     On voir dire, Bidwell stated that while he meets with the SATC director "on

"repeated occasions[,] [a]s far as the formal orientation and training, that was a one

time meeting."  Id. at 77.  During the meeting, Bidwell received training in

conducting pelvic examinations of both males and females.  Id.  He testified that

"[t]he pelvic examination is also a part of [his] area in adolescent medicine [and

that he] do[es] lots of pelvic examinations[;]" (2) specialized training is required

"to be able to get a good [medical] history of a sexual assault[;]" and (3) he

received training in "getting a [medical] history that will guide [the] physical

examination[.]"  Id. at 77, 79, 82.  Petitioner had no objection to the trial court

granting the State's "request to qualify Dr. Bidwell as an expert in the field of

medicine with a specialty in adolescent medicine and a further specialty in sexual

assault."  Id. at 83.

     Bidwell agreed that "[a]s a pediatrician, [he was] aware of the

developmental stages of children[.]"  Id.  He testified:

> Pediatrics, like hopefully most of medicine, is not just dealing
> with the physical organism, but it's really becoming experts in the

development of children as they grow from infancy through
adulthood.

And so while the pediatrician should have a knowledge of the
diseases that a child may have to face as they grow up, they also
should have the knowledge, at least of the basics, of the
developmental progression that a child goes through and issues that
come up for a child. And those are in the areas of relationship to
peers, or to other kids their own age, relationship to parents, sexuality,
growing independence. Their new role as they move into schools[,]
as they develop new friends, those sorts of things, and that's part of
the pediatrician[']s role.

We're not psychologists, we're not psychiatrists and there are
times when we need to refer children, particularly children with
identified problems on to those specialists. But a good pediatrician
should be able to at least bring up and address those issues with
parents.

And often to deal with minor problems[,] things like temper
tantrums, those sorts of things, or a kid that seems to be exceptionally
shy[,] acting out behavior, those sorts of things, again, some
pediatricians -- depends on the pediatrician, some are more
comfortable in working in those areas than others, but all pediatricians
should be able to address and at least be able to begin to work in those
areas in developmental areas as well as the physical concerns in the
kid.

Id. at 84-85.

Before examining Alisha on October 22, 1991, Bidwell took her medical

history.  Id. at 85-86.  Bidwell stated:  "[W]e get a history, a brief general medical

history of how that[] child['s] medical health has been in like in the past.  And then

focusing more on the incidents relating to them coming into the clinic."  Id. at 86.

22

Bidwell testified that he "rel[ied] on the physical examination as well as the ... medical history ... to make a diagnosis and decide how to treat[.]" Id.

Nakamura and Petitioner objected to recitation of Alisha's medical history by Bidwell, alleging that such testimony would constitute hearsay and was prohibited by **State v. Morris**, 72 Haw. 527, 825 P.2d 1051 (1992).[10] Id. at 87-90.

The State countered that such testimony was permitted by **H.R.E. Rule 803(b)(4)**[11] and not prohibited by **Morris**. TR9/21/93 at 87, 90-91. Overruling the objection, the trial court stated:

---

[10]  In **Morris**, the trial court allowed a doctor, who had never seen the victim, to testify that the victim suffered from "chronic sexual abuse." **Morris**, 75 Haw. at 528-29, 825 P.2d at 1052. The Hawaii Supreme Court held that the lower court erred because, since the physician "had no physical evidence whatsoever," his opinion was necessarily based on the child victim's statements. **Morris**, 75 Haw. at 529, 825 P.2d at 1052. The clear implication of the expert's testimony was that he found chronic child abuse only because he believed the child to be truthful. **Morris**, 75 Haw. at 529, 825 P.2d at 1052.

[11]  **H.R.E. Rule 803(b)(4)** provides in pertinent part:

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

\* \* \* \*

(4) *Statements for Purposes of Medical Diagnosis or Treatment.* Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

The objection is overruled for the following reasons:  The Court's difficulties addition testimony state request [sic] for what is sought in this case by the prosecutor [is] properly [admitted] under 803(b)(4) which is [a] statement on the independent medical findings of this physician during the course of his medical exam.  State v. Morris specifically prohibits the eliciting of any conclus[o]ry opinions by this doctor short of anything ... attesting to whether or not the ultimate criminal violation occurred or not.

I am ... going to be quoting from the bottom of State v. Morris on the first page that preclude[s] conclus[o]ry opinions that abuse did occur, and that child victims reported abuse is truthful and believable. These types of conclusions are specifically prohibited by State v. Morris and ... [State v.] Batangan[, 71 Haw. 552, 799 P.2d 48 (1990)][12]. . . . I am overruling your objections because I do not believe this line of question[ing] is [improper] as long as it [stays] within the ambit allowed by this Court which is specifically independent and medical findings under 803(b)(4).

It will be permitted as long as number one, it does not reach the ultimate conclusion of the case of abuse; and, number two, the ultimate conclusion that this is [a] credible account by the victim.

Id. at 92-93 (footnote supplied).  The trial court found that Bidwell would be permitted to testify as to Alisha's medical history as it was taken "for medical diagnosis and treatment."  Id. at 93.  The State also noted that "with respect to the medical history, ... that [it] is [Bidwell's] duty to make sure the child is safe.  And to that what the child gives [in] medical history as far as parents being [the] perpetrators and all that is relevant."  Id. at 94.

---

[12]  In **State v. Batangan**, 71 Haw. 552, 799 P.2d 48, (1990), the Hawaii Supreme Court held that expert witness testimony that clearly indicated that the child complainant in a sex abuse case was truthful and believable had been improperly admitted and was prejudicial to the defendant.  Id. at 563, 799 P.2d at 54.

24

The court issued a cautionary instruction to jurors:

> The jury will be instructed to know that the current state of the law and in the state of Hawaii is that we are prohibited from entertaining or hearing any expert medical opinion as to a victim or a child victim's credibility in a case of such child sex abuse cases. Please remember that the defendants are presumed innocent unless and until they are proven guilty beyond a reasonable doubt.

> I wish to issue this cautionary instruction to the jury in light of my overruling the defense objection to preclude the subsequent testimony on what the independent medical findings might have been with respect to the patient in question. So as not to confuse you, you are prohibited from considering any so-called expert medical opinion on the believeability [sic] or credibility of a patient, in this case Alisha and subsequently perhaps Jana.

> However, I am allowing the question under what we call the 803(b)(4) exception to the hearsay rule which specifically permits the witness to testify to what statements were made for purposes of his diagnosis or his treatment of the patient in question. So that's specifically for purposes of medical diagnosis or treatment. Thank you members of the jury.

Id. at 94-95.

Thereafter, Bidwell testified:

> Alisha told us that [Nakamura] got into bed with her and her sister and that he touched their, what they called cho-cho, which is their vagina or genital area. And that he also put his finger into their cho-cho. And that she was also made to lick her mother's cho-cho or vagina, the vaginal area.

Id. at 96. Alisha also told Bidwell that "her greatest concern was when she had witnessed [Petitioner] and [Nakamura] having sexual relations." Id. at 97. Bidwell "noticed ... in general [that] Alisha was very pleasant and talkative and

25

cooperative.  But when she did speak about [Nakamura] she was noted to be

clinging to [Mazepa.]"  Id. at 98.

> Bidwell testified:
>
>> After getting [the information about the sexual abuse,] we asked whether there was previous history or injuries or diagnostic procedures in the genital area.  The reason for that is to see if there would be any other explanation for any findings that might come up on physical examination.  And there was no history of any injuries to that area.
>>
>> There were -- there was, on the part of Alisha, she did acknowledge that she had had episodes where there was bleeding from the vaginal area when [Nakamura] put his finger into her.  She said that it occurred on a few occasions.

Id. at 100.  Alisha also voluntarily reported to Bidwell that "she had boils on her

butt[.]"  Id.

When Bidwell examined Alisha, he found that her labia and labiamanora

were normal and that "in [the] area in the hymen itself there was no scar[r]ing."

Id. at 101-02.  However, at the front part of Alisha's hymenal ring, he found "an

area of abnormal tissue, it was white, the area of thickened irregular tissue[] [t]hat

was quite small, but definitely present.  It was about ... one-eighth inch by a quarter

inch."  Id. at 102.  Bidwell described the tissue "as probably scar tissue or a scar."

Id.  Bidwell could not "think of anything else that would cause [the] tissue."  Id. at

103.

Bidwell opined that the injury that caused the scar would have been "a slitting where the edges that have been cut and separated and you see the underlying tissue." Id. at 105. When asked if the injury would have caused bleeding, he stated:

> Definitely, in Alisha's case, I would expect that there would be definite bleeding. It would be more than [a] superficial abrasion or scratch. You can get bleeding with scratches in that area because the blood vessels are so close to the surface. But to result in a scar it would have been to be more than a simple scratch.

Id. at 105. He also said that the injury would have caused pain and that the scar: (1) was consistent with the medical history related by Alisha; (2) was consistent, to a reasonable degree of medical certainty, with a penis entering her vagina; and (3) not consistent with childhood masturbation. Id. at 105-06, 108-110.

Bidwell testified that Jana had told him that

> [Nakamura] got into bed with her and touched her cho-cho, put his fingers into her cho-cho. That she was made by her mother to lick her mother's cho-cho.
>
> And in addition to that she had said that [Nakamura] had put his -- I'm sorry, using [her] terminology, his ding-ding into her cho-cho, cho-cho meaning vagina, ding-ding meaning penis. And also that he had made her put her mouth on his ding-ding.

Id. at 111. He also stated that Jana complained of vaginal bleeding. Id. at 112.

While Bidwell did not find any scarring to Jana's hymen, he testified that scarring is more difficult to locate in a fibrated hymen like Jana's, *i.e.*, a hymen

with extra folds of tissue in it.  Id. at 113-14, 176.  He also testified that Jana's

medical history was consistent with his physical findings, explaining

> [t]hat given -- given the findings of a normal examination and
> that she had redundant tissue there and no signs of scar[r]ing, it's
> probably unlikely that an entire penis went through the vaginal
> opening, or went through the hymen into the vaginal opening.  It's
> hard to say because the hymen is a very elastic tissue and it can widen
> up to accommodate fairly large objects.

> But I think that definitely if the penis were against the hymen[,]
> the penis, because it's a rounded object, the head could extend into the
> vagina behind the hymen because it's not like a taut membrane, it's
> fairly loose.  And so I would expect certainly there could be partial
> penetration of the vagina by the penis.

Id. at 115.  Bidwell also indicated that a child could experience a burning sensation

in her mouth as the result of repeated penile penetration.  Id. at 116.

Bidwell testified that passage of time affects the collection of medical

evidence in cases of sexual assault, stating:

> In general, the longer the period of time between the occurrence
> of sexual assault and when an examination is done, the more difficult
> it is to obtain evidence of that assault or even scars sometimes
> disappear over time especially if they're small scars, the body is
> amazingly resilient to injury or scar and that I think is really an
> individual[] thing, some people heal differently than other people.
> But in general, the longer those two periods I mentioned[,] the less
> likely you are to find evidence of sexual assault.

Id. at 117.  Bidwell agreed that "everything that [he] testified to with respect to

[his] observations and everything else has been to a reasonable degree of medical

certainty."  Id. at 117.

On cross-examination Nakamura established that Bidwell did not find any evidence that Jana had been sexually assaulted during his physical examination of her.  Id. at 120.  He also could not say exactly when or how the injury to Alisha's hymenal ring occurred or who inflicted the injury.  Id. at 120-21, 128.  Bidwell acknowledged that the scarring would be consistent with a toy being "very forcibly pushed into that area[.]"  Id. at 136.  Nakamura also confirmed that Bidwell found no trauma to Jana's hymen and that Bidwell could not say within a reasonable degree of medical probability that there had been physical trauma to Jana's genital area.  Id. at 149, 155.  Test results for sexually transmitted diseases ("STDs") were both negative for both Alisha and Jana.  Id. at 135, 151.

On cross-examination by Petitioner, Bidwell stated that it is SATC practice in non-acute cases "to get a history that will guide [their] physical examination." Id. at 160.  Petitioner was also able to establish that:  (1) Bidwell had noted redness to Jana's perineum and buttocks while examining her; (2) the redness could have been caused by bedwetting; (3) Alisha's injury "could be consistent with the insertion of a foreign object other than a penis[;]" and (4) the foreign object could have been inserted by someone other than Alisha.  Id. at 164-65, 168.

On redirect examination, Bidwell testified that the scarring to Alisha's hymenal ring could have been caused by "a penis rubbing repeatedly rubbing against that area[,]" a finger, or a toe.  Id. at 170.  He also indicated that girls

29

stimulating themselves would usually focus on the clitoris. Id. at 170-71.

However, he later acknowledged that he could not state within a reasonable degree

of medical probability that: (1) the scarring to Alisha's hymenal ring was caused

by a toe, a finger, or a penis; or (2) a toe, finger, or penis was ever placed in Jana's

vagina. Id. at 178-79.

After Bidwell left the stand, Petitioner moved to strike Bidwell's testimony

that Jana and Alisha had told him that Petitioner had made them lick her vagina,

arguing that the statement had no impact on Bidwell's examination. Id. at 184.

The court denied Petitioner's motion, stating that: (1) it had issued a cautionary

instruction; (2) the evidence was not unduly prejudicial; and (3) as Bidwell had

testified that the children had been tested for STDs, the alleged sexual contact may

have required further medical attention or treatment. Id. at 186.

Nakamura and Petitioner stipulated that: (1) the Plaza Hotel had been

served with a subpoena requesting records that would indicate that either Petitioner

or Nakamura had stayed at the hotel between November 1989, and July 20, 1991;

(2) in response to the subpoena, the Plaza Hotel had produced State's Exhibit 30,

31, and 32; and (3) the exhibits reflect that a "Francis Nakamura" or "F.

Nakamura" had registered at the hotel on October 30, 1990, May 2, 1991, and from

May 30, 1991, to and including June 4, 2001. TR9/22/93 at 41-42.

Following the stipulation, the State rested its case.  Id. at 45.  The State did not oppose Nakamura's request that judgment of acquittal be entered as to Counts 10, 12, and 22-24.  Id. at 57-59.  The trial court dismissed the five counts with prejudice, but denied Nakamura's motion for judgment of acquittal as to Counts 6-9, 11, and 18-21.  Id. at 59, 65.  The court also denied Petitioner's motion for judgment of acquittal as to Counts 1-5 and 13-17.  Id. at 75.

Nakamura called Larry Palaylay ("Palaylay") to the witness stand.  Id. at 78.  Palaylay testified that:  (1) Nakamura had been his friend for sixteen years and Smith his girlfriend for eight years; and (2) Pacheco disliked Nakamura.  Id. at 81, 93, 105.  Palaylay said that he had observed an incident involving Pacheco, himself, Smith, Alisha, and Jana that had taken place before the girls were removed by CPS.  Id. at 82.  Palaylay indicated that:  (1) Pacheco was upset because Jana had a red mark "on one side of the leg and half of [her] genital[;]" (2) Pacheco believed that Nakamura had touched Jana; (3) Pacheco "[q]uestion[ed] Jana in an aggressive way" and Jana looked scared; (4) Alisha was present during Pacheco's questioning of Jana; (5) he asked Pacheco to leave the room so he could question Jana; (6) after speaking with Jana, he told Pacheco that "Jana said that [Nakamura] didn't touch her."  Id. at 83, 85-86, 96-100.  He also stated that:  (1) Jana had a habit of wetting the bed; and (2) Vandalee was Nakamura's and Petitioner's "pet."  Id. at 94-95, 104.

31

On cross-examination, Palaylay testified that: (1) while he could not recall when he observed the "redness on Jana's vagina[,]" it was at a time when Jana and Alisha were in contact with Petitioner and Nakamura; (2) he visited Nakamura, Petitioner, Alisha, Jana, Vandalee, and possibly Anthony at the Pacific Marina; and (3) he was aware that Nakamura, Petitioner, Alisha, Jana, Vandalee, and Anthony were "kind of a family" with Nakamura as "the dad of the family[.]" Id. at 106-08. He also later conceded that Jana had told Pacheco twice that Nakamura had been touching her. Id. at 116-17.

Nakamura testified that: (1) Pacheco disliked him because he was "too old" for Petitioner and she didn't like Japanese people; (2) if Pacheco told Jana to do something, Jana would do it; (3) when he and Petitioner were living at Aala Park, Alisha and Jana were living with Palaylay; and (4) when he and Petitioner stayed at the Pacific Marina, Alisha and Jana were not present. Id. at 122-25, 127. Nakamura denied ever placing his penis in Alisha or Jana's vaginas or mouths, or placing his fingers or toe in their vaginas. Id. at 129-32. Nakamura also stated that: (1) he was not surprised that Jana's testimony matched Alisha's because Jana would always copy Alisha; (2) Jana was a "bedwetter;" and (3) he never observed Petitioner sexually molest Alisha or Jana. Id. at 133.

On cross-examination, Nakamura admitted that he had stayed at the Pacific Marina with Petitioner, Alisha, Jana, and Vandalee. Id. at 144. He also indicated

that:  (1) while he had bathed Alisha and Jana approximately six times, he had never seen any redness on their vaginas or told them "that they needed to rub very hard back and forth with the soap to keep themselves clean[;]" (2) he had never watched pornographic videos in front of Alisha and Jana; and (3) he and Petitioner had sex "[c]ouple times" while Alisha and Jana were sleeping.  Id. at 152-53, 157-58.  On redirect, Nakamura testified while he cared more for Vandalee and Anthony, he would never sexually abuse Alisha or Jana.  Id. at 161.

Petitioner called Nadine Yokomichi-Teramae ("Yokomichi") as a witness. Id. at 175.  Yokomichi indicated that she was employed by the Department of Human Services ("DHS") and had been Petitioner "income maintenance worker [a] couple [of] years ago."  Id. at 176.  According to Yokomichi, Nakamura came to her office in April 1991, and informed her that Petitioner had abandoned him, Vandalee, and Anthony.  Id. at 179-80.  While Yokomichi saw Vandalee and Anthony asleep in Nakamura's car, she did not see Alisha or Jana.  Id. at 180.

Petitioner took the stand in her own defense.  TR9/23/93 at 10.  Petitioner testified that:  (1) she had been removed from Pacheco's custody at age five because Pacheco "had a previous record of alcohol abuse and child abuse[;]" (2) she was returned to Pacheco when she was  nine; (3) she was thirteen years old when Alisha was born and fifteen when Jana was born; (4) she met Nakamura when she was four months' pregnant with Jana; (5) Pacheco took custody of Alisha

33

and Jana after their births; (6) Pacheco and Nakamura did not get along; (7) Pacheco would yell and argue with Nakamura in front of Jana and Alisha; (8) Vandalee was Nakamura's and her "pet;" (9) Alisha and Jana would throw tantrums, fight with each other, pick on Vandalee, and lie because of the attention shown to Vandalee; and (10) Jana had a bedwetting problem even before she came to live with her.  Id. at 11-14, 16-19, 25-26.

While Petitioner admitted to touching the girls' breasts and vaginas while bathing them, she denied ever putting her finger in their vaginas.  Id. at 40-42.  She also denied ever putting her mouth on their vaginas or ever having them put their mouths on her vagina.  Id.  However, Petitioner indicated that she and Nakamura would watch pornographic movies at night when they thought the children were asleep.  Id. at 36-38.  According to Petitioner, the movies depicted "females making love, male and a female making love, a female masturbating with dildos," as well as oral sex.  Id. at 37.  She and Nakamura would also have sex, including oral sex, when they thought the children were asleep.  Id. at 39.

On cross-examination, Petitioner indicated that she had lived with Nakamura for six years and that Nakamura had acted as the father of the family.  Id. at 47.  She also admitted that she had "more feelings" for Vandalee and Anthony than Alisha and Jana.  Id. at 52-53.  Petitioner expressed her belief that Jana and Alisha were jealous of the attention paid to Vandalee and Anthony.  Id. 51, 53.

Following her testimony, Petitioner rested her case. Id. at 64. The trial

court denied Petitioner's and Nakamura's motions for judgment of acquittal as to

all counts. Id. at 81-82.

During closing argument, the prosecutor argued to the jury

that Jana and Alisha, when they came into court, told you the truth
about what happened to them. It's difficult for them to talk about it.
But they came in here as best a five and seven year old can to tell you,
to put their trust in you as to what happened to them.

* * * *

Ladies and gentlemen, this case boils down to credibility. Who
do you believe, Jana and Alisha or [Nakamura] and [Petitioner]? And
when you look at the facts of this case, the facts show that Jana and
Alisha are telling you the truth.

And ladies and gentlemen, be reasonable in what you would
expect the children to be. Be reasonable in what you would expect a
five year old and a seven year old to come in here and tell you when
they were abused before they were three and five, two years ago.

And ladies and gentlemen, the only thing that you have to do to
convict the defendants of every single one of these counts is to believe
the children. If you believe Jana and Alisha, then the defendants are
guilty of all of these counts."

TR9/24/93 at 15, 17.

In his closing argument, Nakamura argued that there was no medical

evidence to show that either girl had been sexually assaulted and that their

testimony was "pre-recorded and programed [sic]." Id. at 25. Similarly, Petitioner

argued that the girls had been repeatedly questioned until the police and CPS and

CAC workers got the answers they were looking for.  Id. at 46.  She also argued

that:  (1) the girls' testimony was motivated by the desire to live with their foster

parents; (2) Mazepa's testimony had been given simply to convict Petitioner; and

(3) Bidwell's testimony was inconsistent with the charges against her and

Nakamura.  Id. at 45-46, 49, 54-55.

In rebuttal, the prosecutor argued that the scarring inside Alisha's vagina

was medical evidence that Alisha had been assaulted and that Bidwell's testimony

that the injury would have caused bleeding was consistent with what Alisha

reported to him.  Id. at 65-66.  Over Nakamura's objection, he also argued that the

jurors should use their common sense to determine whether Mazepa's testimony of

the girls' preoccupation with safety, sexualized behavior, and Jana's bedwetting

was consistent with the defense theory that Alisha and Jana had been programmed

into making up allegations of sexual abuse.  Id. at 71-72, 77.

On September 29, 1993, the jury found Petitioner guilty as charged.

TR9/29/93 at 8-11.  Nakamura was found guilty in Counts 6-8, 11, and 18-20; he

was acquitted in Counts 9 and 21.  Id. at 6-8.

### D.    Sentencing.

On November 23, 1993, the State filed a motion for extended term of

imprisonment ("Sentencing Motion"), alleging that:  (1) Petitioner was a "multiple

offender" within the meaning of **H.R.S.** **§ 706-662(4)(a)** and **(b)**;[13] and (2) her

commitment for an extended prison term was necessary for the protection of the

public. Exh. L. The motion was heard on November 29, 1993. See TR11/29/93.

At the hearing, the State requested that the trial court "take judicial notice of

the records and files in this case as well as the presentence diagnosis and report."

Id. at 9. The trial court granted the State's request "as to the records and files, but

not as to the presentence report." Id. at 10. The State argued that the trial court

should grant extended consecutive terms as to Counts 1-5 and 13-17. TR11/29/93

at 8-9, 11.

After hearing from Petitioner's counsel, the trial court ruled:

---

[13]  **H.R.S.** **§ 706-662(4)(a)** and **(b)** provides:

A convicted defendant may be subject to an extended term of
imprisonment under 706-661, if the convicted defendant satisfies one
or more of the following criteria:

\*   \*   \*   \*

(4) The defendant is a multiple offender whose criminal actions
were so extensive that a sentence of imprisonment for an extended
term is necessary for the protection of the public. The court shall not
make this finding unless:

(a) The defendant is being sentenced for two or more felonies
or is already under sentence of imprisonment for felony; or

(b) The maximum terms of imprisonment authorized for each of
the defendant's crimes, if made to run consecutively would equal or
exceed forty years if the extended term imposed is for a class A
felony.

Pursuant to the [Sentencing Motion], and that would life imprisonment with the possibility of parole, under the relevant statutes of 706-662 and 664, I will conclude that by virtue of the conviction of the five counts of Class A felonies, the Sexual Assault [in the] First Degree, as well as the five counts of Sexual Assault in the Third Degree, that this would qualify for the first prong, that she would be considered or deemed a multiple offender.

Secondly, with respect to the issue of whether these acts or the propensity of this defendant poses a danger to the community, I would be led to the conclusion that yes, she does pose a significant danger to the community by virtue of the facts entered into by this jury to support their guilty verdicts.

Id. at 27-28.  Thereafter, the court orally granted the Sentencing Motion, stating that "the key factors considered by the Court are the nature of the offenses and the harm, the irreparable harm done to the victims and the danger [Petitioner] pose[s] to the community."  Id. at 28-30.  The court orally sentenced Petitioner to five consecutive life terms in Counts 1, 2, 3, 13 and 14 and five extended ten-year terms of imprisonment in Counts 4, 5, 15, 16, and 17.  Id. at 28-29.

Judgment of conviction was entered and Petitioner was sentenced to life imprisonment with the possibility of parole on each of the first degree sexual assault charges, to be served consecutively, and ten years of imprisonment for each of the third degree sexual assault charges, to be served concurrently with all other sentences.  Exh. N.  The written order granting the Sentencing Motion was filed on February 28, 1994 ("Extended Term Order").  Exh. O.

**E.    Direct appeal.**

In her direct appeal, Petitioner argued in her Amended Opening Brief ("1st

Opening Brief") that:

I.    THE RELEVANCE OF THE COMPLAINANT'S
SUBSEQUENT BEHAVIOR WAS CONDITIONAL UPON
EXPERT TESTIMONY ESTABLISHING THAT THE BEHAVIOR
WAS PROBATIVE OF SEXUAL ABUSE AND THE LOWER
COURT ERRED IN ADMITTING THE EVIDENCE IN THE
ABSENCE OF SUCH TESTIMONY.

II.    THE COMPLAINANT'S HEARSAY STATEMENTS
ELICITED BY DR. BIDWELL THAT SMITH AND NAKAMURA
HAD SEXUALLY ABUSED THEM WERE NOT ADMISSIBLE
UNDER HRE RULE 803(b)(4) AS STATEMENTS MADE FOR
THE PURPOSES OF MEDICAL TREATMENT OR DIAGNOSIS.

III.    THE LOWER COURT'S IMPROPER ADMISSION OF DR.
BIDWELL'S OPINION REGARDING THE COMPLAINANTS
HEARSAY STATEMENTS THAT SMITH AND NAKAMURA
ABUSED THEM UNFAIRLY PREJUDICED SMITH'S RIGHT TO
A FAIR TRIAL.

IV.    THE LOWER COURT REVERSIBLY ERRED BY FAILING
TO INSTRUCT THE JURY THAT SMITH COULD NOT BE
FOUND GUILTY OF SEXUAL ASSAULT IN THE THIRD
DEGREE BASED ON EVIDENCE THAT SHE TOUCHED THE
COMPLAINANT'S SEXUAL OR INTIMATE PARTS IN THE
COURSE OF NORMAL CARE AND HYGIENE.

V.    IT WAS AN ABUSE OF DISCRETION FOR THE LOWER
COURT TO EXTEND SMITH'S MAXIMUM SENTENCES AND
TO SENTENCE HER TO FIVE CONSECUTIVE LIFE TERMS OF
IMPRISONMENT.

Exh. P at ii.  The State filed its Answering Brief on October 24, 1994.  Exh. Q.

Petitioner filed a Reply Brief ("Reply Brief") on November 7, 1994.  Exh. R.  The

Hawaii Supreme Court affirmed the judgment of conviction by summary

disposition order on January 13, 1997.  Exh. S.  Petitioner filed a Motion for

Reconsideration on January 27, 1997 ("Reconsideration Motion").  Exh. T.  Notice

and Judgment on Appeal was filed on January 31, 1997.  Exh. U.

### F.     First Rule 40 proceedings.

Petitioner filed a Petition for Post-Conviction Relief pursuant to **H.R.P.P.**

**Rule 40** in SPP No. 98-0027 on April 1, 1998 ("1st Rule 40 Petition").  Exh. V.

The State filed its answer to the petition on April 29, 1998.  Exh. W.

On August 17, 1999, Petitioner filed an Amended Petition for Post-

Conviction Relief in SPP No. 98-0027 ("Amended Rule 40 Petition").  Exh. X.  In

her Amended Rule 40 Petition, Petitioner alleged four grounds for relief:  (1)

"Denial of Effective Assistance of Counsel" (Ground 1); (2) "Defendant was

denied certain rights provided under the Hawaii Court Rules (Ground 2); (3)

"Upon direct appeal, appellate writer showed ineffectiveness by failing to raise the

issue of ineffectiveness of trial counsel (Ground 3); and (4) "Incidents occurred on

the record that were clearly prejudicial to the defendant and bolstered the

credibility of the victims and invoked sympathy from the jurors" (Ground 4).[14]  Id.

at 6-10.

---

[14]  In Ground 1, Petitioner alleged that trial counsel was ineffective for
failing to:  (1) file pre-trial motions or motions in limine to exclude Bidwell's
testimony; (2) hire an expert witness to challenge Bidwell's testimony; (3) request

The State filed its answer to the Amended Rule 40 Petition on April 3, 2000. Exh. Y.  The State argued, *inter alia*, that:  (1) Ground 1 had been previously ruled upon by the Hawaii Supreme Court when it rejected Petitioner's claim on direct appeal that Bidwell's testimony had been improperly admitted; and (2) Grounds 2, 3, and 4 should be deemed waived as Petitioner had not raised them on direct appeal.  Id. at 16-18.

On February 22, 2001, the state court filed a decision and order denying Petitioner's Amended Rule 40 Petition.  Exh. Z.  The court ruled that Petitioner's claim that trial counsel had been ineffective for failing to move pretrial or in limine to exclude Bidwell's testimony:  (1) was patently frivolous and without a trace of support in the record; and (2) had been previously ruled upon on direct appeal and therefore, relief was foreclosed by **H.R.P.P. Rule 40(a)(3).**  Id. at 11-15.  It further ruled that Petitioner's other claims were patently frivolous and without a trace of support in the record and that Ground 4 had been waived.  Id. at 15-29.

Petitioner appealed the denial of her Amended Rule 40 Petition and on October 1, 2001, the Hawaii Supreme Court ordered that the court clerk file a document submitted by Petitioner to the Office of the Chief Justice, entitled,

---

discovery on Mazepa's background; and (4) subpoena Pacheco.  Exh. X at 6-8.  In Ground 4, Petitioner alleged that the guardian ad litem's invitation to Alisha to slap his hand and his "making small talk" with her during a bench conference, was prejudicial, bolstered Alisha's credibility, and invoked sympathy from the jury.  Id. at 8-10.

"Petition for Writ of Certiorari to the Circuit Court of the First Circuit of the State of Hawaii" as the Opening Brief in Sup. Ct. No. 24155 ("2nd Opening Brief"). Exh. AA. The 2nd Opening Brief contained two arguments, neither of which had been asserted as grounds for relief in the Amended Rule 40 Petition:

> I.     THE STATE TRIAL COURT VIOLATED SMITH'S FOURTH AND SIXTH AMENDMENT RIGHT TO CONFRONTATION AND DUE PROCESS OF LAW BY ADMITTING HEARSAY TESTIMONY WHICH VOUCHED FOR THE CREDIBILITY OF THE TWO CHILD VICTIMS FROM THE PROSECUTION'S MEDICAL EXPERT, ROBERT BIDWELL[.]
>
> II.    THE COMPLAINANT'S HEARSAY STATEMENTS ELICITED BY DR. BIDWELL THAT SMITH AND NAKAMURA HAD SEXUALLY ABUSED THEM WERE NOT ADMISSIBLE UNDER HRE RULE 803(b)(4) AS STATEMENTS MADE FOR THE PURPOSES OF MEDICAL TREATMENT OR DIAGNOSIS.

Exh. BB at i-ii. In addition, the Hawaii Supreme Court ordered that Petitioner: (1) serve, within thirty days after entry of the order, copies of her 2nd Opening Brief on the State; and (2) submit two copies of the document to the clerk. Exh. AA.

On December 11, 2001, the Hawaii Supreme Court granted the prosecution's motion for relief from default and ordered Petitioner, *inter alia*, to: (1) serve a copy of the 2nd Opening Brief on the State within fifteen days; and (2) file a response within ten days as to why she failed to comply with the court's order of October 1, 2001. Exh. CC. Petitioner was warned that the failure to file a response or to show good cause could result in dismissal of the appeal. Id.

42

On Petitioner's motion, the deadline to respond to the Hawaii Supreme Court's December 11, 2001 order was extended to January 31, 2002. Exh. DD. On February 21, 2002, Petitioner moved to hold the proceedings in abeyance for ninety days due to extraordinary and exigent circumstances. Exh. EE. The court dismissed the motion that same day as a non-attorney had attempted to represent Petitioner in connection with the motion. Exh. FF. However, the court waited until April 24, 2002, before dismissing the appeal for Petitioner's failure to: (1) serve a copy of the 2nd Opening Brief upon the prosecution; and (2) timely respond to the order to show cause. Exh. GG.

### G.    Second Rule 40 proceeding.

On July 3, 2002, Petitioner filed another Petition for Post-Conviction Relief pursuant to **H.R.P.P. Rule 40** in SPP No. 02-1-0051 ("2nd Rule 40 Petition"). Exh. HH. In the petition, Petitioner alleged that "[she] was illegally sentenced because [her] sentence was enhanced by a judge based upon a fact that should have been determined by a jury by a standard of proof beyond a reasonable doubt." Id. at 5. Petitioner blamed her failure to previously raise the issue on: (1) ignorance of the law; (2) inadequate access to legal materials; and (3) denial of a prior request for counsel. Id. The State filed its answer to the petition on August 6, 2002, arguing that Petitioner's sentence was not illegal under **Apprendi v. New Jersey**,

530 U.S. 466 (2000).  Exh. II.  The state court denied Petitioner's 2nd Rule 40

Petition on March 20, 2003.  Exh. JJ.

Petitioner appealed the order denying her 2nd Rule 40 Petition, filing an

Opening Brief ("3rd Opening Brief") on August 5, 2003.  Exh. KK.  In the brief,

Petitioner argued:

> WHEN THE TRIAL COURT SENTENCED [PETITIONER] TO
> LIFE IMPRISONMENT IT VIOLATED HER UNITED STATES
> AND HAWAII CONSTITUTIONAL RIGHTS TO A JURY TRIAL
> AS THE TRIAL JUDGE'S FINDING THAT [PETITIONER'S]
> CRIMINAL ACTIONS WERE SO EXTENSIVE THAT A
> SENTENCE OF IMPRISONMENT FOR AN EXTENDED TERM
> WAS NECESSARY FOR PROTECTION OF THE PUBLIC WAS A
> FACT THAT SHOULD HAVE BEEN DETERMINED BY THE
> JURY BY PROOF BEYOND A REASONABLE DOUBT.  THIS IS
> BECAUSE THE JUDGE'S FINDINGS EXPOSED [PETITIONER]
> TO A PENALTY EXCEEDING THE MAXIMUM SHE WOULD
> RECEIVE IF PUNISHED ACCORDING TO THE FACTS
> REFLECTED IN THE JURY VERDICT ALONE IN VIOLATION
> OF APPRENDI V. N.J., 530 U.S. 466 (2000) AND ITS PROGENY.

Id. at i.  The State filed its Answering Brief on October 10, 2003.  Exh. LL.  The

Hawaii Supreme Court affirmed the order denying Petitioner's 2nd Rule 40

Petition by summary disposition order on February 2, 2004.  Exh. MM.  Notice

and Judgment on Appeal was filed on February 24, 2004.  Exh. NN.

### H.     Instant Habeas proceeding.

On February 6, 2004, Petitioner filed a "Petition Under § 2254 for Writ of

Habeas Corpus by a Person in State Custody" ("Petition").  See Petition.  The

Petition alleged six grounds for relief:

44

GROUND ONE:  In violation of the confrontation clause of the Sixth amendment to the United States Constitution and the due process clause of the Fourteenth Amendment to the United States Constitution, the State adduced inadmissible hearsay -- which, moreover, did not bear particularized indicia of reliability or trustworthiness -- to convict [Petitioner].

* * * *

GROUND TWO:  In violation of the due process clause of the Fourteenth Amendment to the United States Constitution, the State was permitted to adduce testimony from the complainants' foster mother concerning post-offense behaviors, which adduced inadmissible hearsay -- which, without any further testimony -- expert or lay -- about the children's particular behaviors, the State was permitted to argue to the jury constituted "acting out" behaviors and was evidence of sexual abuse.

* * * *

GROUND THREE:  In violation of the confrontation clause of the Sixth Amendment to the United States Constitution and the due process clause of the Fourteenth Amendment to the United States Constitution, the children's guardian *ad litem* bolstered and vouched for the complainants' credibility in front of the jury.

* * * *

GROUND FOUR:  In violation of the right to counsel clause of the Sixth Amendment to the United States Constitution and the due process clause of the Fourteenth Amendment to the United States Constitution, trial counsel rendered [Petitioner] ineffective assistance of counsel.

* * * *

GROUND FIVE:  In violation of the due process clause of the Fourteenth Amendment to the United States Constitution, [Petitioner] was sentenced to consecutive extended life terms of imprisonment,

without the trial court having considered statutorily required factors
and on insufficient evidence.

* * * *

GROUND SIX:  In violation of the trial-by-jury clause of the Sixth
Amendment to the United States Constitution and the due process
clause of the Fourteenth Amendment to the United States
Constitution, [Petitioner's] extended term sentences were imposed on
the basis of a factual finding statutorily committed to and in fact made
by the sentencing judge rather than a jury.

Petition at 4-7.

On June 1, 2004, Respondents filed their Answer.  See Answer.  On May 12,

2005, United States Magistrate Kevin S.C. Chang entered "Findings and

Recommendation to Dismiss Petition for Writ of Habeas Corpus" ("F&R").  See

F&R.  The Magistrate concluded that Petitioner failed to exhaust Grounds Three

and Four of the Petition and that the Petition should be dismissed without

prejudice.  Id. at 12, 17.  However, Petitioner was given the option of:  (1)

voluntarily deleting Grounds Three and Four of the Petition; or (2) voluntarily

dismissing Grounds Three and Four of the Petition and moving to stay the Petition

and holding it in abeyance until she had fully exhausted her claims in state court.

Id. at 17-18.  The F&R directed Petitioner to notify the court within thirty days as

to how she would be proceeding.  Id.

On August 30, 2005, Petitioner filed "Petitioner's Response to Magistrate's

Findings and Recommendation to Dismiss Petition for Writ of Habeas Corpus

Filed on May 12, 2005" ("Petitioner's Response").  See Petitioner's Response.

Petitioner disputed the Magistrate's finding that Grounds Three and Four had not

been exhausted in state court, but agreed with the Magistrate's finding that said

grounds had been procedurally defaulted.  Petitioner's Response at 3.  Petitioner

requested that the matter be remanded to the Magistrate for a hearing as to whether

Petitioner could show "cause and prejudice" excusing her default.  Petitioner's

Response at 4.  On April 6, 2006, Chief United States District Judge Helen Gillmor

issued a Minute Order ("Minute Order") directing Petitioner by April 21, 2006:

> (1)   to identify the exact place she raised Grounds Three and Four in
>        her opening brief to the Hawaii Supreme Court; and
>
> (2)   to brief the issue of whether Grounds Three and Four are
>        procedurally barred.

Minute Order at 2.  On April 21, 2006, Petitioner filed "Petitioner's Response to

Court's Order Issued on April 6, 2006" ("Petitioner's 2nd Response").  See

Petitioner's 2nd Response.  In the response, Petitioner withdrew Grounds Three

and Four of the Petition.  Id. at 3.

On June 13, 2006, Chief United States District Judge Helen Gillmor entered

the "Order Adopting in Part Magistrate Judge's Findings Regarding Petition for

Writ of Habeas Corpus" ("Order").  See Order.  The District Court ruled that

Petitioner could proceed on Grounds One, Two, Five, and Six of the Petition and

directed the parties to resubmit briefs on the merits of Grounds One, Two, Five,

and Six of the Petition.  Order at 15.

## II.

## STANDARD OF REVIEW

As Petitioner filed her Petition after the effective date of the Antiterrorism

and Effective Death Penalty Act of 1996 (hereinafter "AEDPA"), the provisions of

the AEDPA apply to her Petition.  **Woodford v. Garceau**, 538 U.S. 202, 207

(2003) (application filed after the AEDPA's effective date should be reviewed

under the AEDPA).  **28 U.S.C. § 2254(d)** provides:

> (d)    An application for a writ of habeas corpus on behalf of a person
> in custody pursuant to the judgment of a State court shall not be
> granted with respect to any claim that was adjudicated on the
> merits in State court proceedings unless the adjudication of the
> claim –
>
> (1)    resulted in a decision that was contrary to, or
> involved an unreasonable application of, clearly
> established Federal law, as determined by the
> Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an
> unreasonable determination of the facts in light of
> the evidence presented in the State court
> proceeding.

**28 U.S.C. § 2254(d)** created a "new, highly deferential standard for

evaluating state-court rulings."  **Lindh v. Murphy**, 521 U.S. 320, 333 n.7 (1997).

The AEDPA has narrowed the scope of federal habeas review of state convictions

where the state court has adjudicated a petitioner's federal claim on the merits. Under that standard, the reviewing court may grant habeas relief only if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." **28 U.S.C. § 2254(d)(1)**. The Supreme Court has interpreted the phrase "clearly established Federal law" to mean "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." **Williams v. Taylor,** 529 U.S. 362, 412, (2000).

A state-court decision is "contrary to" clearly established Federal law where "the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." **Williams**, 529 U.S. at 412-13. A state-court decision is an "unreasonable application" of clearly established Supreme Court law if a state court "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of [a] prisoner's case." **Williams**, 529 U.S. at 413. "Under the latter standard, 'a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.'" **Williams**, 529 U.S. at 411. The

49

Supreme Court has made clear that some erroneous applications may nonetheless be reasonable: "an unreasonable application of federal law is different from an incorrect application of federal law." **Williams**, 529 U.S. at 410. A state court's decision is an "unreasonable application" of federal law only if it is "objectively unreasonable," which "requires the state court decision to be more than incorrect or erroneous." **Lockyer v. Andrade**, 538 U.S. 63, 75 (2003).

The Supreme Court has repeatedly emphasized the deference owed under the AEDPA to state court adjudications on the merits. Even if the federal court might agree with a petitioner on the merits of a claim, where it is "at least reasonable" for the state court to have concluded otherwise, relief is foreclosed by the AEDPA. **Early v. Packer**, 537 U.S. 3, 11 (2002) (per curiam). A federal court may not "substitute[] its own judgment for that of the state court, in contravention of 28 U.S.C. § 2254(d)." **Woodford v. Visciotti**, 537 U.S. 19, 25 (2002) (per curiam). The federal habeas scheme leaves "primary responsibility with the state courts" to make judgments about the validity of federal constitutional claims "and authorizes federal-court intervention only when a state-court judgment is objectively unreasonable." **Visciotti**, 537 U.S. at 27. Furthermore, "state court are the ultimate expositors of state law[.]" **Mullaney v. Wilbur**, 421 U.S. 684, 690-91 (1975).

# III.

## ARGUMENT

**A.    THE TRIAL COURT'S RULING ADMITTING BIDWELL'S TESTIMONY RECOUNTING THE COMPLAINANTS' MEDICAL HISTORY WAS NOT CONTRARY TO, OR INVOLVED AN UNREASONABLE APPLICATION OF CLEARLY ESTABLISHED FEDERAL LAW, AS DETERMINED BY THE SUPREME COURT OF THE UNITED STATES.**

### 1.    Introduction.

In her Petition, Petitioner claims that the admission of Bidwell's testimony recounting Alisha and Jana's out-of-court statements of their medical histories violated her federal right to confrontation and due process.  See Petition at 4-5.  In her "Memorandum in Support of Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody" ("Petitioner's Memo"), she expands the claim to include the trial court's ruling permitting Bidwell to testify "that the results of his 'examination' were 'consistent' with what the children had said[.]" Petitioner's Memo at 40.

Over Petitioner's hearsay objection, Bidwell had been permitted to testify that:  (1) Alisha had told him that Nakamura placed his finger in her vagina and that she had been made to lick Petitioner's vagina; and (2) Jana had told him that: (a) Nakamura had placed his fingers and penis in her vagina; (b) Nakamura had made her put her mouth on his penis; and (c) Petitioner had made her lick

51

Petitioner's vagina.  TR9/21/93 at 96, 111.  The trial court ruled that Alisha and Jana's out-of-court statements were admissible pursuant to **H.R.E. Rule 803(b)(4)**. Id. at 92-93.

Over Nakamura's objection "based on State v. Morris[,]" the trial court permitted Bidwell to testify that the scar to Alisha's hymenal ring was consistent with the medical history she provided.  Id. at 106.  Nakamura later made "a running objection to all [of Bidwell's] testimony[] [based on] [l]ack of foundation, State v. Morris[.]" Id. at 110.  Thereafter, Bidwell testified that:  (1) Alisha's injury was consistent with someone placing a penis into her vagina; and (2) Jana's medical history was consistent with the physical findings of his examination of Jana.  Id. at 110, 115.

> **2.     The trial court's ruling admitting Bidwell's testimony recounting the complainants' medical history did not violate Petitioner's confrontation rights.**

Although Petitioner acknowledges that "the state trial court found that Dr. Bidwell's testimony fell under the medical examination exemption, [she] submits that the trial court misapplied the analysis and failed to consider issues of trustworthiness in contradiction of clearly established federal law regarding the introduction of hearsay statements."  Petitioner's Memo at 31.  She argues that: (1) Bidwell's testimony did not fall within the "medical examination exception" to the rule against hearsay; (2) all or some of the complainants' statements were not

supported by particularized guarantees of trustworthiness; and (3) Bidwell should not have been permitted to testify as to the identity of the persons who allegedly perpetrated the acts of sexual abuse.  Petitioner's Memo at 32-33.  Based upon the foregoing, Petitioner claims that "the admission of these various distinct hearsay testimony violated [her] right to confrontation."  Id. at 33.  Petitioner's claim is without merit.

"The Confrontation Clause of the Sixth Amendment, made applicable to the States through the Fourteenth Amendment provides:  "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him."  **Idaho v. Wright**, 497 U.S. 805, 813 (1990) (ellipses in original).  "The Confrontation Clause provides two types of protections for a criminal defendant: the right physically to face those who testify against him, and the right to conduct cross-examination."  **Coy v. Iowa**, 487 U.S. 1012, 1017 (1988) (citation and internal quotation marks omitted).  It confers "a right to meet face to face all those who appear and give evidence at trial."  Id. at 1016 (citation and internal quotation marks omitted).

While Petitioner provides lengthy arguments and cites to numerous decisions in support of her confrontation claim, see Petitioner's Memo at 33-55, her analysis clearly misses the mark.  Petitioner omits the one fact that entirely disposes of her confrontation claim:  both Alisha and Jana testified at trial and

53

were therefore, subjected to cross-examination by Petitioner and Nakamura.  See TR9/15/93 at 99-211; TR9/16/93 at 30-105, 109-76; TR9/17/93 at 8-33.  As both girls testified at trial, the trial court's ruling admitting their out-of-court statements to Bidwell was not contrary to, or an unreasonable application of, "clearly established [Confrontation Clause] law, as determined by the Supreme Court of the United States[.]"  **28 U.S.C. § 2254(d)(1)**.

In **California v. Green**, 399 U.S. 149 (1970), the United States Supreme Court ("Supreme Court") held that admission of a witness' preliminary hearing testimony at the respondent's trial did not violate the Confrontation Clause despite the witness' "apparent lapse of memory[.]"  Id. at 170.  The Supreme Court explained:

> "The primary object of the [Confrontation Clause] was to prevent depositions or ex parte affidavits, such as were sometimes admitted in civil cases, being used against the prisoner in lieu of a personal examination and cross-examination of the witness, in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief."  Mattox v. United States, 156 U.S. 237, 242-243, 15 S.Ct. 337, 339, 39 L.Ed. 409 (1895).

> ***Viewed historically, then, there is good reason to conclude that the Confrontation Clause is not violated by admitting a declarant's out-of-court statements, as long as the declarant is testifying as a witness and subject to full and effective cross-examination.***

> This conclusion is supported by comparing the purposes of confrontation with the alleged dangers in admitting an out-of-court

statement.  Confrontation:  (1) insures that the witness will give his statements under oath-thus impressing him with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury; (2) forces the witness to submit to cross-examination, the "greatest legal engine ever invented for the discovery of truth"; (3) permits the jury that is to decide the defendant's fate to observe the demeanor of the witness in making his statement, thus aiding the jury in assessing his credibility.

**Green**, Id. at 158-59 (footnote omitted) (emphasis supplied).

Similarly, in **United States v. Owens**, 484 U.S. 554 (1988), the Supreme Court held that the Confrontation Clause is not "violated by admission of an identification statement of a witness who is unable, because of memory loss, to testify concerning the basis for the identification." Id. at 564.  The Supreme Court stated that its

constitutional analysis [was] not altered by the fact that the testimony here involved an out-of-court identification that would traditionally be categorized as hearsay.  This Court has recognized a partial (and somewhat indeterminate) overlap between the requirements of the traditional hearsay rule and the Confrontation Clause.  ***The dangers associated with hearsay inspired the Court of Appeals in the present case to believe that the Constitution required the testimony to be examined for "indicia of reliability," or "particularized guarantees of trustworthiness[.]"  We do not think such an inquiry is called for when a hearsay declarant is present at trial and subject to unrestricted cross-examination.  In that situation, as the Court recognized in Green, the traditional protections of the oath, cross-examination, and opportunity to observe the witness' demeanor satisfy the constitutional requirements.***

**Owens**, 484 U.S. at 560 (citations omitted) (emphasis supplied); see also

**Crawford v. Washington**, 541 U.S. 36, 59 n.9 (2004) ("[W]hen the declarant

appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements....  The Clause does not bar admission of a statement so long as the declarant is present at trial to defend or explain it.  (citations omitted)); **United States v. Valdez-Soto**, 31 F.3d 1467, 1470 (9th Cir. 1994) cert. denied, 514 U.S. 1113 (1995) ("We are aware of no Supreme Court case, or any other case, which holds that introduction of hearsay evidence can violate the Confrontation Clause where the putative declarant is in court, and the defendants are able to cross-examine him.").

Accordingly, admission of Bidwell's testimony concerning the girls' medical history did not violate Petitioner's confrontation rights as both girls testified at Petitioner's trial.  Therefore, the trial court's ruling admitting Bidwell's testimony was not contrary to, or an unreasonable application of, "clearly established [Confrontation Clause] law, as determined by the Supreme Court of the United States[.]"  **28 U.S.C. § 2254(d)(1)**.

> **3.    The trial court's rulings admitting Bidwell's testimony recounting the girls' medical histories and that the histories were consistent with his examination findings did not render Petitioner's trial fundamentally unfair.**

The trial court ruled that Bidwell's testimony recounting Alisha and Jana's out-of-court statements were admissible under **H.R.E. Rule 803(b)(4)**.  TR9/21/93 at 92-93, 95.  **H.R.E. Rule 803(b)(4)** provides in pertinent part:

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

\* \* \* \*

(4) *Statements for Purposes of Medical Diagnosis or Treatment.* Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

The Hawaii Supreme Court has stated:

HRE Rule 804(b)(4) excepts from the general prohibition against hearsay, statements "made for purposes of medical diagnosis *or* treatment ... insofar as reasonably pertinent to diagnosis *or* treatment...." Thus, by its plain language, HRE Rule 804(b)(4) permits ... the admission of statements made *solely* for the purpose of diagnosis, insofar as reasonably pertinent to diagnosis, even if made in anticipation of litigation.

**State v. Yamada**, 99 Hawaii 542, 555, 57 P.3d 467, 480 (Sup. 2002) (emphases and some ellipses in original). "[A] state court's interpretation of state law ... binds a federal court sitting in habeas corpus." **Bradshaw v. Richey**, __ U.S. __, 126 S.Ct. 602, 604 (2005) (citations omitted).[15]

_____

[15] Although Petitioner "submits" that the Hawaii Supreme Court's interpretation of its own evidentiary rule violates clearly established federal law, she fails to identify the specific Supreme Court holding it contravenes. See Petitioner's Memo at 35 n.3. Moreover, the Hawaii Supreme Court's interpretation of **H.R.E.** **Rule 803(b)(4)** comports with the Eighth Circuit Court of Appeals' interpretation of **Federal Rules of Evidence** ("**F.R.E.**") **Rule 803(4)**. **United States v. Iron Shell**, 633 F.2d 77, 83 (8th Cir. 1980) ("[F.R.E. Rule 803(4) abolished the distinction between the doctor who is consulted for the purpose of treatment and an examination for the purpose of diagnosis only; the latter usually

Petitioner claims that the trial court erred in admitting Bidwell's testimony under **H.R.E. Rule 803(b)(4)** as "it can be concluded that Dr. Bidwell, the prosecution's hired medical legal expert, did not examine the alleged victims for the purpose of medical diagnosis or treatment."[16] Petitioner's Memo at 39. However, federal habeas corpus relief "is unavailable for alleged error in the interpretation or application of state law." **Middleton v. Cupp**, 768 F.2d 1083, 1085 (9th Cir. 1985). The Supreme Court has stated:

> We have stated many times that "federal habeas corpus relief does not lie for errors of state law. Today we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States.

**Estelle v. McGuire**, 502 U.S. 62, 67-68 (1991) (citations omitted). Furthermore,

---

refers to a doctor who is consulted only in order to testify as a witness." (footnote omitted).

[16] In support of her claim, Petitioner baldly asserts that "[t]he facts of this case demonstrate that the prosecution disguised Dr. Bidwell's testimony under the medical examination exception for the purpose of admitting inadmissable [sic] evidence." Petitioner's Memo at 33. She also questions Bidwell's "alleged medical expertise," calling him "nothing less than a hired prosecution witness whose sole purpose was to get into evidence the hearsay statements of the child witnesses[.]" Id. at 34. However, the record reveals that Bidwell's education, training, and experience more than qualified him to be an "expert in the field of medicine with a specialty in adolescent medicine and a further subspecialty in sexual assault" given his education, training and experience. See TR9/21/93 at 68-83. Petitioner apparently thought so as she did not object to the State's request to qualify him as such. Id. at 83.

> [a] state court's ... evidentiary ruling is not subject to federal habeas
> review unless the ruling violates federal law, either by infringing upon
> a specific federal constitutional or statutory provision or by depriving
> the defendant of the fundamentally fair trial guaranteed by due
> process.  Thus, a federal court cannot disturb on due process grounds
> a state court decision to admit ... evidence unless the admission of the
> evidence was arbitrary or so prejudicial that it rendered the trial
> fundamentally unfair.

**Walters v. Maass**, 45 F.3d 1355, 1357-1358 (9th Cir. 1995) (citations omitted).

As admission of Bidwell's testimony did not violate the Petitioner's right of

confrontation, see Argument A(2) supra, Petitioner must look to the Due Process

Clause for relief.  However,

> [b]eyond the specific guarantees enumerated in the Bill of Rights, the
> Due Process Clause has limited operation.  [The Supreme Court],
> therefore, ha[s] defined the category of infractions that violate
> "fundamental fairness" very narrowly.  As [it] observed in *Lovasco*,
> [431 U.S.] at 790, 97 S.Ct., at 2048;
>
>> "Judges are not free, in defining 'due process,' to impose on
>> law enforcement officials their 'personal and private notions' of
>> fairness and to 'disregard the limits that bind judges in their
>> judicial function.'  They are to determine only whether the
>> action complained of violates those 'fundamental conceptions
>> of justice which lie at the base of our civil and political
>> institutions,' and which define 'the community's sense of fair
>> play and decency[.]'"

**Dowling v. United States**, 493 U.S. 342, 352-53 (1990) (citations, brackets, and

ellipses omitted).

Although Petitioner claims that Bidwell did not examine Alisha and Jana for

purposes of medical diagnosis or treatment, Petitioner's Memo at 32, the trial court

found otherwise, stating: "I am allowing the [evidence] under ... the [H.R.E. Rule] 803(b)(4) exception to the hearsay rule which specifically permits the witness to testify to what statements were made for the purposes of his diagnosis or his treatment of the patient in question. So that's specifically for purposes of medical diagnosis or treatment."[17] TR9/21/93 at 95. The trial court's factual determination that the girls' statements were made for purposes of diagnosis and treatment is presumed correct and can be rebutted only by "clear and convincing evidence." See 28 U.S.C. § 2254(e)(1). Petitioner has failed to satisfy her burden.

At trial, Bidwell testified that he performed medical examinations on both Alisha and Jana. TR9/21/93 at 85, 110, 153. Although a social worker initially took the girls' medical histories, Bidwell stated that he "confirm[ed] [the medical history] with the patient[s], it's just standard practice."[18] TR9/21/93 at 111. Bidwell testified: "[W]e get a history, a brief medical history of how that[] child['s] medical health has been in the past. And then focusing more on the incidents relating to them coming into the clinic." Id. at 86. When asked if he

---

[17] In addition, in denying Petitioner's motion to strike Bidwell's testimony that the girls had said that they had been made to lick Petitioner's vagina, the court noted that "Bidwell testified further to the giving of certain tests for sexually transmitted disease. And certainly the fact that the children may have allegedly been exposed to such physical contact in such a private area might subject them and would require medical attention or treatment." TR9/21/93 at 186.

[18] Bidwell specifically confirmed with Alisha that Nakamura had put his fingers in her vagina and that Petitioner had made her lick Petitioner's vagina. TR9/21/93 at 99.

relied on both the physical examination and the medical history to "make a

diagnosis and decide how to treat[,]" Bidwell responded:  "Yes, those are both

important parts of the evaluation process."  Id.  The patient's medical history

"guides" the physical examination.  Id. at 160.  Bidwell testified:

> After getting [the information about the sexual abuse from
> Alisha,] we asked whether there was previous history or injuries or
> diagnostic procedures in the genital area.  The reason for that is to see
> if there would be any other explanation for any findings that might
> come up on physical examination.  And there was no history of any
> injuries to that area.
>
> There were -- there was, on the part of Alisha, she did
> acknowledge that she had had episodes where there was bleeding
> from the vaginal area when [Nakamura] put his finger into her.  She
> said that it occurred on a few occasions.

Id. at 100.  As such, the record demonstrates that the girls' out-of-court statements

to Bidwell were made for diagnostic and treatment purposes.  Bidwell testified

that:  (1) he examined the girls for injury; (2) tested them for STDs; and (3) relied

on both the physical examination and the medical history for diagnostic purposes

and treatment decisions.  Id. at 86, 101-02, 134-35, 148-51, 160.

Petitioner also asserts that the trial court should not have allowed Bidwell to

recount the girls' out-of-court statements as the girls' statements lacked reliability

because "there was no evidence whatsoever that [Bidwell] identified himself as a

doctor to the children or that the children wanted medical treatment."  Petitioner's

Memo at 44-45.  However, the record reflects otherwise.  Mazepa testified that

both girls were nervous before the examinations so she "tried to prepare them a little bit of why [they] needed to do this."  TR9/17/93 at 64.  Furthermore, when Bidwell asked Alisha if she had a previous history of injuries or diagnostic procedures in the genital area, she informed him that she had experienced vaginal bleeding on occasions when Nakamura put his finger into her.  TR9/21/93 at 100.

Similarly, Jana told Bidwell that she had experienced vaginal bleeding.  Id. at 112.  Alisha also volunteered that she had boils on her buttocks for which she had received treatment.  Id. at 100.  Thus, the record reflects that Mazepa explained to the girls the purpose of Bidwell's examination.  Moreover, the information provided by the girls indicates that they were aware the purpose of giving such information, both physical and emotional, was to assist Bidwell in treating them.[19]

---

[19]  Although Petitioner questions the reliability of the girls' statements to Bidwell, statements made for purposes of medical diagnosis or treatment are "firmly rooted hearsay exceptions."  **White v. Illinois**, 502 U.S. 346, 357 (1992).  Firmly rooted hearsay exceptions are those that "rest upon such solid foundations that admission of virtually any evidence within them comports with the substance of constitutional protection."  **Ohio v. Roberts**, 448 U.S. 56, 66 (1980) (citation and internal quotation marks omitted).  "Admission under a firmly rooted hearsay exception satisfies the constitutional requirement of reliability because of the weight accorded longstanding judicial and legislative experience in assessing the trustworthiness of certain types of out-of-court statements."  **Wright**, 497 U.S. at 817.  Thus, even where the declarant does not testify at trial, admission of the declarant's statements made for medical diagnosis or treatment purposes do not violate the Confrontation Clause.  **White**, 502 U.S. at 357.

Petitioner also claims that the trial court erred by permitting Bidwell to testify that the girls named Nakamura and herself as the perpetrators of the sexual abuse. Petitioner's Memo at 52. However, numerous federal courts, including the Ninth Circuit Court of Appeals ("Ninth Circuit") have held that statements identifying a sexual abuser are "reasonably pertinent to treatment or diagnosis." See e.g. **United States v. George**, 960 F.2d 97 (9th Cir. 1992); **People of Territory of Guam v. Ignacio**, 10 F.3d 608 (9th Cir. 1993); **United States v. Cherry**, 938 F.2d 748 (7th Cir. 1991); **Morgan v. Foretich**, 846 F.2d 941 (4th Cir. 1988); **United States v. Renville**, 779 F.2d 430 (8th Cir. 1985). Even the Supreme Court has permitted such testimony under the medical treatment exception. See **White**, 502 U.S. 346.

In **George**, the Ninth Circuit noted:

The critical inquiry is whether such statements are "made for purposes of medical diagnosis or treatment" and are "reasonably pertinent to diagnosis or treatment." Fed.R.Evid 803(4).

Sexual abuse involves more than physical injury; the physician must be attentive to treating the victim's emotional and psychological injuries, the exact nature and extent of which often depend on the identity of the abuser. *Renville*, 779 F.2d at 437. Furthermore, depending upon the nature of the sexual abuse, the identity of the abuser may be pertinent to the diagnosis and treatment of sexually transmitted diseases....

**George**, 960 F.2d at 99 (footnote omitted).

Bidwell testified that in addition to a child's physical health, a pediatrician must consider the child's emotional and psychological needs, including whether referral to a specialist is warranted:

Pediatrics, like hopefully most of medicine, is not just dealing with the physical organism, but it's really becoming experts in the development of children as they grow from infancy through adulthood.

And so while the pediatrician should have a knowledge of the diseases that a child may have to face as they grow up, they also should have the knowledge, at least of the basics, of the developmental progression that a child goes through and issues that come up for a child. And those are in the areas of relationship to peers, or to other kids their own age, ***relationship to their parents***, sexuality, growing independence. Their new role as they move into schools as they develop new friends, those sorts of things, and that's part of the pediatricians['] role.

***We're not psychologists, we're not psychiatrists and there are times when we need to refer children, particularly children with identified problems on to those specialists.*** But a good pediatrician should be able to at least bring up and address those issues with parents.

And often to deal with minor problems things like temper tantrums, those sorts of things, or a kid that seems to be exceptionally shy acting out behavior, those kinds of things, again, some pediatricians -- depends on the pediatrician, some are more comfortable in working in those areas than others, but ***all pediatricians should be able to address and at least to begin to work in those areas*** in developmental areas as well as the physical concerns in the kid.

TR9/21/93 at 84-85 (emphases supplied).

64

Consequently, Bidwell stated that a patient's mental and medical history was an important part of making a diagnosis and deciding on treatment and tested both girls for STDs. Id. at 86, 135, 151. Moreover, the fact that Bidwell asked both girls about their greatest concern demonstrated his concern for their emotional and psychological well-being. See id. at 96-97, 160-61.

Thus, the record reflects that Bidwell was "attentive to treating the victim's emotional and psychological injuries, the exact nature and extent of which often depend on the identity of the abuser." **George**, 960 F.2d at 99 (citation omitted).

> Moreover, physicians often have an obligation under state law to prevent an abused child from being returned to an abusive environment. As a result, where the abuser is a member of the family or household, the abuser's identity is especially pertinent to the physician's recommendation regarding an appropriate course of treatment, which may include removing the child from the home.

**United States v. Joe**, 8 F.3d 1488, 1494 (10th Cir. 1993);

Although Bidwell indicated that he did not "necessarily" need to know the identity of the abuser, TR9/21/93 at 161, such information was required in this case. See **Joe**, 8 F.3d at 1494 ("[T]he identity of the abuser is reasonably pertinent to treatment in virtually every domestic assault case, even those not involving children."). While the girls may have already been residing in a foster home, Bidwell still needed to determine the identity of their abuser because he did not necessarily know how long they would remain with Mazepa. For all Bidwell knew, Petitioner could have regained physical custody of the girls. CPS was not

awarded permanent custody of the girls until November 4, 1992, more than a year after the examinations. TR9/20/93 at 59; TR9/21/93 at 85. Accordingly, the girls' statements identifying Petitioner and Nakamura as their abusers were "reasonably pertinent to treatment or diagnosis." **H.R.E.** **Rule 803(b)(4).**

Petitioner also complains that the trial court erred by permitting Bidwell to testify "that the results of his 'examination' were 'consistent' with what the children had said[.]" Petitioner's Memo at 40. The trial court had permitted Bidwell to testify that: (1) the scar found on Alisha's hymenal ring was consistent with the medical history provided by Alisha and consistent with someone placing a penis into the vagina; and (2) Jana's medical history was consistent with his examination of Jana. TR9/21/93 at 106, 110, 115. Petitioner claims that Bidwell's testimony "necessarily means that he relied on [the girls] statements, and is, in effect, an impermissible opinion as to the truthfulness of their hearsay statements." Petitioner's Memo at 48. Petitioner is clearly mistaken.

When Bidwell examined Alisha, he found "an area of abnormal tissue [at the front part of the hymenal ring], it was white, the area of thickened irregular tissue[] [t]hat was quite small, but definitely present. It was about ... one-eighth inch by a quarter inch." TR9/21/93 at 102. He described the tissue "as probably scar tissue or a scar." Id. Bidwell could not "think of anything else that would cause [the] tissue" and opined that the injury that caused the scar would have been "a slitting

66

where the edges that have been cut and separated and you see the underlying

tissue." Id. at 103, 105. Bidwell stated that the injury would have caused bleeding

and pain and had to have been more than a "simple scratch." Id. at 105-06.

While Bidwell did not find any scarring to Jana's hymen, he testified that

scarring is more difficult to locate in a fibrated hymen like Jana's, i.e., a hymen

with extra folds of tissue in it. Id. at 113-14, 176. Although he indicated that

Jana's medical history was consistent with his physical findings, Bidwell explained

that opinion:

> [G]iven the findings of a normal examination and that [Jana] had
> redundant tissue there and no signs of scar[r]ing, it's probably
> unlikely that an entire penis went through the vaginal opening, or
> went through the hymen into the vaginal opening. It's hard to say
> because the hymen is a very elastic tissue and it can widen up to
> accommodate fairly large objects.

> But I think that definitely if the penis were against the hymen[,]
> the penis, because it's a rounded object, the head could extend into the
> vagina behind the hymen because it's not like a taut membrane, it's
> fairly loose. And so I would expect certainly there could be partial
> penetration of the vagina by the penis.

Id. at 115.

By testifying that the girls' medical histories were consistent with his

physical findings, Bidwell was not commenting on their credibility. See **Punches**

**v. State**, 944 P.2d 1131, 1136 (Wyo. 1997) ("Testifying that the injuries were

consistent with sexual abuse is not directly expressing an opinion that there was

sexual abuse, that the victim is telling the truth, or that the defendant was guilty of

67

sexual abuse."). Instead, he was simply indicating that the findings of his examination of the girls did not preclude the possibility that they had been abused in the manner in which they testified. Bidwell readily admitted that he could not testify that Jana had been sexually assaulted or that a toe, a penis, or a finger had ever penetrated her vagina. Id. at 120, 155, 178-79. He also admitted that he could not say exactly when the injury to Alisha's hymenal ring occurred or who or what caused it. Id. at 120-21. Bidwell never testified or implied that the girls were telling the truth about the sexual abuse. Therefore, the trial court's ruling permitting Bidwell's testimony did not violate either **Morris** or **Batangan**.

Furthermore, any danger that the jury might have interpreted Bidwell's testimony as a comment on the girls' credibility was eliminated by the trial court's limiting instruction:

> The jury will be instructed to know that the current state of the law and in the State of Hawaii is that ***we are prohibited from entertaining or hearing any expert medical opinion as to a victim or a child victim's credibility in a case of such child sex abuse cases. Please remember that the defendants are presumed innocent unless and until they are proven guilty beyond a reasonable doubt.***

> I wish to issue this cautionary instruction to the jury in the light of my overruling the defense objection to preclude the subsequent testimony on what the independent medical findings might have been with respect to the patient in question. ***So as not to confuse you, you are prohibited from considering any so-called expert medical opinion on the believeability [sic] or credibility of a patient, in this case Alisha and subsequently perhaps Jana.***

However, I am allowing the question under what we call the 803(b)(4) exception to the hearsay rule which specifically permits the witness to testify to what statements were made for purposes of his diagnosis or his treatment of the patient in question. So that's specifically for purposes of medical diagnosis or treatment.

Id. at 94-95 (emphases supplied). "[J]uries are presumed to follow their instructions." **Zafiro v. United States**, 506 U.S. 534, 540 (1993) (citation omitted); **Marshall v. Lonberger**, 459 U.S. 422, 438 n.6 (1983) ("[T]he crucial assumption underlying the system of trial by jury is that juries will follow the instructions given them by the trial judge. Were this not so, it would be pointless for a trial court to instruct a jury[.]" (citation and internal quotation marks omitted)).

Finally, even if the trial court's rulings were arguably erroneous, "failure to comply with the state's rules of evidence is neither necessary nor a sufficient basis for granting habeas relief." **Jammal v. Van De Kamp**, 926 F.2d 918, 919 (9th Cir. 1991); **Estelle**, 502 U.S. at 72 (habeas powers do not allow Supreme Court to reverse a petitioner's conviction based on a state court's misapplication of its own evidentiary rules). "Only if there are *no* permissible inferences the jury may draw from the evidence can its admission violate due process. Even then, the evidence must 'be of such quality as necessarily prevents a fair trial.'" **Jammal**, 962 F.2d at 920 (citation omitted) (emphasis in original).

69

Given the limited nature of Bidwell's testimony, the court's limiting instruction as to use of his testimony, the fact that the girls had already testified that the specific acts of abuse they reported to Bidwell had occurred, see TR9/15/93 at 128, 130, 138; TR9/16/93 at 120-21, 124, and Nakamura's and Petitioner's extensive cross-examination of the two girls, see TR9/15/93 at 191-211; TR9/16/93 at 31-61, 66-88, 89-104, 150-61, 167-76; TR9/17/93 at 9-22, 27-31, Bidwell's testimony was not "so prejudicial as to render [Petitioner's] trial fundamentally unfair." **Walters**, 45 F.3d 1355, 1357-1358 (citation omitted).

Accordingly, admission of Bidwell's testimony as to either the girls' medical histories or the findings of his examinations did not violate Petitioner's right to due process. The trial court's rulings permitting such evidence were not "contrary to, or involve[] an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[.]" **28 U.S.C. § 2254(d)(1)**. Therefore, Petitioner is not entitled to relief.

**B.     THE TRIAL COURT'S RULINGS ADMITTING MAZEPA'S TESTIMONY AS TO HER OBSERVATIONS OF THE GIRLS' "ACTING OUT BEHAVIOR" AND PERMITTING THE PROSECUTOR TO REFER TO THE OBSERVED BEHAVIOR IN REBUTTAL ARGUMENT WERE NOT CONTRARY TO, OR INVOLVE AN UNREASONABLE APPLICATION OF CLEARLY ESTABLISHED FEDERAL LAW, AS DETERMINED BY THE SUPREME COURT OF THE UNITED STATES.**

### 1.     Introduction.

Petitioner claims that the admission of Mazepa's testimony as to her observations of the girls' "acting out behavior" and the prosecutor's reference to the girls' observed behavior during closing argument violated her right to due process.  See Petition at 5.  Petitioner's claim is without merit.

### 2.     The trial court's ruling admitting Mazepa's testimony as to her observations of the girls' "acting out behavior" did not render Petitioner's trial fundamentally unfair.

Petitioner moved in limine to prohibit the State's expert witness to testify "as to the credibility of the children when these incidents were reported to them, and any testimony as to whether or not a child would make something like this up or would not make something like this up."  TR9/7/93 at 53-54.  The State responded that if its expert, "[Kurren] testifie[d], the only thing she would testify as to is that she's a psychologist, that she deals with children, that acting-out behavior is consistent or can be explained by sexual abuse."  Id. at 59.  Arguing that the State had not provided any discovery as to "what incidences that Dr.

71

Kurren would testify about the acting out behavior[,]" Petitioner asked for "an exclusion or prohibition from having [Kurren] testify as to that." Id. at 60. The court ruled that while "any specific testimony dealing with the credibility of the child witnesses in this case" was excluded, expert testimony "explaining, quote, seemingly bizarre, unquote, behavior" of the children would be permitted. Id. at 62.

Prior to opening statements being given, Nakamura moved to preclude Kurren from testifying because her reports had not been provided to the defense. TR9/15/93 at 6-7. Petitioner joined in the motion. Id. at 18. While acknowledging that the records had not been provided to the defense,[20] the State stated that it would not be eliciting any evidence that Kurren was the children's therapist. Id. at 10. Instead, "[Kurren] would be proffered as an expert in the area of sex abuse to talk specifically about the phenomena of explaining seemingly bizarre behavior, the acting out which the Perry girls did in this case, the touching of the vaginas of each other, and that sort of thing." Id. at 12.

The court reserved ruling on Nakamura's motion, but ordered "the State to turn over all relevant clinical records of Ms. Kurren ... in her treatment of the two alleged victims[.]" Id. at 20, 82. It also ruled that the Kurren would not be

---

[20] As previously noted, the State was under no duty to provide the records to the defense as Kurren's records were never in its possession. See **H.R.P.P. Rule 16(b)**. Thus, the State did not "fail[] to provide the necessary pretrial discovery to the defense on this issue" as alleged by Petitioner. See Petitioner's Memo at 61.

permitted to testify until "defense counsel[] have had an opportunity to review

[the] records." Id. The State later struck Kurren as a witness. TR9/16/93 at 64.

At trial, Mazepa testified that two weeks after Alisha and Jana were placed

in her home she was giving the girls a bath when she noticed Jana rubbing her

vagina with a bar of soap for an excessive period of time. TR9/17/93 at 51-52.

Mazepa told "Jana, you don't need to use that much soap, sweetheart, like that."

Id. at 51. Jana's said something to Mazepa that frightened Alisha.[21] Id. at 51, 59-

61. The incident led to Mazepa contacting CPS and the SATC. Id. at 62.

Over Nakamura's running objection, Mazepa also testified that she

observed: (1) Jana touching Alisha's vagina while Alisha straddled Jana and both

girls were naked on October 12, 1991; (2) Jana touching Alisha's vagina during a

bath on November 3, 1991; (3) Jana sitting on the arm of a recliner, gyrating

repeatedly, on November 12, 1991; (4) Jana putting a McDonald's "Happy Meals"

figurine into her vagina on November 25, 1991; (5) Jana fondling herself while

watching television on December 2, and 5, 1991; (6) Jana taking Mazepa's one-

and-a-half year old daughter's hand and placing it on Jana's crotch on December

11, 1991; and (7) Jana putting her hand on Mazepa's daughter's crotch "a couple

days later[.]" Id. at 69-71.

---

[21] As noted previously, Mazepa was prevented from testifying as to what Jana told her by Nakamura's hearsay objection. TR9/17/93 at 51-52.

73

Mazepa testified that she took notes of the incidents because she was "very shocked" by the girls' behavior, never having seen children behave in such a manner.  Id. at 72.  Mazepa had been a foster parent for almost five years, caring for sixteen children over that time period, and a licensed day-care provider for over five years before that.  Id. at 47.  Mazepa also testified that:  (1) the girls were fearful when they went to bed, overly concerned with making sure the doors and windows were locked, and suffered "lots of nightmares'[;]" and  (2) Jana began wetting her bed after sharing her experiences at the CAC.  Id. at 76-78.

After Mazepa testified to the incidents, Nakamura moved to strike Mazepa's testimony concerning "the alleged acting out behavior of the children[,]" arguing that the testimony was irrelevant and more prejudicial than probative.  Id. at 97.  He also moved for a mistrial, asserting that the "acting out" evidence should not have been admitted.  Id.  However, Nakamura requested that the trial court reserve ruling on his motion for mistrial until the State had concluded its case.  Id.  Petitioner joined in Nakamura's motions.  Id. at 98-99.

The State argued that the evidence was relevant and that it was for the jury to decide whether the children's described behaviors were "normal" or not.  Id. at 99.  The trial court denied the motion to strike, stating that the evidence was relevant, the jury could attach whatever weight it felt was appropriate to the

74

evidence, and that "Mazepa, as a lay witness, [was] entitled to offer her testimony if it's based on firsthand knowledge and is relevant." Id. at 102-03.

Petitioner later revisited the court's ruling, arguing that the "acting out behavior of Alisha and Jana" was not relevant to the case as "[t]here's been no showing or nexus between the acting behavior and the fact of consequence which [t]hat they were sexually assaulted or sexual[ly] abused." TR9/20/93 at 3. She also argued that even if the testimony was relevant, the prejudicial effect outweighed its probative value. Id.

The State responded that the "acting out behavior" was relevant and that "it [was] within a lay person's ability to be able to determine that [the] behavior is not what is to be expected of children of a tender age[.]" Id. at 4. It also noted that

> [t]he acting out behaviors that they displayed are consistent with the specific behaviors that they claim were performed on them. In other words, they said [Petitioner] and [Nakamura] touched them, touched their privates and this was the behavior that they were expressing to each other or toward themselves and toward other children.

Id. The State also disagreed that "the prejudicial effect [of the evidence] outweigh[ed] it probative value[,]" arguing that "it's relevant behavior. It goes to the circumstances of disclosure. It combats the defense theory ... that the children have been coached, that the children have repeatedly been told to do things." Id. at 4-5. The trial court reaffirmed its prior ruling with regard to striking the evidence and denied Petitioner's motion for a mistrial. Id. at 5.

As noted previously,

> [a] state court's ... evidentiary ruling is not subject to federal habeas review unless the ruling violates federal law, either by infringing upon a specific federal constitutional or statutory provision or by depriving the defendant of the fundamentally fair trial guaranteed by due process. Thus, a federal court cannot disturb on due process grounds a state court decision to admit ... evidence unless the admission of the evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair.

**Walters**, 45 F.3d at 1357-1358 (citations omitted). In addition,

> [b]eyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation. [The Supreme Court], therefore, ha[s] defined the category of infractions that violate "fundamental fairness" very narrowly. As [it] observed in *Lovasco*, [431 U.S.] at 790, 97 S.Ct., at 2048;
>
> > "Judges are not free, in defining 'due process,' to impose on law enforcement officials their 'personal and private notions' of fairness and to 'disregard the limits that bind judges in their judicial function.' They are to determine only whether the action complained of violates those 'fundamental conceptions of justice which lie at the base of our civil and political institutions,' and which define 'the community's sense of fair play and decency[.]'"

**Dowling**, 493 U.S. at 352-53 (citations, brackets, and ellipses omitted).

Furthermore, "[o]nly if there are *no* permissible inferences the jury may draw from the evidence can its admission violate due process. Even then, the evidence must 'be of such quality as necessarily prevents a fair trial.'" **Jammal**, 926 F.2d at 920 (emphasis in original) (citation omitted).

The admission of Mazepa's testimony describing the girls' "acting-out behavior" did not render Petitioner's trial fundamentally unfair.  The trial court ruled that the evidence was relevant, permitted by **H.R.E.** **Rule 701**,[22] and implicitly concluded that the probative value of Mazepa's testimony was not substantially outweighed by the danger of any unfair prejudice.  See TR9/21/93 at 92-93.  With regard to the trial court's weighing of prejudice versus probative value, the Ninth Circuit has stated:

> When a trial court's weighing of prejudice versus probative value is challenged on appeal, the "trial court's exercise of broad discretion will not lightly be disturbed ... due to its proximity."  This deference is heightened on habeas, where we afford the state trial court's conclusions the presumption of correctness of 28 U.S.C. § 2254(d).

**Ortiz-Sandoval v. Gomez**, 81 F.3d 891, 898 (9th Cir. 1996) (ellipses and quotation marks in original) (citation omitted).

Here, the jury could permissibly infer from the girls' "acting-out behavior" that:  (1) something terrible of a sexual nature had happened to them; and (2) their allegations of sexual abuse were not the product of a desire to live with Mazepa, jealousy, or the result of being "programmed" by Mazepa and the other adults

---

[22]  Although the trial court ruled that Mazepa's testimony was admissible as a lay opinion under **H.R.E.** **Rule 701**, Mazepa did not testify in the form of opinions or inferences.  She only testified as to her observations of the girls' behavior.

involved in the case. The initial bathtub incident was also relevant to explain why Mazepa had contacted CPS and the SATC in the first place.

Petitioner inferred through her cross-examination of the girls that they had fabricated their sexual abuse allegations so that they could remain with Mazepa. See TR9/16/93 at 84-88, 90-91, 93-95; TR9/17/93 at 10-11, 14-15, 29. She also indicated that they were jealous of Vandalee. TR9/23/93 at 26. Petitioner established that Mazepa and her husband took Alisha to the beach, played with her in their pool, threw her a birthday party, and bought her a cake and presents, while Petitioner and Nakamura had not. TR9/16/93 at 84-88, 90-91. Petitioner asked Alisha:

> Q.    Now, Alisha, when you lived with [Petitioner] and [Nakamura], you never liked living with them, right?
>
> A.    No.
>
> Q.    You're happier where you are now?
>
> A.    Yes.
>
> Q.    You don't want to go back to them, do you?
>
> A.    No.

Id. at 93. Petitioner also asked Alisha:

> Q.    Your new mommy and daddy, they haven't adopted you yet, right?
>
> A.  Right.

78

Q.    You would like to be adopted by them, though, right?

A.    Yes.

Q.    In fact, if you are adopted by them, they can be your mommy and daddy forever, right?

A.    Yes.

TR9/16/93 at 95.

Nakamura's questions implied that Mazepa and the other adults had "programmed" the girls into providing false testimony.  See TR9/15/93 at 192-97, 199-202, 207-11; TR9/16/93 at 32-37.  Nakamura repeatedly asked Alisha how many times she talked to her foster parents about the sexual assaults.  TR9/15/93 at 195, 199-202; TR9/16/93 at 32-36, 71.  Nakamura asked Alisha:

Q.    When you talked to your mom about this, she listened, yes?

A.    Yes.

Q.    And your mom wanted you to tell as much as possible, yes?

A.    Yes.

Q.    When you talked to your dad about this, your dad wanted you to tell as much as possible?

A.    Yes.

TR9/15/93 at 210.  Nakamura also asked Alisha:

Q.    When you talked with your mommy about what happened between you and [Nakamura], your mommy tells you to tell people, yes?

79

A.    I don't remember.

Q.    Okay.  When you talked to your dad about what happened between you and [Nakamura], your dad told you to tell people, yes?

A.    I don't remember.

TR9/16/93 at 44.

Cross examination of Jana also suggested that Jana's reporting of the sexual assaults was motivated by a desire to please her foster parents.  Nakamura asked Jana how often she had discussed Nakamura's sexual abuse with her mother and father.  TR9/16/93 at 154-55.  Nakamura then confirmed that Jana liked her dad and mom.  TR9/16/93 at 156.  Finally, Nakamura asked Jana:

Q.    By being here today, you want to make mom happy?

A.    Yes.

Q.    And by being here today, you want to make dad happy?

A.    Yes.

TR9/16/93 at 157.  Accordingly, given Petitioner's and Nakamura's attacks on the credibility of Alisha and Jana, Mazepa's testimony was relevant to show that:  (1) something terrible of a sexual nature had happened to them; and (2) their allegations of sexual abuse were not the product of a desire to live with Mazepa, jealousy, or the result of being "programmed" by Mazepa and the other adults involved in the case.

However, Petitioner "submits that the admission of [Mazepa's testimony] without the subsequent admission of evidence which would make this testimony relevant to the issues in dispute constitutes reversible error[.]"  Petitioner's Memo at 62.  While stating that the evidence of the "acting out behavior" would have been "perfectly admissible" had "expert witness testimony regarding child behavior which evidenced sexual abuse" been introduced, Petitioner claims that the lack of such expert testimony rendered Mazepa's testimony "irrelevant, inadmissible, and extremely prejudicial."  Petitioner's Memo at 65-66.  Petitioner is wrong.

Petitioner claims that expert testimony was required because "behavior that is consistent with having been sexually abused ... necessarily requires 'specialized knowledge.'"  Petitioner's Memo at 66.  However, courts have admitted expert testimony not to explain behavior that a lay person would normally associate with a victim of a sexual assault, but to explain behavior seemingly inconsistent with such behavioral norms.  See **United States v. Tsinnijinnie**, 91 F.3d 1285 (9th Cir. 1996) (not abuse of discretion to admit testimony of child sex abuse expert as testimony only offered to explain why children may be intimidated by physical abuse and deterred from complaining against the abuser, sometimes for long period of time); **People v. Peterson**, 537 N.W.2d 857, 863 (Mich. 1995) ("In child sexual abuse cases, we have previously determined that expert testimony ... is sometimes

81

necessary to explain behavioral signs that may confuse a jury so that it believes

that the victim's behavior is inconsistent with that of an ordinary victim of sexual

abuse." (footnote omitted)).  As noted in **Batangan**,

> Child victims of sexual abuse have exhibited some patterns of
> behavior which are seemingly inconsistent with behavioral norms of
> other victims of assault.  ***Two such types of behavior are delayed
> reporting of the offense and recantation of allegations of abuse.
> Normally, such behavior would be attributed to inaccuracy or
> prevarication.***  In these situations it is helpful for the jury to know that
> many child victims of sexual abuse behave in the same manner.
> ***Expert testimony exposing jurors to the unique interpersonal
> dynamics involved in prosecutions for intrafamily child sexual
> abuse, may play a particularly useful role by disabusing the jury of
> some widely held misconceptions*** ... so that it may evaluate the
> evidence free of the constraints of popular myths.

**Batangan**, 71 Haw. at 557-58, 799 P.2d at 51-52 (citations, quotation marks, and

brackets omitted) (emphases supplied).

Thus, the Hawaii Supreme Court recognized in **Batangan** that while that

some behaviors so contradicted behavioral norms as to mislead a layperson without

expert guidance, generally a juror's common experience should suffice to

understand behavioral evidence.  "Expert testimony, assists the trier of fact by

providing a resource for ascertaining truth in relevant areas outside the ken of

ordinary laity."  **Batangan**, 71 Haw. at 556, 799 P.2d at 51 (citation and internal

quotation marks omitted).  Here, the probative value of Mazepa's testimony

describing the girls' behavior was not "beyond the common knowledge of the

average layman."  **United States v. Peralta**, 941 F.2d 1003, 1009 (9th Cir. 1991).

Sexualized behavior, nightmares, a preoccupation with safety, and

bedwetting are behaviors a layperson would normally expect of a child sex assault

victim.  Expert testimony would only have confirmed that such behaviors are

probative of sexual abuse:

> ***Many reactions have been observed in sexually abused children, including anxiety, regression, sleep disturbance, acting out, depression, nightmares, and enuresis, to name just a few***.  An examination of these behaviors quickly reveals that they are also associated with a wide range of psychological problems that have nothing to do with sexual abuse.  For example, the fact that a child suffers nightmares, regression, and depression says little about sexual abuse.  Myriad other circumstances cause such behaviors.
>
> While some of the behaviors observed in sexually abused children are consistent with a number of problems, ***others are more strongly associated with personal or vicarious sexual experience. Examples*** of behavior that have a greater specificity for sexual abuse include ***age inappropriate knowledge of sexual acts or anatomy, sexualization of play and behavior in young children***, the appearance of genitalia in young children's drawings, and sexually explicitly play with anatomically detailed dolls.
>
> ***The presence in a young child of behaviors commonly observed in sexually abused children can be probative of abuse***.  Evidence of the behaviors is relevant because it has a tendency to prove that abuse occurred.  ***Children with behaviors associated with sexual abuse -- particularly sexual reactions -- are more likely to have been abused than children without such behaviors***.  This conclusion does not ignore the fact that approximately twenty percent of sexually abused children demonstrate no observable behavioral reactions.  Absence of behaviors does not disprove abuse, but ***presence of behaviors increases the likelihood of abuse***.  Evidence of behaviors is seldom dispositive, but ***evidence need not be dispositive to be logically relevant and admissible***.

> *The probative value of expert testimony describing behaviors observed in young sexually abused children is highest when there is a coalescence of three types of behaviors:  (1) a central core of sexual behaviors which are strongly associated with sexual abuse; (2) nonsexual behaviors which are commonly observed in sexually abused children; and (3) medical evidence of sexual abuse.*

John E.B. Myers et al., Expert Testimony in Child Sexual Abuse Litigation,

**Nebraska Law Review** Vol. 68, No. 1 & 2, 1, 62-64 (1989) (footnotes omitted)

(emphases supplied); see also **United States v. Juvenile**, 347 F.3d 778, 781 n.1

(9th Cir. 2003) ("Age-inappropriate sexual knowledge is a common symptom

among sexually abused children, along with other sexualized behaviors, anxiety,

depression, withdrawn behavior, somatic complaints, aggression, and school

problems."  (citation omitted)); **Adaway v. State**, 902 So.2d 746, 751 (Fla. 2005)

(seven factors stand out in sexually abused children as compared with non-abused

children:  aggression, anxiety, depression, externalizing, internalizing, sexualized

behavior, and withdrawal).[23]

---

[23]  Petitioner cites to **Almeida v. Correa**, 51 Haw. 594, 465 P.2d 564 (1970), in support of her claim that expert testimony was required to establish the relevancy of Mazepa's testimony.  In **Almeida**, the petitioner was permitted to exhibit her nine-month-old child to jurors in order to prove that the defendant had fathered the child.  The Hawaii Supreme Court held that exhibition of the baby was error as "[a]fter exhaustive research we can discern no good reason either in law or in science to warrant exhibition of a child to a jury for the purpose of proving paternity."  **Almeida**, 51 Haw. at 597, 465 P.2d at 567 (footnote omitted).  While Petitioner claims that the Hawaii Supreme Court "found that it was reversible error to admit evidence which permitted the jury to make inferences regarding an issue in controversy where such expert testimony was necessary to establish the relevance of the evidence[,]" Petitioner's Memo at 68, the court's decision turned

84

Accordingly, expert testimony was not required for Mazepa's testimony to have been properly admitted into evidence. Expert testimony would only have confirmed what the jurors could already infer from the evidence on their own. While an expert may have given the jury a better appreciation of the behavioral evidence presented, no specialized knowledge was needed for a layperson to recognize that nightmares, bedwetting, and a preoccupation with safety indicated that the girls had been traumatized by some past experience. Specialized knowledge was also unnecessary for a layperson to infer from the girls' sexualized behavior that the traumatic event had been sexual in nature.

Moreover, while disturbing, Mazepa's testimony was not of such highly inflammatory or emotionally charged quality as necessarily preventing a fair trial. See **Jammal**, 926 F.2d at 920-921; **Kealohapauole v. Shimoda**, 800 F.2d 1463 (9th Cir.) (admission of autopsy videotape did not inject element of unfairness into petitioner's trial). Petitioner, Nakamura, and Palaylay all testified that Jana was a

---

on the lack of any basis in scientific fact between proof of paternity and general resemblance of a child to his parent. See **Almeida**, 51 Haw. at 599, 465 P.2d at 568 (if child's face is not inherited as a unit, then exhibition of the child or testimony by an expert for the purpose of showing general resemblance is irrelevant in determining paternity). Had there been such a basis in scientific fact, a different result could be expected. See **Almeida**, 51 Haw. at 598, 465 P.2d at 568 (introduction of resemblance evidence as proof of paternity is justified only if general or specific resemblance of a child to his parent has a basis in scientific fact). Here, unlike **Almeida**, there was a basis in scientific fact for a juror to infer that a child's sexualized behavior, nightmares, preoccupation with safety, and bedwetting were probative of sexual abuse. See Myers, Expert Testimony, 68 **Neb.L.Rev.** at 62-64.

"bedwetter" and Petitioner attempted to explain the girls' sexualized behavior when she testified that she and Nakamura would watch pornographic movies and have sex when they thought the girls were asleep.  TR9/22/93 at 94-95, 133; TR9/23/93 at 27, 36-39.

Accordingly, the trial court's ruling admitting Mazepa's testimony was not "contrary to, or involve[] an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[.]"  **28 U.S.C. § 2254(d)(1)**.  Therefore, Petitioner is not entitled to relief.

>    **3.    The trial court's ruling permitting the State to refer to the girls' "acting out behavior" in rebuttal argument did not so infect the trial with unfairness as to make the resulting conviction a denial of due process.**

In its initial closing argument, the State made only passing references to Jana's bedwetting and the bath incident which led Mazepa to call CPS.  <u>See</u> TR9/24/93 at 11, 14.  Petitioner and Nakamura did not object to the references.  <u>Id.</u> The State did not mention the girls' sexualized behavior, nightmares, or preoccupation with safety.  <u>See</u> <u>generally</u> <u>id.</u> at 5-18.

During the defendants' closing arguments, both Nakamura and Petitioner argued that the children had been "programmed."  TR9/24/93 at 25-26, 45. Nakamura argued:

>    When you think about the testimony of Jana and Alisha you realize after awhile their testimony is pre-recorded and program[m]ed.

And I'm going to give a specific example because they have talked with [the trial prosecutor]. Alisha talked with [the trial prosecutor] five times. She talked with the victim witness kokua person at least once. She talked with her [guardian ad litem] about this at least twice. She talked with Jana lots of times. Lots of times to Alisha means five to ten times. She's talked with [another prosecutor].

She's talked with her mom lots of times about this. Of course, by mom she means Denise Mazepa. And she talked with Mazepa ten to twenty times about this incident, this alleged incident.

She has also talk[ed] with her dad lots of times, more than ten. And she's talked with Auntie Kayle lots of times. How many times? Twenty to thirty times.

* * * *

Jana has talk[ed] to [the trial prosecutor]. She's talked to Alisha five to ten times. She talked with [the other prosecutor], her mom, her dad, and Auntie Kayle. And as Alisha, Jana both admitted [their] mistake, they wanted to make everyone happy.

No one they talked to asked them if it really happened. Everybody they talked to assumes that it happened. Did everything they could to get the information and then told it to them, it made them happy when [sic]. They heard what they wanted to hear.

Id. at 25-26.

Similarly, Petitioner argued: "[T]he fact that they come in and say the exact same thing tells you one thing, they were program[m]ed and/or Alisha and Jana, well, Jana is parroting Alisha. Id. 45. She then argued that the girls' testimony was motivated by a desire to live with Mazepa:

They have told you that they're happy where they are. They are. What child wouldn't want to have a Christmas tree, things we

take for granted.  To be asked what you want for your birthday?  Well
I want a mermaid cake and you get that.

Well, who doesn't want to go to the beach?  The Mazepa's [sic]
have a swimming pool at their house.  These children are merely
happy, they have go what they want.  They have finally got the
attention that they finally desired.  Mrs. Mazepa, every time they
spoke to her, every time they revealed all these things they, were
getting the direct attention of Mrs. Mazepa.  They were crying out for
attention.  They were crying out for love.

Id.  Petitioner then asserted that Mazepa's testimony was only given toconvict her

and Nakamura, stating:  "[Y]ou must understand that her testimony is fostered

[sic], is given to convict [Petitioner] and [Nakamura]."  Id. at 49.

In rebuttal, the trial court permitted the State to argue, over Nakamura's

objection, that jurors should use their common sense to determine whether

Mazepa's testimony of the girls' nightmares, preoccupation with safety, sexualized

behavior, and Jana's bedwetting was consistent with the defense theory that Alisha

and Jana had been programmed into making up allegations of sexual abuse.  Id. at

71-72, 77.  The court stated:  "Knowing that there is no evidence for the jury from

an expert[,] I will permit [the trial prosecutor] to draw reasonable inferences as will

the jury depending on credibility of questions to resolve.  So I will overrule

[Nakamura's] objection with that caution to the jury."  Id. at 72.

Petitioner now claims that "[w]ithout such expert testimony tying the

["acting out] behavior["] to the charges, the ... [trial prosecutor's] arguments were

irrelevant, inadmissible and extremely prejudicial."  Petitioner's Memo at 66.

88

However, prosecutorial misconduct gives rise to a constitutional claim only if the misconduct deprived the defendant of a fair trial. **Greer v. Miller**, 483 U.S. 756, 765 (1987). The relevant question is whether the prosecutor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process. **Darden v. Wainwright**, 477 U.S. 168, 181 (1986). Furthermore, the prosecutor's comments must be considered in the context of the whole trial in order to evaluate their probable effect on the ability of the jury to evaluate the evidence fairly. **United States v. Young**, 470 U.S. 1, 11-12 (1984).

In rebuttal, the trial prosecutor responded to Petitioner's and Nakamura's attack on the prosecution by arguing that the girls' nightmares, sexualized behavior, bedwetting, and preoccupation with safety rebutted the defendants claim that the girls had been "programmed" and "might be consistent with [the behavior] of someone who's been sexually assaulted." See id. at 71-72, 77. "Counsel are given latitude in the presentation of their closing arguments, and ***courts must allow the prosecution to strike hard blows based on the evidence presented and all reasonable inferences therefrom.***" **Ceja v. Steward**, 97 F.3d 1246, 1253 (9th Cir. 1996) (citation and internal quotation marks omitted) (emphasis supplied); see also **United States v. Lester**, 749 F.2d 1288, 1301 (9th Cir. 1984) ("[A]ttorneys are allowed reasonably wide latitude in making their closing arguments."). The prosecutor's comments were based on reasonable inferences drawn from the

89

evidence and were a fair response to defense counsels' arguments.  See **Young**,

470 U.S. at 12-13 (reviewing court must take into account defense counsel's

"opening salvo" and if the prosecutor's remarks were "invited" and did no more

than respond substantially in order to "right the scale," such comments would not

warrant reversing a conviction).

Moreover, the prosecutor's references to the "acting out behavior"

constituted only a small fraction of his rebuttal argument, less than two pages of a

rebuttal that went on for twenty-three pages, see TR9/24/93 at 64-87, and the jury

was instructed just prior to closing argument that counsel's arguments did not

constitute evidence.  Id. at 3 ("[C]losing argument is just that, *it's argument, it's*

*not evidence*, so we don't call it closing of evidence."  (emphasis supplied)).

Jurors were also informed immediately after closing argument and again before

deliberating that their verdict must be based solely on the *evidence* presented in the

case.  TR9/23/93 at 88; TR9/27/93, attached hereto as Exhibit OO, at 12.  The trial

court also cautioned jurors that it was only permitting the prosecutor "to draw

reasonable inferences as will the jury depending on credibility of questions to

resolve."  TR9/23/93 at 72.  "Jurors are presumed to have performed their duties

faithfully."  **James v. Borg**, 24 F.3d 20, 28 n.4 (9th Cir. 1994) (citation omitted).

"The arguments of counsel are generally accorded less weight by the jury

than the court's instructions and must be judged in the context of the entire

argument and the instructions." **Ortiz-Sandoval**, 81 F.3d at 899 (citation omitted).

Given the prosecutor's limited references to the "acting out behavior" during his

entire rebuttal argument, the court's instructions to the jurors, and that juries are

presumed to follow the court's instructions, **Zafiro**, 506 U.S. at 540, Petitioner's

trial was not so infected with unfairness as to make her resulting conviction a

denial of due process. **Darden**, 477 U.S. at 181. Therefore, the trial court's ruling

permitting the prosecutor's comments was not "contrary to, or involve[] an

unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States[.]" **28 U.S.C. § 2254(d)(1)**. Therefore,

Petitioner is not entitled to relief.

> **C.     THE TRIAL COURT DID NOT VIOLATE
> PETITIONER'S RIGHT TO DUE PROCESS WHEN
> IT SENTENCED HER TO CONSECUTIVE TERMS
> OF IMPRISONMENT.**

Petitioner "submits that the manner that the sentencing court imposed

consecutive life sentences utterly failed to comply with state procedural law which

afforded her due process protections before the state court could impose such a

sentence." Petitioner's claim is without merit.

While Petitioner now claims that the trial court's alleged failure to consider

the sentencing factors provided in **H.R.S. § 706-606** as required by **H.R.S. § 706-

668.5** violated her right to due process, see Petitioner's Memo at 72-82, she never

made this claim on direct appeal or at sentencing. On direct appeal, Petitioner only

asserted that the imposition of the consecutive terms constituted an abuse of

discretion.  See Exh. P at 26-27, 47-49; Exh. R at 7-9; Exh. T at 21-23.  At

sentencing, she only "argue[d] that consecutive terms [were] excessive and cruel

and unusual punishment."  TR11/29/93 at 24.  As such, this Court lacks

jurisdiction over the claim.  See **Langford v. Day**, 110 F.3d 1380, 1389 (9th Cir.

1996), *cert. denied* 522 U.S. 881 (1997) (habeas petitioner may not transform state

law issue into a federal one merely by asserting violation of due process).

Moreover, even if **H.R.S. §§ 706-668.5 and 706-606** gave rise to a protected

liberty interest, see **Jeffers v. Lewis**, 38 F.3d 411, 415 (9th Cir. 1994) (state law

guaranteeing criminal defendants procedural rights at sentencing may give rise to a

state-created liberty interest protected from arbitrary deprivation by the federal due

process clause), Petitioner's claim of error must be reviewed under the plain error

standard.  See **United States v. Cotton**, 535 U.S. 625, 628-629 (2002).  Under the

plain error standard,

> before an appellate court can correct an error not raised at trial, there
> must be (1) error, (2) that is plain, and (3) that affect[s] substantial
> rights.  If all three conditions are met, an appellate court may then
> exercise its discretion to notice a forfeited error, but only if (4) the
> error seriously affect[s] the fairness, integrity, or public reputation of
> judicial proceedings.

**Johnson v. United States**, 520 U.S. 461, 466-467 (1997) (citations and quotation

marks omitted).  Here, there was no plain error as the record reflects that the trial

court considered the factors mandated by **H.R.S. § 706-606** before imposing the consecutive extended life terms.

The trial court sentenced Petitioner to five consecutive life terms.  Exh. N; TR11/29/93 at 28-29.  While Petitioner claims that the issue of consecutive sentencing "arose for the first time in passing when, during the defense attorney's argument as to why the sentencing court should not impose an extended term of imprisonment," Petitioner's Memo at 72, the State had requested that the trial court "impose the extended consecutive sentence which [it] is requesting" at the start of the sentencing proceeding:

> It's the State's position, Your Honor, that the Court should in this case, pursuant to our motion, grant an extended term as to each and every one of the following counts:
>
> With respect to the Class C felonies, Counts 4, 5, 15, 16, and 17, that the Court should extend each one of those five-year offenses to a 10-year offense.  It's the State's further position that with respect to Counts 1, 2, 3, 13 and 14, that the Court should extend each one of those Sexual Assaults in the First Degree 20-year offenses to a term of life imprisonment and *to run each and every one of these sentences consecutive with each other.*
>
> \* \* \* \*
>
> Your Honor, it's the State's position that the presentence diagnosis and report sets forth accurately the reasons why the Court should in this case *impose the extended consecutive sentence[s]* for which the State is requesting....

TR11/29/93 at 9, 11 (emphases supplied).  Moreover, "the plain language of HRS § 706-668.5, which sets forth the statutory framework for multiple sentences,

provided [Petitioner] with notice of the possibility that consecutive sentences could

be imposed." **State v. Vinge**, 81 Hawaii 309, 322, 916 P.2d 1210, 1223 (Sup.

1996).[24]

The trial court's imposition of consecutive sentences was authorized by

**H.R.S. § 706-668.5**.  The statute provides:

> **§ 706-668.5  Multiple sentence of imprisonment.**  (1) If
> multiple terms of imprisonment are imposed on a defendant at the
> same time, or if a term of imprisonment is imposed on a defendant

---

[24]  In **Vinge**, the Hawaii Supreme Court held that the trial court did not
violate the defendant's due process rights when it failed to give notice that
consecutive sentences were at issue.  The Hawaii Supreme Court ruled:

> [The defendant] contends that he was not afforded adequate
> notice of the sentencing court's intention to impose consecutive
> sentences and, therefore, that the sentencing court violated his due
> process rights under the United States and Hawaii constitutions.  We
> believe that [the defendant's] due process rights were not violated
> because:  (1) by statute, a sentencing court has the discretion to
> impose consecutive sentences in matters involving multiple offenses,
> *regardless of whether the prosecution seeks such sentences*; (2) the
> defendant was afforded adequate notice via:  (a) written indictment of
> the grand jury charging him with multiple counts, thereby informing
> [defendant] that he may be subject to consecutive sentences; (b)
> the jury's verdict; (c) written and oral notice of the prosecution's
> motion for consecutive sentences; (d) the plain language of HRS §
> 706-668.5 (1993), which informs the defendant that he may be
> sentenced to consecutive sentences; (e) defense counsel who was
> obligated to inform the defendant of the consequences of being
> charged with multiple offenses via Hawaiʻi Rules of Professional
> Conduct Rule 1.4 (1995); and (3) HRS § 706-668.5 does not expressly
> require that defendant receive notice before receiving consecutive
> sentencing.

**Vinge**, 81 Hawaii at 321, 916 P.2d at 1222 (footnote omitted) (emphasis supplied).

94

who is already subject to an unexpired term of imprisonment, the terms may run concurrently or consecutively.  Multiple terms of imprisonment imposed at the same time run concurrently, unless the court orders or the statute mandates that the terms run consecutively. Multiple terms of imprisonment imposed at different times run consecutively unless the court orders that the terms run concurrently.

(2)  The court, in determining whether the terms imposed are to be ordered to run concurrently or consecutively, shall consider the factors set forth in section 706-606.

**H.R.S.** § **706-606** provides:

§ **706-606.  Factors to be considered in imposing a sentence.** The court, in determining the particular sentence to be imposed, shall consider:

(1)     The nature and circumstances of the offense and the history and characteristics of the defendant;

(2)     The need for the sentence imposed:

(a)     To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(b)     To afford adequate deterrence to criminal conduct;

(c)     To protect the public from further crimes of the defendant; and

(d)     To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3)     The kinds of sentences available; and

      (4)    The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

Petitioner falsely claims that "the record is devoid of any consideration of [the H.R.S. Section 706-606] factors by the sentencing court as to why the court thought it was necessary to impose consecutive sentences pursuant to *any* Hawaii statute, must [sic] less the factors expressly laid out in § 706-606." Petitioner's Memo at 75. In support of this claim, she asserts that the court's remarks prior to the imposition of the consecutive life sentences was in justification of imposing extended sentences, not consecutive sentences. Petitioner's Memo at 76. However, a fair reading of the court's remarks clearly indicate otherwise.

In sentencing Petitioner to consecutive life terms, the trial court stated:

    Pursuant to the State's Motion for an Extended Term, and that would be life imprisonment with the possibility of parole, under the relevant statutes of [H.R.S. §§] 706-662 and 664, I will conclude that by virtue of the conviction of the five counts of Class A felonies, the Sexual Assault [in the] First Degree, as well as the five counts of Sexual Assault in the Third Degree, that this would qualify as to the first prong, that she would be considered or deemed a multiple offender.

    Secondly, with respect to the issue of whether these acts or the propensity of this defendant poses a danger to the community, I would be led to the conclusion that yes, she does pose a significant danger to the community by virtue of the facts entered into by this jury to support their guilty verdicts.

    The Court, accordingly, having reviewed the presentence report, the arguments of counsel ***and the specific sentencing alternatives posed to the Court and advocated by both counsel for***

*the prosecution and defense counsel*, will conclude that, first of all, it is proper for this Court to grant the Motion for Extended Term and it is hereby granted. This is based on the factors considered by the Court to include the defendant's apparent poor prognosis for positive behavioral changes; secondly, the overall need to insure public safety, thirdly, her utter lack of victim empathy which further will be a danger to the community inasmuch as she has failed to appreciate the imminent or serious threat she poses to members of the community, especially children; her extensive history and admission of substance abuse that causes her to be more prone to acting impulsively. Further, the trauma and the emotional and irreparable injury to the very youthful victims who were her children. Further, her flagrant abuse of her trust as mother to these children. And lastly, her inability to have served or met her duty as the lawful parent of these children.

The Court, as to the counts in question, Counts 1, 2, 3, 13, and 14, which are the Sex Assault in the First Degree, the extended term will be from the 20 years to the life imprisonment with the possibility of parole. *Those terms the Court deems will be running consecutively.*

With respect to Counts 4, 5, 15, 16, and 17, which would be the Class C Sexual Assault in the Third Degree, the Court will exercise its discretion to run these concurrently.

* * * *

*[Petitioner], after the Court has weighed all of the factors, I am basing the decision of the Court as not being an unduly excessive penalty or punishment, which I believe is just given the factual allegations that were proven beyond a reasonable doubt in this courtroom.* I would like the record to indicate that they represent an outrage to the moral sense of our community and also shock the conscience of the community. And it is in that light that I do not believe the life terms that are being imposed are excessive and *that the key factors considered by the Court are the nature of the offenses and the harm, the irreparable harm done to the victims and the danger you pose to the community*.

TR11/29/93 at 27-30 (emphases supplied).

97

A review of the trial court's oral remarks indicate that it considered the factors provided in **H.R.S.** **§§ 706-606(1)**, **(2)(a)**, **(2)(c)**, and **(3)**.  While the trial court may not have orally addressed all of the **H.R.S. § 706-606** factors,

> [t]he fact that a court does not orally address every factor stated in HRS § 706-606 at the time of sentencing does not mean the court failed to consider those factors.  The statute contains no requirement that the court expressly recite its findings on the record for each of the factors set forth in HRS § 706-606.  Nevertheless, under HRS § 706-668.5, judges are duty-bound to consider HRS § 706-606 factors before imposing sentence.  The information relevant to HRS § 706-606 factors is made available to the judges in pre-sentence reports.  HRS § 706-601 (1993).  ***The law presumes that judges will conscientiously fulfill their duty to obey the directive of HRS § 706-668.5, and that counsel will offer factor-relevant information at sentencing hearings mandated by HRS § 706-604 (Supp. 1992).  Therefore, absent clear evidence to the contrary, it is presumed that a sentencing court, following the receipt of a pre-sentence report under HRS § 706-601 and a mandated sentencing hearing under HRS § 706-604,[25] will have considered all the factors in HRS § 706-606 before imposing concurrent or consecutive terms of imprisonment under HRS § 706-668.5.***

**State v. Sinagoga** 81 Hawaii 421, 428, 918 P.2d 228, 235 (Sup. 1996) (emphasis and footnote supplied).  Moreover, federal courts presume that state courts follow the law, even when they fail to so indicate.  **Poland v. Stewart**, 169 F.3d 573, 589-590 (9th Cir. 1998).

In any event, any doubt that the trial court failed to consider all of the **H.R.S. Section 706-606** sentencing factors was clearly put to rest by the Extended Term Order.  See Exh. O at 3-6.  The trial court specifically found:

---

[25]  The trial court reviewed the pre-sentence report.  TR11/29/93 at 28.

98

25.    ***In determining the proper sentence in this case this court has judiciously considered all of the relevant sentencing factors set forth in <u>H.R.S.</u> Section 706-606*** and 706-662(4)(a) and (b).

26.    The nature and circumstances of this case and the history and characteristics of [Petitioner] warrant an extended ***consecutive*** term of imprisonment.

27.    The need to reflect the seriousness of these offenses, promote respect for the law and provide [just] punishment warrant an extended ***consecutive*** term of imprisonment.

28.    The need to afford adequate deterrence to criminal conduct of this type warrants an extended ***consecutive*** term of imprisonment.

29.    The need to protect the public from further crimes by [Petitioner] warrants an extended ***consecutive*** term of imprisonment.

30.    The extent of the criminal activity in this case as well as her history demonstrate that [Petitioner] is unlikely to respond to correctional treatment.  Vocational and educational training are not likely to reduce the significant danger which [Petitioner] poses to the community.

31.    This court witnessed and judiciously considered all the evidence including the demeanor of all witnesses, and finds that of all the sentencing alternatives available the extended ***consecutive*** sentence imposed is the most appropriate.

32.    In light of the egregious facts of this case the court believes that the sentence imposed is warranted, and not disparate among other [d]efendants found guilty of similar crimes in similar situations.

Exh. O at 5-6 (emphases supplied).  Thereafter, the trial court concluded:  "***After applying all of the factors set forth in <u>H.R.S.</u> Section 706-606***, this court

determines that the extended *consecutive* term imposed is the appropriate sentence in this case." Id. at 6 (emphases supplied).

Accordingly, the trial court fully complied with state procedural requirements and did not commit plain error in sentencing Petitioner to consecutive life sentences. See **Johnson**, 520 U.S. at 466-467. Therefore, Petitioner is not entitled to relief.

> **D.    THE HAWAII SUPREME COURT'S DECISION AFFIRMING THE DENIAL OF PETITIONER'S 2ND RULE 40 PETITION WAS NOT CONTRARY TO, OR INVOLVE AN UNREASONABLE APPLICATION OF, CLEARLY ESTABLISHED FEDERAL LAW, AS DETERMINED BY THE SUPREME COURT OF THE UNITED STATES.**

In Ground Six, Petitioner claims that her rights to trial by jury and due process were violated when the sentencing judge imposed extended term sentences "on the basis of a factual finding statutorily committed to and in fact made by the sentencing judge rather than a jury." Petition at 6-7. Specifically, Petitioner asserts that "this Court must, as required by the Ninth Circuit's decision in [**Kaua v. Frank**, 436 F.3d 1057 (9th Cir. 2006) ("**Kaua III**")], find that Hawaii's extended term sentencing scheme is unconstitutional under [**Apprendi v. New Jersey**, 530 U.S. 466 (2000)] and grant [her] a new sentencing hearing without the application of the extended term law until such time as Hawaii changes it's [sic]

100

sentencing law to comport with the due process requirements of <u>Apprendi</u>."
Petitioner's Memo at 90-91.  Petitioner's claim is without merit.

Petitioner only raised this **Apprendi** claim in her 2nd Rule 40 Petition,
almost five-and-one-half years after the conclusion of her direct appeal, <u>see</u> Exh. U
and HH, and two years after **Apprendi** was decided.  In general, new
constitutional rules of criminal procedure apply retroactively only to cases which
are on direct appeal at the time the rule is announced.  <u>See **Griffith v. Kentucky**</u>,
479 U.S. 314, 328 (1987); <u>see</u> <u>also</u> **Gray v. Netherland**, 518 U.S. 152, 166 (1996)
(habeas relief appropriate only if a state court considering the petitioner's claim at
the time his conviction became final would have felt compelled by existing
precedent to conclude that the rule he seeks was required by the constitution).
However, a new rule will be applied retroactively on collateral review if it:  (1)
places certain types of primary conduct beyond the power of the criminal
lawmaking authority to proscribe; or (2) requires the observance of those
procedures that are implicit in the concept of ordered liberty.  **Teague v. Lane**, 489
U.S. 288, 305-310 (1989).  Neither exception applies with respect to Petitioner's
claim and this claim for relief is foreclosed.  <u>See</u> **United States v. Sanchez-
Cervantes**, 282 F.2d 664, 671 (9th Cir. 2002), *cert denied* 537 U.S. 939, 123 S.Ct.
48, 154 L.Ed.2d 243 (2002) (<u>Apprendi</u> does not apply retroactively to cases on

collateral review) <u>see</u> <u>also</u> **Reynolds v. Cambra**, 290 F.3d 1029 (9th Cir. 2002)

(applying <u>Sanchez-Cervantes</u> in a 28 <u>U.S.C.</u> § 2254 habeas action).[26]

Petitioner asserts that "this Court should not find because <u>Apprendi</u> may not

apply retroactively to [her] habeas petition, she is not entitled to relief."

Petitioner's Memo at 88.  While she appears to claim that the State waived this

argument, <u>see</u> Petitioner's Memo at 88-90, the State, as the prevailing party with

respect to Petitioner's 2nd Rule 40 Petition, <u>see</u> Exh. JJ, was under no obligation to

argue that <u>Apprendi</u> did not apply retroactively to Petitioner's claim.  <u>See</u> **Padilla**

**v. Terhune**, 309 F.3d 614, 618 (9th Cir. 2002) (although the "residual

trustworthiness" doctrine was not litigated below, issue was not waived because as

the prevailing party, the state had no reason to argue that statement was also

trustworthy, separate and apart from qualifying as a statement against interest).

Furthermore, while the Hawaii Supreme Court did not affirm the denial of

Petitioner's 2nd Rule 40 Petition on this ground, this Court "may affirm on any

ground supported by the record, even if it differs from the rationale of the [Hawaii

Supreme Court]."  **Weaver v. Thompson**, 197 F.3d 359, 362 (9th Cir. 1999);

**Padilla**, 309 F.3d at 618 (same); **Downs v. Hoyt**; 232 F.3d 1031, 1036 (9th Cir.

2000) (same); **United States v. Washington**, 969 F.2d 752, 755 (9th Cir. 1992)

---

[26] The Hawaii Supreme Court has similarly held that <u>Apprendi</u> does not
apply on collateral review.  **State v. Gomes**, 107 Hawaii 308, 113 P.3d 184 (Sup.
2005).

(same); see also **Day v. Mcdonough**, __ U.S. __, 126 S.Ct. 1675, 164 L.Ed.2d

376, (2006) (federal district courts permitted to consider, *sua sponte*, timeliness of

state prisoner's habeas petition even if respondent did not assert statute of

limitations defense in answering petition).  As **Apprendi** does not apply to

Petitioner's claim, she is not entitled to relief.

Moreover, Petitioner argument fails on the merits because her extended

sentences do not violate **Apprendi**.  The trial court sentenced her to five extended

life terms in Counts 1, 2, 3, 13, and 14 and five extended ten-year terms in Counts

4, 5, 15, 16, 17.  Exh. N; TR11/29/93 at 28-29.  The trial court did so after finding

that Petitioner was a multiple offender under **H.R.S. § 706-662(4)(a)** and **(b)**; and

(2) her criminal actions were so extensive that extended consecutive terms were

necessary for the protection of the public.  Exh. O at 6.

In her 2nd Rule 40 Petition, Smith claimed that she had been "illegally

sentenced because [her] sentence was enhanced by a judge based upon a fact that

should have been determined by a jury by a standard of proof beyond a reasonable

doubt."  Exh. HH at 5.  The trial court, relying on **State v. Carvalho**, 101 Hawaii

97, 63 P.3d 405 (App. 2002), denied her petition without a hearing.  Exh. JJ.

Appealing the denial of her petition, Smith claimed that "[u]sing the

'intrinsic-extrinsic' analysis affirmed in *Kaua*, this Court must find that the facts

used by the trial judge to determine the applicability of extended term were

'intrinsic' to the offense" and therefore, should have been determined by the jury. Exh. KK at 6. Under the "intrinsic-extrinsic" analysis, "aggravating circumstances" justifying the imposition of an enhanced sentence that are enmeshed in or "intrinsic" to the commission of the crime charged must be alleged in the indictment and determined by the trier of fact. **State v. Schroeder**, 76 Hawaii 517, 528, 880 P.2d 192, 203 (Sup. 1994). Conversely, "historical facts" that are "extrinsic" to the specific circumstances of a defendant's offenses and therefore, which have no bearing on the issue of guilt *per se*, do not. Id.

In **State v. Kaua**, 102 Hawaii 1, 72 P.3d 473 (Sup. 2003), the appellant ("Kaua") appealed the denial of his **H.R.P.P. Rule 35** (2001) motion for correction of illegal sentence. Relying solely on **Apprendi**, Kaua argued on appeal that

> (1) the assessment of [his] status as a "multiple offender" and (2) the finding that [his] "criminal actions were so extensive that a sentence of imprisonment for an extended indeterminate maximum term is necessary for the protection of the public," interposed by HRS § 706-662(4)(a) ... as preconditions to the imposition of an extended indeterminate maximum term of imprisonment, present questions of fact that must be answered by a jury.

**Kaua**, 102 Hawaii at 8, 72 P.3d at 480.

The Hawaii Supreme Court reviewed the two-step process announced in **State v. Huelsman**, 60 Haw. 71, 588 P.2d 394 (1979), *overruled in part by* State v. Tafoya, 91 Hawaii 261, 982 P.2d 890 (Sup. 1999), that a sentencing court must

104

engage in before sentencing a "multiple offender" to an extended term of

imprisonment:

> For purposes of a motion for an extended term of imprisonment under HRS § 706-662(4), the first step requires a finding beyond a reasonable doubt that the defendant is a multiple offender, which finding may not be made unless the defendant is being sentenced for two or more felonies or is under sentence for a felony and the maximum terms of imprisonment authorized for the defendant's crimes meet certain requisites. In the event that the sentencing court finds that the defendant is a multiple offender under subsection (4), the second step requires the sentencing court to determine whether the defendant's commitment for an extended term is necessary for the protection of the public.

**Kaua**, 102 Hawaii at 9, 72 P.3d at 481 (citations and internal quotation marks

omitted).

Rejecting Kaua's argument, the Hawaii Supreme Court held that:

> the facts at issue in rendering an extended term sentencing determination under HRS §§ 706-662(1), (3), and (4) implicate considerations completely "extrinsic" to the elements of the offense with which [Kaua] was charged and of which he was convicted; accordingly, they should be found by the sentencing judge in accordance with *Huelsman* and its progeny....
>
> In light of the foregoing, we cannot accept Kaua's argument that *Apprendi* mandates that a "multiple offender" determination, for purposes of HRS Section 706-662(4)(a), must be made by the trier of fact and, therefore, that the circuit court's order denying his Rule 35 motion was unconstitutional. The facts foundational to Kaua's extended terms of imprisonment in connection with Counts II-IV and VIII-XIII, pursuant to HRS Section 706-662(4)(a), fell outside the *Apprendi* rule, and, thus, the ultimate finding that he was a "multiple offender" whose extensive criminal actions warranted extended prison terms was properly within the province of the sentencing court. 530

105

U.S. at 490, 120 S.Ct. 2348; *Carvalho*, 101 Hawaii at 111, 63 P.3d at 419.

**Kaua**, 102 Hawaii at 12-13, 72 P.3d at 484-85.

Kaua subsequently filed a petition for writ of habeas corpus in federal district court, challenging his extended term sentence.  The federal district court granted Kaua's petition, "conclud[ing] that Kaua's extended sentence clearly violate[d] *Apprendi*, and that the extended term sentence was based on an unreasonable application of *Apprendi*."  **Kaua v. Frank**, 350 F.Supp.2d 848, 850 (D. Hawaii 2004).  The State appealed the grant of the petition to the Ninth Circuit.  **Kaua III**, 436 F.3d at 1058.

The Ninth Circuit affirmed the district court's grant of Kaua's petition, concluding that "[t]he Hawaii Supreme Court's affirmance of Kaua's extended sentence was contrary to the U.S. Supreme Court's decision in *Apprendi*."  **Kaua III**, 436 F.3d at 1062.  In so doing, the Ninth Circuit stated:

> Kaua challenges the Hawaii Supreme Court's conclusion that *Apprendi* permits a judge, rather than a jury, to find the facts required to satisfy step two of section 706-662(4)'s sentencing process.  The second step requires a sentencing judge to determine if extending the defendant's sentence is necessary for the protection of the public.  This inquiry requires the court to find facts outside of those found by the jury that expose the defendant to an increased sentence.  Because *Apprendi* held that any fact other than the fact of prior conviction that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt, we agree with Kaua that a jury must find the facts required to satisfy step two.

**Kaua III**, 436 F.3d at 1060 (footnotes omitted).

The Ninth Court concluded that the second step "requires the court to find facts outside of those found by the jury that expose the defendant to an increased sentence." **Kaua III**, 436 F.3d at 1059 (footnote omitted). Rejecting the State's arguments that the public protection determination in step two is discretionary and that the sentencing court's finding that a defendant's prior felony convictions alone subjects the defendant to an extended sentence, the Ninth Circuit stated:

> Contrary to the State's arguments, however, Hawaii courts repeatedly have interpreted section 706-662(4) to require a two step process. In *State v. Okumura*, the Hawaii Supreme Court stated that both steps of the process "*must* be followed" when the prosecution seeks an extended sentence. Hawaii courts have never characterized step two as anything other than the finding and evaluation of facts. The State's reading of section 706-662(4), therefore, does not comport with the Hawaii Supreme Court's interpretation....
>
> With respect to the Hawaii Supreme Court's decision [in *Kaua*], ***we disagree with its reasoning that the "extrinsic" nature of the factual finding required for step two exempt them from Apprendi's reach***. *Apprendi* made irrelevant any distinction between facts based on their "intrinsic" or "elemental" quality for purposes of ascertaining whether the Sixth Amendment requires a jury to find them. *Apprendi* announced a new rule that focused on the *effect* of a court's finding of fact, not on the label the statute or the court applied to that fact. The United States Supreme Court plainly set forth this new rule, stating that "the relevant inquiry is one not of form, but of effect-does the required finding expose the defendant to a greater punishment than that authorized by the jury's guilty verdict?" If so, the Sixth Amendment requires a jury, not a judge to make the finding. *Apprendi* exempted only one finding-the fact of a prior conviction-from this "general rule."

**Kaua III**, 436 F.3d at 1060-62 (footnotes omitted) (some emphases in original).

The Ninth Circuit concluded:

> The Hawaii Supreme Court's affirmance of Kaua's extended sentence
> was contrary to the U.S. Supreme Court's decision in *Apprendi*.  ***The***
> ***state court applied its "intrinsic[-]extrinisic analysis, which is a***
> ***variant of the "element-sentencing factor" distinction that Apprendi***
> ***rejected.  Because the effect of the public protection finding was to***
> ***increase Kaua's sentence above that authorized by the jury's guilty***
> ***verdict, the Sixth Amendment required a jury to make the finding.***

**Kaua III**, 436 F.3d at 1062 (emphasis supplied).  The Ninth Circuit "agree[d] with

Kaua that a jury must find the facts required to satisfy step two."  **Kaua III**, 436

F.3d at 1060.

However, Petitioner's reliance on **Kaua III** is misplaced.  In affirming the

district court's granting of Kaua's petition, the Ninth Circuit stated that it

"disagree[d] with [the Hawaii Supreme Court's] reasoning [in Kaua] that the

'extrinsic' nature of the factual finding required for step two exempt them from

*Apprendi's* reach."  **Kaua III**, 436 F.3d at 1061.  However, the Ninth Circuit

misconstrued the Hawaii Supreme Court's analysis.  In affirming the denial of

Petitioner's 2nd Rule 40 Petition, the Hawaii Supreme Court stated:

> ***Contrary to [Petitioner's] interpretation of Kaua, the***
> ***"intrinsic-extrinsic" analysis is relevant only for purposes of the***
> ***first prong of the two-step process for imposing an extended term***
> ***sentence -- i.e., whether the defendant is a member of the class of***
> ***offenders to which extended term sentencing applies.  The second***
> ***phase of the two-step process is a matter of ordinary sentencing,***
> during which the sentencing court is "'afforded wide latitude in the
> selection of penalties from those prescribed and in the determination
> of their severity.  This authority is normally undisturbed on review in
> the absence of an apparent abuse of discretion or unless applicable

statutory and constitutional commands have not been observed.'" <u>Id.</u> at 9-10, 72 P.3d at 481-82 (quoting <u>State v. Okumura</u>, 78 Hawaii 383, 413, 894 P.2d 80, 110 (1995). That being the case, [Petitioner's] argument that the family court erred in relying on "intrinsic" facts in its finding that an extended term sentence was "necessary for protection of the public" misinterprets this court's decision in <u>Kaua</u>. Moreover, not only does [Petitioner] not challenge the family court's [findings of fact] with respect to its finding that an extended term sentence was "necessary for protection of the public," but the record reflects that the family court rendered extensive findings, pursuant to the sentencing factors enumerated in HRS § 706-606 (1993), to support the imposition of an extended term sentence in the present matter. Thus, inasmuch as the family court's imposition of an extended term sentence complied with the procedural safeguards mandated by <u>Kaua</u> and <u>Apprendi</u>, the circuit court did not err in denying Smith's petitioner for post-conviction relief....

Exh. MM at 3-4 (footnote omitted) (emphasis supplied); <u>see also</u> **State v. Rivera**, 106 Hawaii 146, 163, 102 P.3d 1044, 1061 (Sup. 2004), *cert denied,* __ U.S.__, 126 S.Ct. 45, 163 L.Ed.2d 78 (2005) (sole determining factor that subjected a defendant to an extended term sentence under <u>H.R.S.</u> § 706-662(4) was the defendant's multiple convictions); **State v. White**, 110 Hawaii 79, 89, 129 P.3d 1107, 1117 (Sup. 2006) ("[B]ut for [the defendant's] multiple convictions there would be no basis for extended prison terms.").

This Court is bound by the Hawaii Supreme Court's interpretation of **H.R.S. § 706-662(4)**. The Supreme Court has "repeatedly held that a state court's interpretation of state law, ***including one announced on direct appeal of the challenged conviction***, binds a federal court sitting in habeas corpus." **Bradshaw**, 125 S.Ct. at 604 (citations omitted) (emphasis supplied); <u>see also</u> **Mullaney**, 421

U.S. at 691 (state courts are the ultimate expositors of state law and it is bound by their constructions except in extreme circumstances).

As such, the sole determining factor that subjected Petitioner to extended terms as a "multiple offender" pursuant to **H.R.S. § 706-662(4)** was the fact of her multiple felony convictions.  **Rivera**, 106 Hawaii at 163, 102 P.3d at 1061. Thereafter, the trial court's determination that an extended term sentence was necessary for the protection of the public was a matter of ordinary sentencing. **Kaua**, 102 Hawaii at 9, 72 P.3d at 481.

Accordingly, Petitioner's extended sentences would not violate **Apprendi** even if the decision had retroactive application and the Hawaii Supreme Court's decision affirming the denial of Petitioner's 2nd Rule 40 Petition was not "contrary to, or involve an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[.]" **28 U.S.C. § 2254(d)(1)**. Therefore, Petitioner is not entitled to relief.

# IV.

## **CONCLUSION**

Petitioner has failed to prove that her confinement to the custody of the State of Hawaii is in violation of the **U.S. Const. amend. VI** and **XIV**.  As Petitioner's claims are devoid of merit, Respondent respectfully requests that this Honorable Court dismiss the instant Petition.

Dated at Honolulu, Hawaii:  October 6, 2006.

Respectfully submitted,

JOHN F. PEYTON, JR., Director,
Department of Public Safety,
State of Hawaii and
MILLICENT NEWTON EMBRY,
Warden, Mabel Bassett
Correctional Center
Respondents

By PETER B. CARLISLE
   Prosecuting Attorney

By _____/s/_____
   DANIEL H. SHIMIZU
   Deputy Prosecuting Attorney
   City and County of Honolulu

111